SEALED
ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2015 NOV 23  PM 2: 24

DEPUTY CLERK_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

**THE UNITED STATES OF AMERICA**
ex. rel. GORDON GRANT BACHMAN

      Plaintiffs,

vs.

                               **CIVIL ACTION NO. 3:13-cv-0023-P**
                               **FILED UNDER SEAL PURSUANT**
                               **TO SECTION 3729 et. seq. of the**
                               **FEDERAL FALSE CLAIMS ACT**

**HEALTHCARE LIAISON PROFESSIONALS,
INC. d/b/a US PHYSICIAN HOME VISITS;
DALLAS MEDICAL CENTER, LLC;
BE GOOD HEALTHCARE, INC.
d/b/a A GOOD HOMEHEALTH.;
PRESCRIPTION MEDICAL EQUIPMENT
AND SUPPLIES, INC.;
GAINES DISTRIBUTION, INC.;
MEDPRO A CLASS SERVICES, INC.;
PRIMARY ANGEL, INC., d/b/a
ESSENCE HOMEHEALTH;
NET TIME, INC. d/b/a ALL IN ONE MEDICAL SUPPLY;
COVENANT CARE FAMILY CLINIC, P.A.;
AVEIN GROUP, INC. d/b/a SUPERIOR HOME
HEALTH CARE;ALWAYS HOSPICE, INC.;
BEN P. GAINES, III; MERNA PARCON ;
RANSOME ETINDI; PERRY ONG;
SATURNINA LUDEKE; SAI GADIRAJU;
ALMA QUINAGORAN; ARNEL QUINAGORAN;
NOBLE EZUKANMA, M.D.; NOBLE EZUKANMA,
M.D., P.A.; ASHRUF KHAN; NIEVA LEONARDO CUA;
EXPRESS MEDICAL CENTER; DR. FREDERICO
MAESE; RITZ MOBILE DIAGNOSTIC IMAGING;
ALI RIZLI; MT. ZION HOME HEALTH AGENCY,
LLC; PADEZ HOME HEALTH, INC.; SAS HOME
HEALTH SERVICES, INC.; ACUTE HOME
HEALTH SERVICES, LLC; GOOD SHEPHERD
HOME HEALTHCARE AGENCY, INC.;
PARADISE HOME HEALTH AGENCY;**

---

**TIPPLE ALLIANCE HOME HEALTH SERVICE, INC.;**
**MAM UNIQUE HEALTH SERVICES, INC.;**
**ELIM HOME HEALTH, INC.;**
**REGENCY HOME HEALTH CARE;**
**ALPHA-MK HEALTHCARE, INC.;**
**PRINCEWILL HEALTHCARE SERVICES, INC.;**
**MACHRIS HOME HEALTH SERVICES, INC.;**
**VCARE HEALTH SERVICES, PLLC;**
**EFE HEALTHCARE SERVICES INC.;**
**BARCLAYS HEALTHCARE INC D/B/A**
**BETA HOME HEALTH SERVICES INC.;**
**ESSENCEE CARE HEALTH SERVICES, LLC;**
**ASSURE RX**

**And UNKNOWN DEFENDANTS 1-50**

**Defendants**

## PLAINTIFFS' FIRST AMENDED COMPLAINT

COMES NOW GORDON GRANT BACHMAN, on behalf of the United States of America, by and through his attorney, James "Rusty" Tucker of the Law Offices of James R. Tucker, P.C., and respectfully would show unto the Court the following:

## I.  INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made, presented, and caused to be presented by the defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("THE FEDERAL FALSE CLAIMS ACT").

2. THE FEDERAL FALSE CLAIMS ACT provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government for payment or approval of payment is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the government. THE FEDERAL FALSE CLAIMS ACT allows any person having information regarding a false or fraudulent claim against the government to bring an action for himself or herself (the "Relator" or "*qui tam* plaintiff") and on behalf of the government and to share in any recovery. The Complaint is filed under seal for at least 60 days (without service on the Defendants during that period) to enable the government: (a) to conduct its own investigation without the Defendants' knowledge, and (b) to determine whether to join in the action.

3. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program ("Medicare"), to pay for the costs of certain health care services for those persons entitled to receive such health care. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program. The Center for Medicare Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

4. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily children under the age of 18 and the poor and disabled. The federal government's involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

5. Plaintiff Grant Bachman (the "Relator") brings this action on behalf of the United States of America against Defendants for civil damages and penalties arising from the Defendants' false claims in violation of THE FEDERAL FALSE CLAIMS ACT. The violations at issue arise out of false Medicare claims by the Defendants who fraudulently billed the government for Medicare payments for at least a four (4) year period for providing home healthcare services for Medicare patients that were not in conformity with federal statutes and/or regulations authorizing reimbursement for said charges.

## II. JURISDICTION AND VENUE

6. This Court has Jurisdiction of this action because it arises under THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 et. seq.  This Court has jurisdiction over the subject matter of THE FEDERAL FALSE CLAIMS ACT action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

7. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) one or more of the Defendants reside in this district; (ii) one or more of the Defendants transacts business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) the Defendants committed acts prohibited by 28 U.S.C. § 3729—which are acts giving rise to this action within this district.

## III. CONDITIONS PRECEDENT

8. Before filing his Original Complaint, Relator served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. §3730(b) (2) of the FEDERAL FALSE CLAIMS ACT. The Relator has previously made the required disclosure ("Disclosure Statement") to the U.S. Government by providing to the Attorney General of the United States and the U.S. Attorney for the Eastern District of Texas a copy of the Original Complaint and a statement of all material information relative to this Complaint. The Disclosure Statement consists of Affidavit of the Relator and exhibits thereto and other evidence submitted is supported by material evidence and information

known to the Relator at the time of his filing, establishing the existence of Defendants' False Claims. Because the information provided includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General of the United States and the U.S. Attorney for the Eastern District of Texas in their capacity as potential co-counsel in the litigation, the Relator understands that the Disclosure Statement is confidential. Relator has complied with all other conditions precedent to bringing this action.

9. Relator does not believe that any of the information upon which he bases his allegations is the subject of public disclosure. In the unlikely event the Court were to deem that certain information has been publicly disclosed, Relator is nevertheless the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the federal and state governments before filing this action.

## IV. PARTIES

10. Relator is a citizen of the State of Texas. During the years 2008 until 2014, Relator has been an officer, member and/or employee of one or more of the USPHV Defendants. Relator has direct, independent and personal knowledge of the fraud perpetrated by the Defendants during the time of his employment. Relator brings this action based upon his direct, independent, and personal knowledge.

11.  The U.S. Government funds certain health care services through Medicare when those services are determined to be medically necessary in compliance with regulations of the U.S. Government, as well as federal laws pertaining to payment and/or reimbursement for Medicare health care expenses. Medicare regulations provide that if a person needing health care is unable to travel for medical reasons, they are entitled to be provided with home health care services under very strict and well defined guidelines. The Defendants herein repeatedly over the years have billed Medicare for thousands of claims for beneficiaries that were not "homebound" as required by Medicare, this qualifying as False Claims as defined below.

12.  As set forth below, Relator is aware of multiple False Claims, as defined herein, whereby Medicare were fraudulently billed by the USPHV Defendants to the U.S. Government. In fact, Plaintiffs submit that most claims for home health and related services submitted by the Defendants were False Claims, therefore entitling the U.S. Government to tens if not hundreds of millions of dollars in recovery from the Defendants for civil damages and penalties for the claims submitted.

13.  Defendant HEALTHCARE LIAISON PROFESSIONALS, INC. d/b/a US PHYSICIAN HOME VISITS is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Diamond Financial Services, who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

14. Defendant DALLAS MEDICAL CENTER, LLC is a domestic Limited Liability Company organized under the laws of the State of Texas. Its registered agent for service of process is Ragu Kosuri, who may be served with process at 4901 Monterrey Drive, Frisco, Texas 75034.

15. Defendant BE GOOD HEALTHCARE, INC. d/b/a A GOOD HOMEHEALTH is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Alma Quinagoran, who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

16. Defendant PRESCRIPTION MEDICAL EQUIPMENT AND SUPPLIES, INC is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Arnel Quinagoran , who may be served with process at  3636 McArthur Blvd. Suite 100, Irving, Texas 75062.

17. Defendant GAINES DISTRIBUTION, INC is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Alma Quinagoran, who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

18. Defendant MEDPRO A CLASS SERVICES, INC is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Diamond Financial Services, who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

19.   Defendant   PRIMARY   ANGEL,   INC.,   d/b/a   ESSENCE HOMEHEALTH is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Olive Padilla, who may be served with process at 6824 Heatherknoll Drive Dallas, TX 75248.

20. Defendant NET TIME, INC. d/b/a ALL IN ONE MEDICAL SUPPLY is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Ashruf Ali Khan, who may be served with process at 4912 Valley Ridge Drive, #2037 Irving, TX 75062.

21. Defendant COVENANT CARE FAMILY CLINIC, P.A. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Ransome Etindi, who may be served with process at 300 Sioux Court, Waxahachie, Texas 75165.

22. Defendant AVEIN GROUP, INC. d/b/a SUPERIOR HOME HEALTH CARE is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Nieva L Cua, who may be served with process at 5405 Keating Court, Richardson, TX 75082.

23.   Defendant   ALWAYS   HOSPICE,   INC.   is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Ben P Gaines III, who may be served with process at 3609 Diamond Ranch Road Roanoke, TX 76262.

24. Defendant BEN P. GAINES, III is an individual who may be served with process at 3609 Diamond Ranch Road Roanoke, TX 76262.

25. Defendant MERNA PARCON is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

26. Defendant RANSOME ETINDI is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

27. Defendant PERRY ONG is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

28. Defendant SATURNINA LUDEKE is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

29. Defendant SAI GADIRAJU is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

30. Defendant ALMA QUINAGORAN is an individual who may be served with process at  1513 Viceroy Drive, Dallas, Texas 75235.

31. Defendant ARNEL QUINAGORAN is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

32. Defendant NOBLE EZUKANMA, M.D. is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

33. Defendant NOBLE EZUKANMA, M.D., P.A. is a professional association whose registered agent for service of process is Jeffry Foust, who may be served with process at 1700 Tennison Parkway, Colleyville, Texas 76034.

34. Defendant ASHRUF KHAN is an individual who may be served with process at 1513 Viceroy Drive, Dallas, Texas 75235.

35. Defendant NIEVA LEONARDO CUA is an individual who may be served with process at  1513 Viceroy Drive, Dallas, Texas 75235.

36. Defendant EXPRESS MEDICAL CENTER is, upon information and belief, a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is unknown at this time as it is not registered with the Secretary of State.

37. Defendant RITZ MOBILE DIAGNOSTIC IMAGING is, upon information and belief, a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is unknown at this time as it is not registered with the Secretary of State.

38. Defendant DR. FREDERICO MAESE is an individual who may be served with process at 106 Plaza Dr Red Oak, TX 75154.

39. Defendant ALI RIZLI is an individual who may be served with process at 3648 Old Denton Road, Carrollton, Texas 75007.

40. Defendant MT. ZION HOME HEALTH AGENCY, LLC is a domestic Limited Liability Company organized under the laws of the State of Texas. Its registered agent for service of process is Millicent Y Koroma, who may be served with process at 1410 Robinson Rd Ste 200 Bldg A, Corinth, Texas 76210.

41. Defendant PADEZ HOME HEALTH, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Amina Sultan, who may be served with process at 8111 LBJ Freeway Suite 1460 Dallas, Texas 75251.

42. Defendant SAS HOME HEALTH SERVICES, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Samuel Azubuike, who may be served with process at 4593 Mountain Laurel Drive, Grand Prairie, Texas 75052.

43. Defendant ACUTE HOME HEALTH CARE SERVICES is an organization of unknown origin formed under the laws of the State of Texas. It may be served with process by serving its owner, Charles Edward Mcgriff, at 2915 S Lancaster Road, Dallas, Texas 75216.

44. Defendant GOOD SHEPHERD HOME HEALTHCARE AGENCY, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Fidelis Simo, who may be served with process at 9421 Ann's Way Plano, Texas 75025.

45. Defendant PARADISE HOME HEALTH AGENCY is an organization of unknown origin formed under the laws of the State of Texas. It may be served with process by serving its owner, Theo Adeoye, at 917 Hems Ln, Arlington, TX 76001.

46. Defendant TIPPLE ALLIANCE HOME HEALTH SERVICE, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Martin N. Mboe, who may be served with process at 10729 Audelia Road Suite 210 Dallas, Texas 75238.

47. Defendant MAM UNIQUE HEALTH SERVICES, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Mariana Mbah, who may be served with process at 424 Saint Andrews Drive Allen, Texas 75002.

48. Defendant ELIM HOME HEALTH, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is George Thomas, who may be served with process at 2309 Granbury Drive, Mesquite, Texas 75150.

48. Defendant REGENCY HOME HEALTH CARE is, upon information and belief, a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is not known at this time and is unavailable on the Secretary of State website.

49.   Defendant ALPHA-MK HEALTHCARE, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Patience Anyanna, who may be served with process at 509 Creek Court, Lewisville, Texas 75067.

50.   Defendant PRINCEWILL HEALTHCARE SERVICES, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Sylvia Ogbogu-Nwankwo, who may be served with process at 1622 Lake Travis Drive, Allen, Texas 75002.

51.   Defendant MACHRIS HOME HEALTH SERVICES, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Mary Mawen Ngong, who may be served with process at 12350 Sail Maker Lane, Frisco, Texas 75035.

52.   Defendant VCARE HEALTH SERVICES, PLLC is a domestic Professional Limited Liability Company organized under the laws of the State of Texas. Its registered agent for service of process is Mary Boggan, who may be served with process at 717 Phillips Drive Ennis, Texas 75119.

53.   Defendant EFE HEALTHCARE SERVICES, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Franklin C Hadome, who may be served with process at 1510 Riverdale Drive, Allen, Texas 75013.

54. Defendant BARCLAYS HEALTHCARE INC D/B/A BETA HOME HEALTH SERVICES INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Victor Amechi Ochei , who may be served with process at 10925 Estate Lane, Suite 385, Dallas, Texas 75238.

55. Defendant ESSENCEE CARE HEALTH SERVICES, LLC is a domestic Limited Liability Company organized under the laws of the State of Texas. Its registered agent for service of process is Samuel Dele Adagbon, who may be served with process at 705 Bill Shaw Drive, Mesquite, Texas 75149.

55. Defendant Assure RX is an entity of unknown origin whose service of process information will be timely supplemented upon discovery thereof.

56. In addition to the entities set forth above, Plaintiffs have sued Unknown Defendants 1-50 for the reason that it is believed that the above referenced Defendants, including but not limited to Merna Parcon, have submitted False Claims to and received payments from Medicare from other Home Health Care Agencies which discovery will reveal the identity of.

## V. FACTS

57. USPHV is a physicians' practice that employs physicians, nurse practitioners and occasionally physician assistants. Relator has on occasion been designated as Managing Director of USPHV. USPHV sees patients exclusively at their place of residence, and patients are typically seen every month to six weeks. The primary clients of USPHV are home health agencies ("HHA's"), including

AGood Home Health ("AGood") and Essence Healthcare ("Essence"), which were owned and/or controlled by USPHV and Defendant Merna Parcon. Additionally, there were referrals to dozens of other home health agencies who are Defendants herein that are not owned and/or controlled by USPHV and Defendant Merna Parcon discussed below.

### A. USPHV, AGOOD HOME HEALTH, AND ESSENCE HOME HEALTH PROVIDED TREATMENT FOR THOUSANDS OF PATIENTS THAT WERE NOT "HOMEBOUND"

58. In order to receive Medicare benefits, patients of a HHA must be certified as "homebound," meaning that leaving the home must involve a "taxing effort" under Medicare regulations. These and other regulations cited herein are found in Chapter 7 of the Medicare Benefit Policy Manual of the Center for Medicare Services ("CMS") regarding Home Health Care. "Homebound" is defined in Medicare regulations as follows:

> Generally speaking, a patient will be considered to be homebound if they have a condition due to an illness or injury that restricts their ability to leave their place of residence except with the aid of: supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated.

As described more fully below, most of the patients of the HHA's discussed herein receiving Medicare payments are not "homebound' in compliance with the foregoing definition. Pursuant to Medicaid Guidelines, the criteria for coverage for Home Health Services is as follows:

### 20 - Conditions to Be Met for Coverage of Home Health Services (Rev. 1, 10-01-03) A3-3116, HHA-203

Medicare covers HHA services when the following criteria are met:

1. The person to whom the services are provided is an eligible Medicare beneficiary;

2. The HHA that is providing the services to the beneficiary has in effect a valid agreement to participate in the Medicare program;

3. The beneficiary qualifies for coverage of home health services as described in §30;

4. The services for which payment is claimed are covered as described in §§40 and 50;

5. Medicare is the appropriate payer; and

6. The services for which payment is claimed are not otherwise excluded from payment.

59. For **patients** to be eligible to receive home health care, the Medicare regulations stipulate as follows:

**30 - Conditions Patient Must Meet to Qualify for Coverage of Home Health Services**
**(Rev. 1, 10-01-03)**
**A3-3117, HHA-204, A-98-49**

To qualify for the Medicare home health benefit, under §§1814(a)(2)(C) and 1835(a)(2)(A) of the Act, a Medicare beneficiary must meet the following requirements:

Be confined to the home;

Under the care of a physician;

Receiving services under a plan of care established and periodically reviewed by a physician;

Be in need of skilled nursing care on an intermittent basis or physical therapy or speech-language pathology; or

Have a continuing need for occupational therapy.

60. These "homebound" patients of HHA's must be certified or re-certified every sixty days, a period of time in Medicare regulations and HHA practice that is referred to as an "episode", as more fully described in Medicare regulations as follows:

**HH-201**
The unit of payment under home health PPS is a national 60-day episode rate with applicable adjustments. The episodes, rate, and adjustments to the rates are detailed in the following sections.

**10.1 - National 60-Day Episode Rate**
**(Rev. 1, 10-01-03)**
**HH-201.1**

**A. Services Included**
The law requires the 60-day episode to include all covered home health services, including medical supplies, paid on a reasonable cost basis. That   means the 60-day episode rate includes costs for the six home health disciplines and the costs for routine and non-routine medical supplies. The six home health disciplines included in the 60-day episode rate are:

1. Skilled nursing services
2. Home health aide services;
3. Physical therapy;
4. Speech-language pathology services;
5. Occupational therapy services; and
6. Medical social services.

The 60-day episode rate also includes amounts for:

1. Non-routine medical supplies and therapies that could have been unbundled to part B prior to PPS. See §10.12.C for those services;
2. Ongoing reporting costs associated with the outcome and assessment information set (OASIS); and
3. A one time first year of PPS cost adjustment reflecting implementation costs associated with the revised OASIS assessment schedules needed to classify patients into appropriate case-mix categories.

## B. Excluded Services

The law specifically excludes durable medical equipment from the 60-day episode rate and consolidated billing requirements. DME continues to be paid on the fee schedule outside of the PPS rate.

## 10.4 - Counting 60-Day Episodes
## (Rev. 1, 10-01-03)
## HH-201.4

### A. Initial Episodes
The "From" date for the initial certification must match the start of care   (SOC) date, which is the first billable visit date for the 60-day episode. The "To" date is up to and including the last day of the episode which is not the  first day of the subsequent episode. The "To" date can be up to, but never exceed a total of 60 days that includes the SOC date plus 59 days.

### B. Subsequent Episodes
If a patient continues to be eligible for the home health benefit, the home health PPS permits continuous episode re-certifications. At the end of the 60-day episode, a decision must be made whether or not to recertify the patient for a subsequent 60-day episode.

### 30.5.2 - Periodic Recertification
**(Rev. 139, Issued: 02-16-11, Effective: 01-01-11, Implementation: 03-10-11)** At the end of the 60-day episode, a decision must be made whether or not to recertify the patient for a subsequent 60-day episode. An eligible beneficiary who qualifies for a subsequent 60-day

episode would start the subsequent 60-day episode on day 61. Under HH PPS, the plan of care must be reviewed and signed by the physician every 60 days unless one of the following occurs:
A beneficiary transfers to another HHA;

A discharge and return to the same HHA during the 60-day episode.

Medicare does not limit the number of continuous episode re-certifications for beneficiaries who continue to be eligible for the home health benefit. The physician certification may cover a period less than but not greater than 60 days.

**30.5.3 - Who May Sign the Certification**
**(Rev. 1, 10-01-03)**
**A3-3117.5.C, HHA-204.5.C**
The physician who signs the certification must be permitted to do so by 42 CFR 424.22.

61. At each certification, a physician must certify his or her approval of the plan of care ("POC") and that the patient is "homebound" per Medicare guidelines. This signature is placed by the following statement box 26 on what is known as a Medicare Form 485 wherein the physician certifies:

"I certify/recertify that this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy. The patient is under my care, and I have authorized the services on this plan of care and will periodically review the plan."

**B. CERTIFICATION FORMS ARE ROUTINELY SIGNED BY DOCTORS AND NURSES WHO NEVER SEE THE PATIENT!**

62. "Homebound" status is one of the cornerstones of home health practice. Defendant Noble Ezukanma, MD is the so-called "medical director" of USPHV. He owns a very profitable pulmonary practice in Fort Worth, Texas which is where

his primary practice is located. He has signed thousands of Form 485 certifications on behalf of patients of USPHV without seeing any of these patients, yet most of the patients are not "homebound" per Medicare guidelines. Defendant Etindi has likewise signed Form 485 certifications knowing that the patients involved were not homebound. Relator has also observed that numerous Form 485's were forged with Dr. Ezukanma's signature by Merna Parcon or others under her direction or control.

63. The foregoing practices of Defendants Dr. Ezukanma, Merna Parcon, and the HHA's are in violation of the following "face to face" requirement before home health services can begin pursuant to CMS provisions, as Dr. Ezukanma NEVER saw the patients nor did he comply with any of the following Medicare regulations:

**30.5.1.1 – Face-to-Face Encounter**
**(Rev. 139, Issued: 02-16-11, Effective: 01-01-11, Implementation: 03-10-11)**

**1. The certifying physician must document that he or she or an allowed non-physician practitioner (NPP) had a face-to-face encounter with the patient.**

Certain NPPs may perform the face-to-face encounter and inform the certifying physician regarding the clinical findings exhibited by the patient during the encounter. However, the certifying physician must document the encounter and sign the certification. NPPs who are allowed to perform the encounter are:

A nurse practitioner or clinical nurse specialist working in collaboration with the certifying physician in accordance with State law;

A certified nurse-midwife as authorized by State law;

A physician assistant under the supervision of the certifying physician

NPPs performing the encounter are subject to the same financial restrictions with the HHA as the certifying physician, as described in 42CFR 424.22(d).

2. Encounter Documentation Requirements:

The documentation must include the date when the physician or allowed NPP saw the patient, and a brief narrative composed by the certifying physician who describes how the patient's clinical condition as seen during that encounter supports the patient's homebound status and need for skilled services. ...

**It is unacceptable for the physician to verbally communicate the encounter to the HHA, where the HHA would then document the encounter as part of the certification for the physician to sign.** (emphasis added)

64. The way the procedure worked for Defendants USPHV, AGood, and Essence is that rafts of paperwork went to Dr. Noble Ezukanma or Dr. Etindi to sign in exchange for periodic payments by Ms. Parcon and/or USPHV. They lent their signatures for use of his billing information and a check every month from Ms. Parcon. Dr. Ezukanma is the quintessential "robo-signer" for a fee so that USPHV, AGood, and Essence can submit claims for "homebound" care to Medicare. This process has been going on for several years.

65. Without seeing the patient, Defendant Dr. Ezukanma obviously has no idea whether these patients he is "certifying" were "homebound" per the Medicare guidelines set forth above. Additionally, he does not have a nurse practitioner or physician's assistant in his employ that meets the guidelines set forth above.

66. Defendant Ransome Etindi, PHD, MD, is the associate medical director of USPHV who also knowingly signs Form 485's for USPHV, AGood, and Essence with full knowledge that these patients are not homebound. Defendant

Parcon provides payments to him as long as he does what she desires and certifies the patients to receive home health services for another 60 days and bill Medicare for same.

67. The Viceroy headquarters is also the principle office of Defendant AGood Home Health ("AGood"), another home health care company, as well as USPHV. Defendant Parcon also controls this company and again Defendants Ezukanma and Etindi sign a wide array of documents including Form 485's in order to allow AGood to bill and receive payments from Medicare for patients that should not be certified as needing "home health" care.

68. Additionally, Defendant Parcon controls Defendant Essence Home Health in Addison, Texas where the same activity occurs. Defendants Ezukanma and Etindi sign a wide array of documents for Essence Home Health such as Form 485's in order to allow Essence to bill and receive payments from Medicare for patients that should not be certified as needing "home health" care. As is the case with USPHV and AGood, this is a violation of the Stark and anti-kickback laws.

69. Additionally, at USPHV/AGood headquarters, nurses fill out and sign "Conditions of Participation" ("COPs") documents in violation of Medicare guidelines. These Conditions of Participation documents are mandated by law to be filled out and signed by a **doctor**--not a nurse. From Relator's observation, however, these forms are routinely filled out by nurses instead of doctors as mandated by Medicare regulations. One of the nurses who signs these forms is Nieva Cua, who is part owner of USPHV and also owns Superior Home Health, another home health agency. Defendant Saturnina Ludeke ("Nina") has also signed these documents. Nina is the Administrator and Director of Nurses for AGood

Home Health. Both Nina and Nieva have forged signatures of doctors on these COP forms.

## C. REFERRALS TO NON-USPHV OWNED HOME HEALTH CARE AGENCIES THAT CONSTITUTE FALSE CLAIMS

70. In addition to referring to their own USPHV/Parcon owned home health care agencies, USPHV and Parcon have referred cases to other home health care agencies throughout the Dallas Fort Worth metroplex. On each of these referrals, Doctors Ezukanma or Etindi would certify the patients being referred as "homebound" knowing that the patient in question in 95% plus of the cases did not meet the criteria for receiving home health care as set forth above and incorporated herein by reference. Further, in each of these cases where a referral was made, the patient would receive multiple home visits, each and every one of which constituted a false claim under the FCA as defined herein.

71. The top twenty (20) of these non-USPHV health care agencies and the number of referrals to each are being added as defendants to which referrals were made that constituted false claims are as follows:

> MT. ZION HOME HEALTH AGENCY, LLC (95);
> AVEIN GROUP, INC. d/b/a SUPERIOR HOME HEALTH CARE(95);
> PADEZ HOME HEALTH, INC.(70);
> SAS HOME HEALTH SERVICES, INC.(60);
> ACUTE HOME HEALTH SERVICES, LLC(55);
> GOOD SHEPHERD HOME HEALTHCARE AGENCY, INC.(55);
> PARADISE HOME HEALTH AGENCY(54);
> BETA HOME HEALTH SERVICES INC.(50);
> TIPPLE ALLIANCE HOME HEALTH SERVICE, INC.(47);
> MAM UNIQUE HEALTH SERVICES, INC.(45);
> ELIM HOME HEALTH, INC.(44);
> REGENCY HOME HEALTH CARE(39);
> ALPHA-MK HEALTHCARE, INC.(37);
> PRINCEWILL HEALTHCARE SERVICES, INC.(37);
> MACHRIS HOME HEALTH SERVICES, INC.(36);

VCARE HEALTH SERVICES, PLLC(35);
EFE HEALTHCARE SERVICES INC.(34);and
BARCLAYS HEALTHCARE INC D/B/A
ESSENCEE CARE HEALTH SERVICES, LLC(33).

72. The scheme between Defendants Parcon and the non-USPHV home health care agencies worked as follows. None of the above 20 entities had a doctor on staff who could certify a patient as being homebound, so they would pay USPHV to do that for them so that they could render services to the patients. These services were nursing, physical therapy, and many other types of services other than what a doctor would perform. USPHV billed each of these non USPHV HHA's for the services of Doctors Ezukanma or Etindi, and many times these patients would be recertified multiple times and stay on home health services for years. An audit has now shown that on average, 97% of the certifications of the patients as being homebound by Doctors Ezukanma or Etindi were fraudulent.

73. Accordingly, there was a scenario where USPHV was submitting false claims, the doctors who certified and recertified the patients as being home bound submitted false claims, and the home health care agencies who paid USPHV to get patients certified likewise submitted false claims for each and every visit (sometimes several times a week) after getting the patient certified. The above named entities came to Defendant Parcon and USPHV knowing that their medical director and assistant medical director (Defendants Ezukanma or Etindi) would certify virtually any patient as homebound whether they were or not. Out of the hundreds of referrals set for above, most every patient was seen on multiple occasions over several months if not years, resulting in thousands of false claims being submitted by all of the above at $5,500-$11,000 per false claim as described elsewhere herein.

## D. IMPROPER REFERRALS BY DEFENDANTS EXPRESS
## MEDICAL CENTER, RIZLI, RITZ, AND MAESE

74. Defendant Ali Rizli owns and operates Defendant Express Medical Center (hereinafter "EMC") and Ritz Mobile Diagnostic Imaging ("Ritz"). Both are located at an office at 3648 Old Denton Road in Carrollton, 75007. Defendant Rizli's partner, Amed Kahn, MD, referred multiple unnecessary diagnostic tests from EMC to Ritz. Rizli also owns a DME company in which he refers things like braces and scooters. Defendants Rizli and Kahn have been referring business to these companies that they own. Kahn and Rizli had a failing "doc in the box" type business until they met Defendant Merna Parcon. After government officials raided the offices of Defendant USPHV effectively shutting down its operations shortly thereafter, Defendant Parcon transferred her entire portfolio of patients to these entities which conducted multiple unnecessary procedures and billed them to Medicare, including but not limited to conducting unnecessary nerve conduction studies ordered by Defendants Rizli and Kahn. Moreover, for an extended period of time Defendant Parcon was actively running that office from EMC and/or remotely. Essentially the business of USPHV simply transferred to EMC, and Defendant Parcon was paid by EMC to run the operations pertaining to her previous patients.

75. Additionally, Defendant Dr. Frederico Maese has been routinely certifying patients as homebound when they are not. On multiple occasions, Defendants EMC and Maese would see the same patients in the same week or the even the same day, all of which visits are medically unnecessary. Further, Maese always coerced patients to sign a supplemental waiver of co-pay. While Relator

was assisting doctors in the field, he witnessed many of these supplemental forms. Copies of these forms reside in the home care folder.

## E. ILLEGAL REFERRALS IN VIOLATION OF STARK LAW AND MEDICARE GUIDELINES

76. The Federal government has specific laws governing financial transactions between health care providers, including the Medicare Fraud and Abuse laws and the Stark I and Stark II (hereinafter "Stark Law"). These laws prohibit any incentives that influence physicians to refer patients. The Stark Law prohibits physicians from ordering designated health services ("DHS") for Medicare patients from entities with which the physician, or a family member, has a financial relationship unless an exception applies. The Stark Law has been routinely violated by the Defendants for reasons which follow.

77. Physician self-referral is the practice of a physician referring a patient to a medical facility in which he has a financial interest, be it ownership, investment, or a structured compensation arrangement. Such arrangements create an inherent conflict of interest, given the physician's position to benefit from the referral and also because such arrangements may encourage over-utilization of services, in turn driving up health care costs. In a 1994 Bulletin issued by the OIG of the U.S. Department of Health and Human Services ("HHS"), published in the Federal Register, the OIG described why it is inappropriate to provide financial incentives for referrals:

> Why is it Illegal for Hospitals to Provide Financial Incentives to Physicians for Their Referrals?
>
> The Office of Inspector General has become aware of a variety of hospital incentive programs used to compensate physicians (directly or

indirectly) for referring patients to the hospital. These arrangements are implicated by the anti-kickback statute because they can constitute remuneration offered to induce, or in return for, the referral of business paid for by Medicare or Medicaid. In addition, they are not protected under the existing ``safe harbor'' regulations.

These incentive programs can interfere with the physician's judgment of what is the most appropriate care for a patient. They can inflate costs to the Medicare program by causing physicians to overuse inappropriately the services of a particular hospital. The incentives may result in the delivery of inappropriate care to Medicare beneficiaries and Medicaid recipients by inducing the physician to refer patients to the hospital providing financial incentives rather than to another hospital (or non-acute care facility) offering the best or most appropriate care for that patient.

78. Over the past four (4) years, Relator has witnessed hundreds of referrals that violate the anti-referral provisions of the Stark Law. As one example, Defendant Ben Gaines, III was an initial investor in and past administrator of AGood Home Health. He conspired with Defendant Parcon to accept "referrals" of patients from Defendants Ezukanma and USPHV and to over utilize physical therapy referrals for the sole purpose of increasing billing Medicare for services that were not medically necessary. Defendant Gaines has been paid for his actions by Defendant Parcon yet he knew these actions where illegal and has expressed and acknowledged same to Relator on numerous occasions.

79. In order to increase billing to and receiving payment from Medicare, Defendant Parcon has routinely transferred patients from AGood to Essence Home Health ("Essence") located on Midway Road in Addison, another entity under her control. The reason for these transfers was to increase billing to and receive payment from Medicare from two separate entities and reduce the length of stay

with one health care agency in order to fly under the radar of government authorities.

80. Relator also discovered that Dr. Chris Michael Vicente, a part-time employee of USPHV, has referred patients to his wife's, (Dr. Jessela Tan) sleep clinic. Dr. Vicente told Relator that he refers about twenty patients a month to his wife with full knowledge of Defendant Parcon in blatant violation of the Stark Law. Defendant Perry Ong facilitates these illegal referrals.

81. Defendant Perry Ong has also been a referral source to two durable medical equipment ("DME") companies--Defendants Prescription Medical Equipment and Supplies, Inc. and Defendant All In One Medical Supply, Inc. He has full access to the documents at all entities mentioned above. Countless orders for durable medical equipment ("DME"), including motorized wheel chairs and scooters, have been processed by Defendant Ong for these DME entities. Relator warned Merna Parcon that because Alma Quinagoran's husband, Arnel Quinagoran, owned Defendant Prescription Medical it was illegal for Perry Ong to be referring DME referrals to Prescription Medical, but she continued the practice despite Relator's warning.

82. Defendant Perry Ong has submitted multiple claims to Medicare and received payment for DME pursuant to the following regulations:

> (e) *Durable medical equipment.* Durable medical equipment in accordance with §410.38 of this chapter, which describes the scope and conditions of payment for durable medical equipment under Part B, may be covered under the home health benefit as either a Part A or Part B service. Durable medical equipment furnished by an HHA as a home health service is always covered by Part A if the beneficiary is entitled to Part A.

### 50.4.2 - Durable Medical Equipment

**(Rev. 1, 10-01-03)**
**A3-3119.4.B, HHA-206.4.B**
Durable medical equipment which meets the requirements of the Medicare Benefit Policy Manuals, Chapter 6, "Hospital Services Covered Under Part B," §80, and Chapter 15, "Covered Medical and Other Health Services" §110, is covered under the home health benefit with the beneficiary responsible for payment of a 20 percent coinsurance.

83. Ms. Parcon has also referred countless USPHV patients to Dallas Medical Center, some as far away as Corsicana, in return for promises of future partnerships and compensation. These referrals are in violation of Stark laws prohibiting referrals.

## F. MEDICARE ANTI-KICKBACK VIOLATIONS

84. In the 1994 Bulletin issued by the OIG of the U.S. Department of Health and Human Services ("HHS"), the anti-kickback provision of the OIG is described as follows:

What Is the Medicare and Medicaid Anti-Kickback Law?

Among its provisions, the anti-kickback statute penalizes anyone who knowingly and willfully solicits, receives, offers or pays remuneration in cash or in kind to induce, or in return for:

A. Referring an individual to a person for the furnishing, or arranging for the furnishing, of any item or service payable under the Medicare or Medicaid program; or
B. Purchasing, leasing or ordering, or arranging for or recommending purchasing, leasing or ordering, any goods, facility, service or item payable under the Medicare or Medicaid program.

Violators are subject to criminal penalties, or exclusion from participation in the Medicare and Medicaid programs, or both....

85. Relator was a 30% owner of Saint Joseph's Hospice, LLC yet another entity under the control of Defendant Merna Parcon. The office of Saint Joseph's is also located at the same Viceroy Headquarters as USPHV and Agood Home Health, and Relator suggested to Defendant Parcon and the others involved with these entities that it was a Stark Law violation to have all of these entities share the same office space when they were doing business with and accepting referrals from one another. Thereafter, Relator was retaliated against by having his interest in Saint Joseph's unilaterally reduced.

86. Medicare Part A pays for physician services and Part B or Medicaid pays for home health care. A beneficiary sometimes will have only Part B or Medicaid enabling the beneficiary to be eligible for the home health benefit. As set forth above, a Home Health patient must have a face-to-face encounter with a Doctor (or a NP or PA visit countersigned by a MD or DO), but many times the patient has no means to pay for the face to face encounter for lack of a Part A benefit. In such cases, USPHV (via Merna Parcon) would directly bill the home health agency for these visits. The home health agencies paid USPHV $180 to $250 for these "visits". This is in violation of Medicare regulations and is an illegal inducement by the agencies in the form of a kick-back to USPHV. The manner in which this is accomplished is that the referral forms are marked "CASH PATIENT" manually on the form. The visit is done, and the file is then routed to the USPHV office manager and a bill is sent to and paid my Medicare. Relator is personally aware of hundreds of instances of this fraudulent conduct. the sole purpose of the illegal kick-backs was to insure the recertification of HHA benefits by the HHA's resulting in millions of dollars in false claims on the behalf 95% of pt's that were not home-bound.

87. Most of the patients of USPHV are not truly "home bound" and a vast majority of them are addicted to opiates, a bizarre, demeaning, hateful and evil inducement for these patients to want to remain on home health care. These "CASH PATIENT" home health agencies are typically Defendant Parcon's largest clients who bill and receive payment from Medicare for millions of dollars each year for the past several years.

The Home Health Care Medicare Manual specifically excludes narcotics:

> **80.1 - Drugs and Biologicals**
> **(Rev. 1, 10-01-03)**
> **A3-3125.A, HHA-230.A**
>
> Drugs and biologicals are excluded from payment under the Medicare home health benefit.

88. Relator also observed on many occasions that USPHV, AGood and Essence have "up-coded" charges for the time spent with patients. If a patient was seen for 30 minutes, it is routinely up-coded to 60 minutes, and if a patient was seen for 60 minutes, it is routinely up-coded to 90 minutes, etc.

89. Defendant Dallas Medical Center and USPHV also had an illegal kickback scheme which was flagrant. USPHV would get paid kickbacks for referring patients to Dallas Medical Center for patients that Dallas Medical Center knew had been improperly certified by Doctors Ezukanma or Etindi of USPHV for services to be received at Dallas Medical Center that Dallas Medical Center knew were medically unnecessary. Despite knowing same, Dallas Medical Center performed the services anyway, billing Medicare for the services, and each and every claim submitted constituted a false claim as defined herein. In the process, it

paid kickbacks to USPHV and/or its owners and affiliates in violation of anti-kickback Medicare rules and regulations.

## G. WAIVER OF CO-PAY

90. Another violation of Medicare regulations by USPHV, AGood and Essence is that each of them systematically waive "co-pay" payments and each has a form for patients to sign requesting that patients waive co-pay. This waiver form has been used in tens of thousands of visits. A healthcare provider cannot automatically waive co-pay and receive payments from Medicare because it is viewed as an inducement to stay on service that tends to lead to over-utilization. On every single physician's progress note of USPHV, AGood and Essence, however, there is an automatic waiver of co-pay. Additionally, there is no evidence of any sort of process, intention or facility for billing or collection of co-pays whatsoever by any of said Defendants.

91. According to the Department of Health and Human Services (HHS), Office of Inspector General (OIG), "It is unlawful to routinely waive co-payments, deductibles, coinsurances or other patient responsibility payments." *(67 Fed. Reg. 72,896 (Dec. 9, 2002))*. This applies to health care and services paid by Medicare and any other program paid partially or in full with federal funds. The OIG issued a Special Fraud Alert warning about this specific practice that year. *OIG Special Fraud Alert (1994) "Routine Waiver of Medicare Part B Copayments and Deductibles"*:

What Are Medicare Deductible and Copayment Charges?

The Medicare ``deductible'' is the amount that must be paid by a Medicare beneficiary before Medicare will pay for any items or services for that individual. Currently, the Medicare Part B deductible is $100 per year.

``Copayment'' (``coinsurance'') is the portion of the cost of an item or service which the Medicare beneficiary must pay. Currently, the Medicare Part B coinsurance is generally 20 percent of the reasonable charge for the item or service. Typically, if the Medicare reasonable charge for a Part B item or service is $100, the Medicare beneficiary (who has met his [or her] deductible) must pay $20 of the physician's bill, and Medicare will pay $80.

Why Is it Illegal for ``Charged-Based'' Providers, Practitioners and Suppliers to Routinely Waive Medicare Copayment and Deductibles?

Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.

A ``charge-based'' provider, practitioner or supplier is one who is paid by Medicare on the basis of the ``reasonable charge'' for the item or service provided. 42 U.S.C. 1395u(b)(3); 42 CFR 405.501. Medicare typically pays 80 percent of the reasonable charge. 42 U.S.C. 1395l(a)(1). ...

A provider, practitioner or supplier who routinely waives Medicare Co-payments or deductibles is misstating its actual charge. For example, if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item.

In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). The statute makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them....

One important exception to the prohibition against waiving Co-payments and deductibles is that providers, practitioners or suppliers may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect deductibles and copayments must be made....

92. As far back as 1991, the Office of Inspector General ("OIG") issued a Special Fraud Alert entitled "Routine Waiver of Copayments or Deductibles":

To help reduce fraud in the Medicare program, the Office of Inspector General is actively investigating health care providers, practitioners and suppliers of health care items and services who (1) are paid on the basis of charges and (2) routinely waive (do not bill) Medicare deductible and copayment charges to beneficiaries for items and services covered by the Medicare program.

93. OIG stated in another fraud alert/bulletin that Medicare fraud is evidenced by:

Routine use of ``Financial hardship'' forms which state that the beneficiary is unable to pay the coinsurance/deductible (i.e., there is no good faith attempt to determine the beneficiary's

actual financial condition).

94. Under certain circumstances, such as the indigency or financial hardship of the patient, co-pays and deductibles may be legally waived. However, it is crucial that the physician, practice or facility document the circumstances. In order to qualify for hardship status and waiver of co-pay, Medicare regulations require that a "Financial Hardship Application" be filled out by the patient and approved. This can't be a matter of routine, however, and should only be done when actual financial hardship and inability to pay are documented.

95. Again, in violation of the above fraud alerts and Medicare regulations, USPHV routinely waives co-pays for EVERY patient, and there are no attempts to collect co-pays from patients. Relator has never observed a patient of USPHV fill out a hardship application to obtain a waiver of co-pay.

## H. PHYSICAL THERAPY

96. Yet another area of overbilling Medicare for unnecessary services is over-utilization of physical therapy ("PT") services in the home health segments. It has been routine to put most of the patients USPHV, AGood, and/or Essence on PT whether needed or not because the compensation from Medicare is higher. Further, because home health has a prospective paying system, the home health is paid in advance for services including PT. If there were no PT services performed, Medicare would take its money back the following month.

97. For Physical Therapy to be covered under home health, there are very strict Medicare guidelines in place:

(c) *Physical therapy, speech-language pathology services, and occupational therapy.* To be covered, physical therapy, speech-language pathology

services, and occupational therapy must satisfy the criteria in paragraphs (c)(1) and (2) of this section.

(1) Speech-language pathology services and physical or occupational therapy services must relate directly and specifically to a treatment regimen (established by the physician, after any needed consultation with the qualified therapist) that is designed to treat the beneficiary's illness or injury. Services related to activities for the general physical welfare of beneficiaries (for example, exercises to promote overall fitness) do not constitute physical therapy, occupational therapy, or speech-language pathology services for Medicare purposes. To be covered by Medicare, all of the requirements apply as follows:

(i) The patient's plan of care must describe a course of therapy treatment and therapy goals which are consistent with the evaluation of the patient's function, and both must be included in the clinical record. The therapy goals must be established by a qualified therapist in conjunction with the physician.

(ii) The patient's clinical record must include documentation describing how the course of therapy treatment for the patient's illness or injury is in accordance with accepted professional standards of clinical practice.

(iii) Therapy treatment goals described in the plan of care must be measurable, and must pertain directly to the patient's illness or injury, and the patient's resultant impairments.

(iv) The patient's clinical record must demonstrate that the method used to assess a patient's function included objective measurements of function in accordance with accepted professional standards of clinical practice enabling comparison of successive measurements to determine the effectiveness of therapy goals. Such objective measurements would be made by the qualified therapist using measurements which assess activities of daily living that may include but are not limited to eating, swallowing, bathing, dressing, toileting, walking, climbing stairs, or using assistive devices, and mental and cognitive factors.

(2) Physical and occupational therapy and speech-language pathology services must be reasonable and necessary. To be considered reasonable and necessary, the following conditions must be met:

(i) The services must be considered under accepted standards of professional clinical practice, to be a specific, safe, and effective treatment for the beneficiary's condition. Each of the following requirements must also be met:

(A) The patient's function must be initially assessed and periodically reassessed by a qualified therapist, of the corresponding discipline for the type of therapy being provided, using a method which would include objective measurement as described in §409.44(c)(1)(iv). If more than one discipline of therapy is being provided, a qualified therapist from each of the disciplines must perform the assessment and periodic reassessments. The measurement results and corresponding effectiveness of the therapy, or lack thereof, must be documented in the clinical record.

(B) At least every 30 days a qualified therapist (instead of an assistant) must provide the needed therapy service and functionally reassess the patient in accordance with §409.44(c)(2)(i)(A). Where more than one discipline of therapy is being provided, a qualified therapist from each of the disciplines must provide the needed therapy service and functionally reassess the patient in accordance with §409.44(c)(2)(i)(A) at least every 30 days.

(C) If a patient is expected to require 13 therapy visits, a qualified therapist (instead of an assistant) must provide all of the therapy services on the 13th therapy visit and functionally reassess the patient in accordance with §409.44(c)(2)(i)(A). Exceptions to this requirement are as follows:

( *1* ) The qualified therapist's visit can occur after the 10th therapy visit but no later than the 13th therapy visit when the patient resides in a rural area or when documented circumstances outside the control of the therapist prevent the qualified therapist's visit at the 13th therapy visit.

( *2* ) Where more than one discipline of therapy is being provided, the qualified therapist from each discipline must provide all of the therapy services and functionally reassess the patient in accordance with paragraph (c)(2)(i)(A) of this section during the visit associated with that discipline which is scheduled to occur close to the 14th Medicare-covered therapy visit, but no later than the 13th Medicare-covered therapy visit.

(D) If a patient is expected to require 19 therapy visits, a qualified therapist (instead of an assistant) must provide all of the therapy services on the 19th

---

therapy visit and functionally reassess the patient in accordance with §409.44(c)(2)(A). Exceptions to this requirement are as follows:

( *1* ) This required qualified therapist service can instead occur after the 16th therapy visit but no later than the 19th therapy visit when the patient resides in a rural area or documented circumstances outside the control of the therapist preclude the qualified therapist service at the 19th therapy visit.

( *2* ) Where more than one discipline of therapy is being provided, the qualified therapist from each discipline must provide all of the therapy services and functionally reassess the patient in accordance with paragraph (c)(2)(i)(A) of this section during the visit associated with that discipline which is scheduled to occur close to the 20th Medicare-covered therapy visit, but no later than the 19th Medicare-covered therapy visit....

(iv) The amount, frequency, and duration of the services must be reasonable and necessary, as determined by a qualified therapist and/or physician, using accepted standards of clinical practice.

98. Patients of USPHV, AGood, and Essence are routinely referred to physical therapy whether it is medically warranted or not. When referred to physical therapy, rarely if ever are the foregoing Medicare guidelines for reimbursement complied with.

## I. ASSURERX AND MEDICALLY UNNECESSARY "BUCCAL SWABS"

99. In the 1994 Bulletin issued by the OIG of the U.S. Department of Health and Human Services ("HHS"), the anti-kickback provision of the OIG as it pertains to lab services is described as follows:

How Does the Anti-Kickback Statute Relate to Arrangements for the Provision of Clinical Lab Services?

Many physicians and other health care providers rely on the services of outside clinical laboratories to which they may refer high

volumes of patient specimens every day. The quality, timeliness and cost of these services are of obvious concern to Medicare and Medicaid patients and to the programs that finance their health care services. Since the physician, not the patient, generally selects the clinical laboratory, it is essential that the physician's decision regarding where to refer specimens is based only on the best interests of the patient.

Whenever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business. The same is true whenever a referral source solicits or receives anything of value from the laboratory. By ``fair market value'' we mean value for general commercial purposes. However, ``fair market value'' must reflect an arms length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them....

In July of 2014, OIG issued another bulletin specifically outlining prohibited behavior that was a constant practice of USPHV and Assure Rx as described below and elsewhere herein, the pertinent portion of which stated as follows:

**Special Fraud Alert: Laboratory Payments to Referring Physicians**

June 25, 2014

This Special Fraud Alert addresses compensation paid by laboratories to referring physicians and physician group practices (collectively, physicians) for blood specimen collection, processing, and packaging, and for submitting patient data to a registry or database. OIG has issued a number of guidance documents and advisory opinions addressing the general subject of remuneration offered and paid by laboratories to referring physicians, including the 1994 Special Fraud Alert on Arrangements for the Provision of Clinical Laboratory Services, the OIG Compliance Program Guidance for Clinical Laboratories, and Advisory Opinion 05-08. In these and other documents, we have repeatedly emphasized that providing free or below-market goods or services to a physician who is a source of referrals, or paying such a physician more than fair market

value for his or her services, could constitute illegal remuneration under the anti-kickback statute. This Special Fraud Alert supplements these prior guidance documents and advisory opinions and describes two specific trends OIG has identified involving transfers of value from laboratories to physicians that we believe present a substantial risk of fraud and abuse under the anti-kickback statute.

I. The Anti-Kickback Statute

One purpose of the anti-kickback statute is to protect patients from inappropriate medical referrals or recommendations by health care professionals who may be unduly influenced by financial incentives. Section 1128B(b) of the Social Security Act (the Act) makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce, or in return for, referrals of items or services reimbursable by a Federal health care program. When remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated....

Registry Arrangements may induce physicians to order medically unnecessary or duplicative tests, including duplicative tests performed for the purpose of obtaining comparative data, and to order those tests from laboratories that offer Registry Arrangements in lieu of other, potentially clinically superior, laboratories. OIG recognizes that whether any particular Registry Arrangement violates the anti-kickback statute depends on the intent of the parties to the arrangement. Payments from a laboratory to a physician to compensate the physician for services related to data collection and reporting may be reasonable in certain limited circumstances. However, the anti-kickback statute prohibits the knowing and willful payment of such compensation if even one purpose of the payments is to induce or reward referrals of Federal health care program business...

III. Conclusion OIG is concerned about the risks that Specimen Processing Arrangements and Registry Arrangements pose under the anti-kickback statute. This Special Fraud Alert reiterates our longstanding concerns about payments from laboratories to physicians in

excess of the fair market value of the physicians' services and payments that reflect the volume or value of referrals of Federal health care program business.

100. Another company involved in defrauding Medicare in conjunction with USPHV which gets referral business from USPHV in violation of anti-kickback and other Medicare regulations is a company called Defendant AssureRx. The major mission of this company is to screen buccal samples of DNA to determine the safety and efficacy of neuropsychiatric medicines as well as analgesic safety and efficacy. Relator has reason to believe that AssureRx is giving a kick-back to Merna Parcon from proceeds billed to and paid by Medicare for reasons which follow.

101. USPHV has been screening most if not all of its home health patients for buccal swabs and billing and receiving payment from Medicare for same regardless of the diagnosis of the patient as to whether this service is needed or not. Further, USPHV asked Relator personally to collect buccal swabs for eight patients on one day starting in September 2012, none of whom in Relator's opinion had any medical reason for getting the test other than for USPHV to bill and receive payments from Medicare.

102. The routine administration of buccal swabs whether medically necessary or not is inappropriate under Medicare guidelines for several reasons. First of all, there were no doctor's orders for these tests as required by Medicare before administering the test! Secondly, as a layman, Relator was not allowed to take DNA samples--per Medicare guidelines it has to be performed by someone licensed to do so, and he has no medical training whatsoever to do so.

103. Defendants USPHV and Ritz Diagnostic Imaging also routinely referred most every patient to Assure-RX to obtain buccal swabs when most if not all of the patients did not need that service performed. USPHV used Assure-RX's web-based data facility to keep track of who was tested for what. Relator has used this database. The sole purpose of using their database was to accurately capture and test the entire USPHV patient portfolio without duplicating tests. This was a front loaded procedure where doctors where concerned because any doctors orders where either not signed, signed by office staff or signed by the doctor after the specimen was already collected. The doctors did not order these tests. Assure-Rx and USPHV through the use of the lab's registry, by operation, ordered the tests on the entire USPHV patient portfolio. There is little doubt about their fraudulent intent on the use of AssureRx's registry.

104. Additionally, chain of custody is very important for DNA samples. However, on Friday, August 14, 2012, Relator had several envelopes full of saliva sitting in his backpack for delivery to USPHV headquarters on Monday morning. He was not even asked to seal the "Outer Envelope" as is protocol per DNA and Medicare guidelines.

## J. SUMMARY OF FALSE
## CLAIMS ACT VIOLATIONS

105. "Claim" under as defined in Section 3730 of THE FEDERAL FALSE CLAIMS ACT:

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

> (I) provides or has provided any portion of the money or property requested or demanded; or

> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy  with no restrictions on that individual's use of the money or property.

106.  "False Claim" under Section 3729 of THE FEDERAL FALSE CLAIMS ACT is defined as follows:

(a) Liability for certain acts.

> (1) In general. Subject to paragraph (2), any person who--

>> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

>> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

>> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

>> (D) has possession, custody, or control of property or money used, or to be used, by the Government and

knowingly delivers, or causes to be delivered, less than all of that money or property... or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

107. Utilizing the foregoing definitions of a False Claim set forth above in THE FEDERAL FALSE CLAIMS ACT, the False Claims submitted by the USPHV entities and other Defendants set forth above that Relator is aware of include, but are not limited to, the following:

(a) Improper referrals from USPHV to AGood in violation of Stark Laws;

(b) Improper referrals from Essence to AGood in violation of Stark Laws;

(c) Improper referrals from AGood to Essence in violation of Stark Laws;

(d) Improper referrals from USPHV to Essence in violation of Stark Laws;

(e) Systematic waiver of co-pays in violation of Medicare guidelines;

(f) Systematic administering buccal swab testing whether medically warranted or not;

(g) Over-utilization of physical therapy referrals whether medically necessary or not;

(h) Signing of Form 485 Certification Forms by doctors who have not examined patients;

(i) Forging of Form 485 Certification Forms by Merna Parcon and nurses and other employees she directs to forge said forms;

(j) Signing of Conditions of Participation forms by nurses when the forms should be signed by doctors;

(k) Certifying to Medicare that patients of USPHV, AGood, and Essence were "home bound" when they were not home bound per Medicare guidelines;

(l) Improper prescription of narcotics to patients to induce them to stay on home health services;

(m) Improper referrals for DME's in violation of Stark Law;

(n) Improper upcoding of procedures;

(o) Sharing of office space by companies referring business to one another in violation of Stark regulations;

(p) Improper referrals to home health agencies not owned by USPHV; and

(q) Improper referrals to Dallas Medical Center and Express Medical Center.

## VI. CAUSES OF ACTION

### COUNT ONE-- SUBSTANTIVE VIOLATIONS
### OF THE FEDERAL FALSE CLAIMS ACT
### [31 U.S.C. §§ 3729(a)(A), (B),(D) and (G)]]

108. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

109. This is a claim for treble damages, civil penalties and forfeitures under the FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, as amended.

110. Through the acts described above, the Defendants, by and through their officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a

false record or statement to get a false or fraudulent claim paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant USPHV and the other corporate Defendants listed above authorized and ratified all the violations of the False Claims Act committed by their respective officers, agents, and employees.

111. Through the acts described above and otherwise, defendants knowingly used false records and statements to conceal, avoid, and/or decrease the USPHV Defendants' obligation to repay money to the United States Government that the defendants improperly and/or fraudulently received. Defendants also failed to disclose to the United States Government material facts that would have resulted in substantial repayments by the Defendants to the United States Government and the State of Texas.

112. The term "claim" as defined in Section 3730 of THE FEDERAL FALSE CLAIMS ACT:

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

113. A False Claim under Section 3729 of THE FEDERAL FALSE

CLAIMS ACT is defined as follows:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property... or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $ 5,000 [currently approximately $5,500] and not more than $ 10,000 [currently approximately $11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

114. Additionally, Plaintiff/Relator on behalf of the U.S. Government is entitled to recover civil monetary penalties pursuant to the following statutes:

42 U.S.C. §1320a–7a. Civil Monetary Penalties

*(A) IMPROPERLY FILED CLAIMS*

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that—

> (1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines—

>> (A) is for a medical or other item or service that the person knows or should know was not provided as claimed, including any person who engages in a pattern or practice of presenting or causing to be presented a claim for an item or service that is based on a code that the person knows or should know will result in a greater payment to the person than the code the person knows or should know is applicable to the item or service actually provided,
>> (B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,
>> (C) is presented for a physician's service (or an item or service incident to a physician's service) by a person who knows or should know that the individual who furnished (or supervised the furnishing of) the service—

>>> (i) was not licensed as a physician,

---

(ii) was licensed as a physician, but such license had been obtained through a misrepresentation of material fact (including cheating on an examination required for licensing), or

(iii) represented to the patient at the time the service was furnished that the physician was certified in a medical specialty by a medical specialty board when the individual was not so certified,

(D) is for a medical or other item or service furnished during a period in which the person was excluded from the Federal arc program (as defined in section 1320a–7b(f) of this title) under which the claim was made pursuant to Federal law.

(E) is for a pattern of medical or other items or services that a person knows or should know are not medically necessary;

(2) knowingly presents or causes to be presented to any person a request for payment which is in violation of the terms of (A) an assignment under section 1395u(b)(3)(B)(ii) of this title, or (B) an agreement with a State agency (or other requirement of a State plan under subchapter XIX of this chapter) not to charge a person for an item or service in excess of the amount permitted to be charged, or (C) an agreement to be a participating physician or supplier under section 1395u(h)(1) of this title, or (D) an agreement pursuant to section 1395cc(a)(1)(G) of this title;

(3) knowingly gives or causes to be given to any person, with respect to coverage under subchapter XVIII of this chapter of inpatient hospital services subject to the provisions of section 1395ww of this title, information that he knows or should know is false or misleading, and that could reasonably be expected to influence the decision when to discharge such person or another individual from the hospital;

(4) in the case of a person who is not an organization, agency, or other entity, is excluded from participating in a program under subchapter XVIII of this chapter or a State health care program in accordance with this subsection or under section 1320a–7 of this title and who, at the time of a violation of this subsection—

(A) retains a direct or indirect ownership or control interest in an entity that is participating in a program under subchapter XVIII of this

chapter or a State health care program, and who knows or should know of the action constituting the basis for the exclusion; or (B) is an officer or managing employee (as defined in section 1320a–5(b) of this title) of such an entity;

(5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a–7(h) of this title) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this chapter, or a State health care program (as so defined);

(6) arranges or contracts (by employment or otherwise) with an individual or entity that the person knows or should know is excluded from participation in a Federal health care program (as defined in section 1320a–7b(f) of this title), for the provision of items or services for which payment may be made under such a program;

(7) commits an act described in paragraph (1) or (2) of section 1320a–7b(b) of this title;

(8) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program; or

(9) fails to grant timely access, upon reasonable request (as defined by the Secretary in regulations), to the Inspector General of the Department of Health and Human Services, for the purpose of audits, investigations, evaluations, or other statutory functions of the Inspector General of the Department of Health and Human Services;

(8) orders or prescribes a medical or other item or service during a period in which the person was excluded from a Federal health care program (as so defined), in the case where the person knows or should know that a claim for such medical or other item or service will be made under such a program;

(9) knowingly makes or causes to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a Federal

health care program (as so defined), including Medicare Advantage organizations under part C of subchapter XVIII, prescription drug plan sponsors under part D of subchapter XVIII, medicaid managed care organizations under subchapter XIX, and entities that apply to participate as providers of services or suppliers in such managed care organizations and such plans;

(10) knows of an overpayment (as defined in paragraph (4) of section 1320a–7k(d) of this title) and does not report and return the overpayment in accordance with such section;

shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; in cases under paragraph (7), $50,000 for each such act, in cases under paragraph (8), $50,000 for each false record or statement, or in cases under paragraph (9), $15,000 for each day of the failure described in such paragraph; or in cases under paragraph (9), $50,000 for each false statement or misrepresentation of a material fact). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose; or in cases under paragraph (9), an assessment of not more than 3 times the total amount claimed for each item or service for which payment was made based upon the application containing the false statement or misrepresentation of a material fact).

115. The False Claims submitted by the Defendants in violation of THE FEDERAL FALSE CLAIMS ACT and 42 U.S.C. Section 1320 that Relator is aware of include, but are not limited to, the following:

(a) Improper referrals from USPHV to AGood in violation of Stark Laws;

(b) Improper referrals from Essence to AGood in violation of Stark Laws;

(c) Improper referrals from AGood to Essence in violation of Stark Laws;

(d) Improper referrals from USPHV to Essence in violation of Stark Laws;

(e) Systematic waiver of co-pays in violation of Medicare guidelines;

(f) Systematic administering buccal swab testing whether medically warranted or not;

(g) Over-utilization of physical therapy referrals whether medically necessary or not;

(h) Signing of Form 485 Certification Forms by doctors who have not examined patients;

(i) Forging of Form 485 Certification Forms by Merna Parcon and nurses and other employees she directs to forge said forms;

(j) Signing of Conditions of Participation forms by nurses when the forms should be signed by doctors;

(k) Certifying to Medicare that patients of USPHV, AGood, and Essence were "home bound" when they were not home bound per Medicare guidelines;

(l) Improper prescription of narcotics to patients to induce them to stay on home health services;

(m) Improper referrals for DME's in violation of Stark Law;

(n) Improper upcoding of procedures;

(o) Sharing of office space by companies referring business to one another in violation of Stark regulations;

(p) Improper referrals to home health agencies not owned by USPHV; and

(q) Improper referrals to Dallas Medical Center and Express Medical Center.

116. The United States Government and its citizens have been damaged as a result of the Defendants' violations of the FEDERAL FALSE CLAIMS ACT. Accordingly, Relators request that they be awarded 25% of the Recovery in the event the U.S. Government intervenes in this matter, and 30% of the Recovery in the event the U.S. Government does not intervene, plus all attorneys' fees, costs and expenses incurred pursuant to the FEDERAL FALSE CLAIMS ACT which provides:

**§ 3730. Civil Actions for False Claims**

(d) AWARD TO QUI TAM PLAINTIFF

(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. ... Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

## COUNT TWO—FEDERAL FALSE CLAIMS ACT CONSPIRACY [31 U.S.C. §§ 3729(C)]

117. Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth herein in full.

118. This is a claim for treble damages, civil penalties and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

119. Through the acts described above and otherwise, the Defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the United States government by getting false and fraudulent claims allowed or paid. Defendants have also conspired with each other and with unnamed co-conspirators to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to the Defendants. Defendants have taken substantial steps in furtherance of those conspiracies by submitting false claims for payment or approval that contained these improper charges, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices and those of their co-Defendants, as well.

120. The Medicare program, unaware of Defendants' conspiracies or the falsity of the records and statements, has paid claims to the Defendants, and as a result thereof, has paid hundreds of millions of dollars in Medicare reimbursements that it would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions caused to be made by Defendants, the United States has not recovered Medicare funds from the Defendants that otherwise would have been recovered.

121. The various Defendants combined, conspired, and agreed together to defraud the United States by knowingly submitting False Claims and billing Medicare for the purpose of getting the False Claims paid, or allowed, and committed other overt acts as set forth above in furtherance of that conspiracy.

This conspiracy caused the United States government to pay hundreds of millions and perhaps billions of dollars for False Claims that should not have been paid to the Defendants, for which damages the Relators seek recovery thereof.

## CONSTRUCTIVE TRUST

122. Relator requests a thorough investigation and accounting of any and all transfers of money by and between the Defendant entities, including all Defendants named herein and any other companies or entities or persons to which transfers of money received by the Defendants from Medicare. To the extent that it is determined that the Defendants have conspired to transfer monies and/or assets and acquire assets from monies derived directly or indirectly from Medicare, Relator requests that a constructive trust be established over the property and assets of all such persons and entities.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Relator, on behalf of himself and the United States Government, prays that this Amended Complaint be received and filed in camera under seal until further Order of the Court, and would pray unto the Court for the following relief and Judgment upon a trial by jury:

(a) That this Court enter a judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the FEDERAL FALSE CLAIMS ACT; and

(b) that this Court enter a judgment against the Defendant for a civil penalty of $11,000 for each of Defendants' violations of the Section 3729 of the FEDERAL FALSE CLAIMS ACT; and

(c) that Relator recovers all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action; and

(d) that Relator be awarded all reasonable attorneys' fees and expenses in bringing this action; and

(e) that in the event the United States government proceeds with this action, Relator be awarded the maximum amount for bringing this action of 25% of the proceeds of the action pursuant to Section 3730(d) of the FEDERAL FALSE CLAIMS ACT and/or other statutes permitting recovery of same; and

(f) that in the event the United States government does not proceed with this action, Relator be awarded the maximum amount for bringing this action of 30% of the proceeds of the action pursuant to Section 3730(d) of the FEDERAL FALSE CLAIMS ACT and/or other statutes permitting recovery of same; and

(g) that Relator be awarded pre-judgment and post-judgment interest; and

(h) that defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.*; and

(i) that Relator and the United States government be awarded all damages and Civil Monetary Penalties to which the U.S. Government is entitled42 U.S.C. §1320a–7a.

(j) that a trial by jury be held on all issues so triable; and

(k) that Relator and the United States receive all relief to which either or both may be entitled at law or in equity as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED, this the 23rd day of November, 2015.

RESPECTFULLY SUBMITTED

**LAW OFFICES OF JAMES R. TUCKER, P.C.**

/s/ James Rusty Tucker

**JAMES "RUSTY" TUCKER
LAW OFFICES OF JAMES R. TUCKER, P.C.
STATE BAR NO. 20272020
3100 DREXEL DRIVE
DALLAS, TX 75205
214-599-8921 (PHONE)
214-599-8874 (FACSIMILE)
rusty@rustytuckerlaw.com**