## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

**THE UNITED STATES OF AMERICA**
**ex. rel. GORDON GRANT BACHMAN**

**Plaintiffs,**

**vs.**                                    **CIVIL ACTION NO. 3:13-cv-0023-M**

**HEALTHCARE LIAISON PROFESSIONALS,**
**INC. d/b/a US PHYSICIAN HOME VISITS;**
**DALLAS MEDICAL CENTER, LLC;**
**ASSUREX HEALTH, INC.**
**UNEC GROUP, INC; MEDPRO A-CLASS**
**SERVICES, INC.; AVEIN GROUP, INC.**
**d/b/a SUPERIOR HOME HEALTH CARE;**
**BEN P. GAINES, III; MERNA PARCON**
 **a/k/a MYRNA PARCON;**
**DR. RANSOME ETINDI; NOBLE**
**EZUKANMA, M.D.; NOBLE EZUKANMA,**
**M.D., P.A.; NIEVA LEONARDO CUA;**
**DR. FREDERICO MAESE;**
**RITZ MOBILE DIAGNOSTIC IMAGING;**
**ALI RIZLI; PADEZ HOME HEALTH, INC.;**
**ACUTE HOME HEALTH SERVICES, LLC;**
**MAM UNIQUE HEALTH SERVICES, INC.;**
**ELIM HOME HEALTH, INC.;**
**MACHRIS HOME HEALTH SERVICES, INC.;**
**BARCLAYS HEALTHCARE INC D/B/A**
**BETA HOME HEALTH SERVICES INC.;**
**SYAM HOME HEALTHCARE LLC;**

**And UNKNOWN DEFENDANTS 1-10**

**Defendants**

---

**PLAINTIFF'S THIRD AMENDED COMPLAINT**                    **Page 1**

## <u>PLAINTIFFS' THIRD AMENDED COMPLAINT</u>

COMES NOW GORDON GRANT BACHMAN, on behalf of the United States of America, by and through his attorney, James "Rusty" Tucker of the Law Offices of James R. Tucker, P.C., and respectfully would show unto the Court the following:

## I.  INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made, presented, and caused to be presented by the defendants and/or their agents, employees and co-conspirators in violation of the federal civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended (hereinafter "FALSE CLAIMS ACT" or "FCA").

2. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government for payment or approval of payment is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the government. The FCA allows any person having information regarding a false or fraudulent claim against the government to bring an action for himself or herself (the "Relator" or "*qui tam* plaintiff") and on behalf of the government and to share in any recovery. The Complaint was filed under seal for at least 60 days (without service on the Defendants during that period) to enable the government: (a) to conduct its own investigation without the Defendants' knowledge, and (b) to determine whether to join in the action. In February of 2016, the United States notified the Court that it was not intervening in the action at this time but reserved the right to do so at a later date.

3. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program ("Medicare"), to pay for the costs of certain health care services for those persons entitled to receive such health care. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program. The Center for Medicare Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

4. Plaintiff Grant Bachman (the "Relator") brings this action on behalf of the United States of America against Defendants for civil damages and penalties arising from the Defendants' false claims in violation of the FCA. The violations at issue arise out of false Medicare claims by the Defendants who fraudulently billed the government for Medicare payments for at least a five (5) year period from 2009 through 2014 for providing home health and other services for Medicare patients that were not in conformity with federal statutes and/or regulations authorizing reimbursement for said charges. In the case of Defendant Assurex, it intentionally and knowingly billed Medicare for laboratory tests on a significant portion of the patient population of Defendant USPHV that it knew were not medically necessary.

## II. JURISDICTION AND VENUE

5. This Court has Jurisdiction of this action because it arises under the FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 et. seq.  This Court has jurisdiction over the subject matter of the FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

6. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) one or more of the Defendants reside in this district; (ii) one or more of the Defendants transacts business in this district and did so at all times relevant to this third amended complaint; and, as averred below, (iii) the Defendants committed acts prohibited by 28 U.S.C. § 3729—which are acts giving rise to this action within this district.

## III. CONDITIONS PRECEDENT

7. Before filing his Original Complaint, Relator served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. §3730(b) (2) of the FCA. The Relator has previously made the required disclosure ("Disclosure Statement") to the U.S. Government by providing to the Attorney General of the United States and the U.S. Attorney for the Northern District of Texas a copy of the Original Complaint and a statement of all material information relative to the Complaint. The Disclosure Statement consisted of Affidavit of the Relator and exhibits thereto and other evidence submitted was and is supported by material evidence and information known to the Relator at the time of his filing, establishing the existence of Defendants' False Claims. Because the information provided included attorney-client communications and work product of Relator's attorneys, and was submitted to the Attorney General of the United States and the U.S. Attorney for the Northern District of Texas in their capacity as potential co-counsel in the litigation, the Relator understands that the Disclosure Statement is confidential. Relator has complied with all other conditions precedent to bringing this action.

8. Relator does not believe that any of the information upon which he bases his allegations is the subject of public disclosure. In the unlikely event the Court were to deem that certain information has been publicly disclosed, Relator is nevertheless the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the federal and state governments before filing this action.

## IV. PARTIES

9. Relator is a citizen of the State of Texas. A Raid of certain Defendants and former Defendants (described hereinbelow) in approximately May of 2014 by the Government effectively shut down the operations of several Defendants and/or former Defendants in the previous Complaints that are now dismissed by omitting them in this Third Amended Complaint. From 2009 until the Raid occurred and for several months thereafter, Relator was an officer, member and/or employee of one or more of Defendant USPHV, and/or former Defendants AGood, Essence and/or other Defendants as well as other entities affiliated with Defendants USPHV and Parcon. Relator has direct, independent and personal knowledge of the fraud perpetrated by all current Defendants during the time of his employment. Relator brings this action based upon his direct, independent, and personal knowledge.

10. The U.S. Government funds certain health care services through Medicare when those services are determined to be medically necessary in compliance with regulations of the U.S. Government, as well as federal laws pertaining to payment and/or reimbursement for Medicare health care expenses. Medicare regulations provide that if a person needing health care is unable to travel for medical reasons, they are entitled to be provided with home health care services under very strict and

well-defined guidelines. Most of the Defendants herein (other than Dallas Medical Center and Assurex) repeatedly over the years have billed Medicare for thousands of claims for beneficiaries that were not "homebound" as required by Medicare, thus qualifying as False Claims in violation of the FCA as defined below. Other Defendants have billed for other types of False Claims as set forth below.

11. As set forth below, Relator is aware of multiple False Claims, as defined herein, whereby Medicare was fraudulently billed by the Defendants to the U.S. Government. In fact, Relator submits that an overwhelming majority of claims submitted by the Defendants were False Claims, therefore entitling the U.S. Government to tens of millions of dollars in recovery from the Defendants for civil damages and penalties for the claims submitted.

12. Defendant HEALTHCARE LIAISON PROFESSIONALS, INC. d/b/a US PHYSICIAN HOME VISITS (hereinafter "USPHV") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process and is properly before the Court.

13. Defendant DALLAS MEDICAL CENTER, LLC ("Dallas Medical Center") is a domestic Limited Liability Company organized under the laws of the State of Texas. Dallas Medical Center is owned by and is a subsidiary of Prime Healthcare Services, which operates 42 acute care hospitals in 14 states. Per its' website, it is one of the nation's largest healthcare service providers with nearly 42,000 employees. Said Defendant has been served with process and is properly before the Court.

14. Defendant ASSUREX HEALTH, INC. (hereinafter "AssureRx" or "Assurex") is a foreign corporation organized under the laws of the State of Delaware. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

15. Defendant UNEC GROUP, INC (hereinafter "UNEC") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

16. Defendant MEDPRO A-CLASS SERVICES, INC. (hereinafter "Medpro") is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Diamond Financial Services, who may be served with process by serving Merna Parcon's attorney, Don Wood, Jr., 303 N Central Expressway Dallas, TX 75205.

17. Defendant AVEIN GROUP, INC. d/b/a SUPERIOR HOME HEALTH CARE (hereinafter "Superior Home Health") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

18. Defendant BEN P. GAINES, III ("Gaines") is an individual who has filed a pro se answer and is properly before the Court.

19. Defendant MERNA PARCON a/k/a MYRNA PARCON (hereinafter "Parcon") is an individual who has filed a pro se answer and is properly before the Court.

20. Defendant DR. RANSOME ETINDI (hereinafter "Etndi") is an individual who has returned a Waiver of Service of Process and is properly before the Court.

21. Defendant NOBLE EZUKANMA, M.D. (hereinafter " EZUKANMA") is an individual who is represented by counsel, and is properly before the Court.

22. Defendant NOBLE EZUKANMA, M.D., P.A. is a professional association which is represented by counsel, and is properly before the Court.

23. Defendant NIEVA LEONARDO CUA ("Cua") is an individual who is represented by counsel, and is properly before the Court.

24. Defendant RITZ MOBILE DIAGNOSTIC IMAGING RITZ MOBILE a/k/a RITZ HOSPITALITY, LLC (hereinafter "Ritz") may be served by serving Ali Rizvi at 1520 Blue Mesa Drive, Carrollton, TX 75007.

25. Defendant DR. FREDERICO MAESE (hereinafter "Maese") is an individual who has been served with process and is properly before the Court.

26. Defendant ALI RIZLI ("Rizli") is an individual who is represented by counsel, and is properly before the Court.

27. Defendant PADEZ HOME HEALTH, INC. (hereinafter "Padez") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

28. Defendant ACUTE HOME HEALTH SERVICES, LLC (hereinafter "Acute") is an organization of unknown origin formed under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

29. Defendant MAM UNIQUE HEALTH SERVICES, INC. (hereinafter "Mam Unique") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

30. Defendant ELIM HOME HEALTH, INC. (hereinafter "Elim") is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is George Thomas, who may be served with process at 2309 Granbury Drive, Mesquite, Texas 75150.

31. Defendant MACHRIS HOME HEALTH SERVICES, INC. (hereinafter "Machris") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

32. Defendant BARCLAYS HEALTHCARE INC d/b/a BETA HOME HEALTH SERVICES INC. (hereinafter "Beta Home Health") is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Victor Amechi Ochei, who may be served with process at 1501 Williams Creek Mesquite, TX 75181.

33. Defendant SYAM HOME HEALTHCARE LLC ("Syam Home Health") is a domestic Limited Liability Company organized under the laws of the State of Texas. Said Defendant has executed a Waiver of Service of Process and is properly before the Court.

34. In addition to the entities set forth above, Plaintiffs have sued Unknown Defendants 1-10 for the reason that it is believed that the above referenced Defendants have submitted False Claims to and received payments from Medicare from other Home Health Care Agencies which discovery will reveal the identity of.

## V. FACTS

### A.   FACTS PERTAINING TO HOME HEALTH AGENCIES AND COMPANIES AND INDIVIDUALS CONNECTED THEREWITH

35. In this section, Relator will discuss facts relating to USPHV and the owners thereof and the egregious fraudulent conduct that resulted in the owners thereof and several other employees being charged with and either pleading guilty to or being convicted of criminal conduct for Medicare fraud. The two owners of USPHV (Defendants Parcon and Ezukanma) are currently serving ten (10) years each in prison for Medicare fraud resulting from allegations brought by this lawsuit. Additionally, this section will discuss the Medicare fraud committed by home health care agencies not owned by USPHV, and other companies and individuals doing business with USPHV in an effort to systematically defraud Medicare. The fraud committed by Assurex and Dallas Medical Center are equally as egregious, and the facts pertaining to those entities are discussed in sections B and C below, respectively.

## 1.  APPLICABLE TIME PERIOD THAT FALSE CLAIMS WERE SUBMITTED TO MEDICARE BY THE DEFENDANTS IN THE ALLEGATIONS WHICH FOLLOW

36. It should be noted that unless otherwise specified herein, the activity alleged to have occurred throughout the entirety of this Third Amended Complaint occurred each and every day services were "provided" by said Defendants from the time Relator was employed by one or more Defendants in 2009 and the time of the Raid in May of 2014 which effectively shut down the operations of some of the Defendants, former Defendants, and others. Accordingly, Relator will not be specifying time frames with respect to each allegation unless the above statement is not applicable, thus satisfying the "when" criteria under applicable case law criteria pertaining to Fed. Rule Civ. Proc. 9(b) the Medicare fraud in question was committed. In the case of Defendants Dallas Medical Center and Assurex, the applicable time period for satisfying the "when" criteria for Fed. Rule Civ. Proc. 9(b) purposes is from 2012 until mid-year in 2014.

## 2.THE RAID OF CERTAIN DEFENDANTS RESULTING IN THE SEIZURE OF EVIDENCE

37. As to certain Defendants identified herein, this case involves one of the largest cases of home health care fraud in the history of the United States. After Relator came forward and reported this fraud to the federal government and filed this lawsuit, the United States investigated the actions of the Defendants thoroughly. Based upon the information provided by Relator to the government, a raid (hereinafter "Raid") of the corporate headquarters of Defendants USPHV and former Defendants Essence and A-Good took place on or about May 14, 2014, by the U.S. Attorney's office in conjunction with the FBI, HHS Office of Inspector General, and possibly other federal and/or State agencies.

38. Just days prior to the Raid (which Relator had no idea was going to occur), Relator met with representatives of several government agencies, and gave a detailed account of what documents could be found where, where the flash drives with evidence would be stored, which computers belonged to whom and where they were located, and provided a diagram of the facilities that were shortly thereafter the subject of the Raid. During this Raid thousands of pages of documents were confiscated, and all computers and data (flash drives, etc.) in the company were confiscated as well in connection with same. The Raid effectively shut down the operations of Defendants USPHV, Medpro and UNEC. Defendant Parcon, however, who controlled all of these entities, continued to find ways to defraud Medicare via other Defendants and other entities as explained herein.

## 3. THE INDICTMENTS OF DEFENDANTS PARCON, EZUKANMA, ETINDI AND GAINES

39. After examining the data obtained during the Raid, along with other information provided by Relator in several meetings with the U.S. Attorney's office, the United States issued indictments for conspiracy to commit Medicare fraud in June of 2015 against Defendants Parcon, Ezukanma, Etindi, and Gaines, among others involved in the fraud. At that time, it was announced in a press release that these Defendants were a significant part of a nationwide sweep involving the **largest home health care fraud committed in the history of the United States.** The press release read, in part, as follows:

> **DALLAS** – Attorney General Loretta E. Lynch and Department of Health and Human Services (HHS) Secretary Sylvia Mathews Burwell announced today a nationwide sweep led by the Medicare Fraud Strike Force in 17 districts, resulting in charges against 243 individuals, including 46 doctors, nurses and other licensed medical professionals, for their alleged participation in Medicare fraud schemes involving approximately **$712**

**million** in false billings. In addition, the Centers for Medicare & Medicaid Services (CMS) also suspended a number of providers using its suspension authority as provided in the Affordable Care Act. This coordinated takedown is the largest in Strike Force history, both in terms of the number of defendants charged and loss amount.

"This action represents the **largest criminal health care fraud** takedown in the history of the Department of Justice, and it adds to an already remarkable record of enforcement," said Attorney General Lynch. "The defendants charged include doctors, patient recruiters, home health care providers, pharmacy owners, and others. They billed for equipment that wasn't provided, for care that wasn't needed, and for services that weren't rendered….

According to the indictment, from January 1, 2009 to approximately June 9, 2013, the defendants ran a conspiracy to defraud Medicare. As part of the fraudulent business model, Ezukanma and another physician certified 94% of the Medicare beneficiaries receiving home health services from A Good, and 65% of the Medicare beneficiaries receiving home health services from Essence. …

The indictment alleges that USPHV submitted billing primarily under Dr. Ezukanma's Medicare provider number, regardless of who actually performed the service. They billed at an alarming rate, generally billing for only the most comprehensive physician exam, and always adding a prolonged service code. USPHV submitted claims to Medicare for physician visits of 90 minutes or more, when most visits took only 15 to 20 minutes. Most all of USPHV patients came from home health companies soliciting certifications and re-certifications for home health. More than 97% of USPHV Medicare patients received home health care, whether they needed it or not. **(emphasis added).**

### 4. THE INDICTMENTS REVEALED THAT DEFENDANTS ETINDI AND EZUKANMA BILLED MORE THAN ONE HUNDRED OF HOURS A DAY TO MEDICARE ON MULTIPLE OCCASIONS

40. Relator observed on many occasions that Defendants Ezukanma and Etindi would "up-code" charges for the time spent with patients. If a patient was seen for 30 minutes, it was routinely up-coded to 60 or 90 minutes, and if a patient was seen for 60 minutes, it was routinely up-coded to 90 minutes, etc. As a result of Relator's conveying this knowledge to the government, the government's investigation based upon Relator's allegations in this regard revealed that the fraud was even more rampant than that first reported by Relator. It was ultimately revealed as set forth in the indictment that 98% of the approximate 27,000 physician home visits submitted to Medicare for payment by Defendants Ezukanma and Etindi were upcoded to show that the maximum time (90 minutes billed via Code 99354) was spent with the patient, whereas on most occasions the patient was only seen 15-20 minutes.

41. This fraudulent scheme astoundingly resulted in resulted in Doctors Ezukanma or Etindi billing over 100 hours--per day!--on several occasions to Medicare for physician home visits! Between May 25, 2010 and November 20, 2012, on twelve different occasions Doctor **Ezukanma** (now no longer a doctor) billed Medicare hours ranging from **102.7 hours per day** to **205.9 hours per day!** Similarly, on three occasions between January 17, 2013, and March 19, 2013, Doctor **Etindi** (also no longer a doctor) billed Medicare between **103.8 hours per day** and **131.8 hours per day!** The Indictment revealed in total that these two Defendant doctors billed in excess of 24 hours per day on **at least 21 occasions!**

## 5. MOST PATIENTS OF THE HHA's WERE NOT "HOMEBOUND"

42. USPHV is or was a physicians' practice that employed physicians, nurse practitioners and occasionally physician assistants. It was formed by Defendants Parcon and Ezukanma, among others. Relator on occasion was designated as Managing Director of USPHV, and on other occasions was paid as an employee of AGood and/or Essence, among other entities. USPHV saw patients exclusively at their place of residence, and patients were typically seen every month to six weeks. The primary clients of USPHV are home health agencies ("HHA's"). Parcon made referrals to dozens of other home health agencies, some of whom are Defendants herein that are not owned and/or controlled by USPHV and Defendant Merna Parcon as discussed below.

43. In order to receive Medicare benefits, patients of a HHA must be certified as "homebound," meaning that leaving the home must involve a "taxing effort" under Medicare regulations. These and other regulations cited herein are found in Chapter 7 of the Medicare Benefit Policy Manual of the Center for Medicare Services ("CMS") regarding Home Health Care. "Homebound" is defined in Medicare regulations as follows:

> Generally speaking, a patient will be considered to be homebound if they have a condition due to an illness or injury that restricts their ability to leave their place of residence except with the aid of: supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated.

44. As described more fully below, most of the patients of the HHA's discussed herein receiving Medicare payments are not "homebound' in compliance with the foregoing definition. In support of same, Relator would often be with the

medical professional driving them to home health visits, and in a significant percentage of time, Relator would note on the list of patients to be seen that day that they were "not home", which of course by common sense means that they were not "home bound". Pursuant to Medicaid Guidelines, the criteria for coverage for Home Health Services is as follows**:**

**20 - Conditions to Be Met for Coverage of Home Health Services (Rev. 1, 10-01-03)**
**A3-3116, HHA-203**

Medicare covers HHA services when the following criteria are met:
1. The person to whom the services are provided is an eligible Medicare beneficiary;

2. The HHA that is providing the services to the beneficiary has in effect a valid agreement to participate in the Medicare program;

3. The beneficiary qualifies for coverage of home health services as described in §30;

4. The services for which payment is claimed are covered as described in §§40 and 50;

5. Medicare is the appropriate payer; and

6. The services for which payment is claimed are not otherwise excluded from payment.

45.   For **patients** to be eligible to receive home health care, the Medicare regulations stipulate as follows:

**30 - Conditions Patient Must Meet to Qualify for Coverage of Home Health Services**
**(Rev. 1, 10-01-03)**
**A3-3117, HHA-204, A-98-49**

To qualify for the Medicare home health benefit, under §§1814(a)(2)(C) and 1835(a)(2)(A) of the Act, a Medicare beneficiary must meet the following requirements:

Be confined to the home;
Under the care of a physician;

Receiving services under a plan of care established and periodically reviewed by a physician;

Be in need of skilled nursing care on an intermittent basis or physical therapy or speech-language pathology; or

Have a continuing need for occupational therapy.

46. These "homebound" patients of HHA's must be certified or re-certified every sixty days, a period of time in Medicare regulations and HHA practice that is referred to as an "episode", as more fully described in Medicare regulations as follows:

**HH-201**
The unit of payment under home health PPS is a national 60-day episode rate with applicable adjustments. The episodes, rate, and adjustments to the rates are detailed in the following sections.

**10.1 - National 60-Day Episode Rate**
**(Rev. 1, 10-01-03)**
**HH-201.1**

**A. Services Included**
The law requires the 60-day episode to include all covered home health services, including medical supplies, paid on a reasonable cost basis. That means the 60-day episode rate includes costs for the six home health disciplines and the costs for routine and non-routine medical supplies. The six home health disciplines included in the 60-day episode rate are:

1. Skilled nursing services
2. Home health aide services;
3. Physical therapy;
4. Speech-language pathology services;
5. Occupational therapy services; and
6. Medical social services.

The 60-day episode rate also includes amounts for:

1. Non-routine medical supplies and therapies that could have been unbundled to part B prior to PPS. See §10.12.C for those services;
2. Ongoing reporting costs associated with the outcome and assessment information set (OASIS); and
3. A one time first year of PPS cost adjustment reflecting implementation costs associated with the revised OASIS assessment schedules needed to classify patients into appropriate case-mix categories.

## B. Excluded Services

The law specifically excludes durable medical equipment from the 60-day episode rate and consolidated billing requirements. DME continues to be paid on the fee schedule outside of the PPS rate.

**10.4 - Counting 60-Day Episodes**
**(Rev. 1, 10-01-03)**
**HH-201.4**

### A. Initial Episodes

The "From" date for the initial certification must match the start of care   (SOC) date, which is the first billable visit date for the 60-day episode. The "To" date is up to and including the last day of the episode which is not the  first day of the subsequent episode. The "To" date can be up to, but never exceed a total of 60 days that includes the SOC date plus 59 days.

### B. Subsequent Episodes

If a patient continues to be eligible for the home health benefit, the home health PPS permits continuous episode re-certifications. At the end of the 60-day episode, a decision must be made whether or not to recertify the patient for a subsequent 60-day episode.

**30.5.2 - Periodic Recertification
(Rev. 139, Issued: 02-16-11, Effective: 01-01-11, Implementation:
03-10-11)** At the end of the 60-day episode, a decision must be made
whether or not to recertify the patient for a subsequent 60-day
episode. An eligible beneficiary who qualifies for a subsequent 60-day
episode would start the subsequent 60-day episode on day 61. Under
HH PPS, the plan of care must be reviewed and signed by the
physician every 60 days unless one of the following occurs:
A beneficiary transfers to another HHA;

A discharge and return to the same HHA during the 60-day episode.

Medicare does not limit the number of continuous episode re-
certifications for beneficiaries who continue to be eligible for the
home health benefit. The physician certification may cover a period
less than but not greater than 60 days.

**30.5.3 - Who May Sign the Certification
(Rev. 1, 10-01-03)
A3-3117.5.C, HHA-204.5.C**
The physician who signs the certification must be permitted to do so
by 42 CFR 424.22.


47. At each certification, a physician must certify his or her approval of the

plan of care ("POC") and that the patient is "homebound" per Medicare guidelines.

This signature is placed by the following statement box 26 on what is known as a

Medicare Form 485 wherein the physician certifies:

> "I certify/recertify that this patient is confined to his/her home and
> needs intermittent skilled nursing care, physical therapy and/or speech
> therapy or continues to need occupational therapy. The patient is
> under my care, and I have authorized the services on this plan of care
> and will periodically review the plan."

## 6. CERTIFICATION FORMS WERE ROUTINELY SIGNED BY DOCTORS AND NURSES WHO NEVER SAW THE PATIENT!

48. Defendant Ezukanma was the so-called "medical director" of USPHV. During the time period applicable to this action he owned a very profitable pulmonary practice in Fort Worth, Texas which is where his primary practice was located. He signed thousands of Form 485 certifications on behalf of patients of USPHV without seeing any of these patients, yet an overwhelming majority of the patients were not "homebound" per Medicare guidelines. Defendant Ezukanma billed Medicare for these fraudulent services via his Medicare number with Defendants Ezukanma, M.D., P.A. and UNEC which he owned. Etindi likewise signed Form 485 certifications knowing that the patients involved were not homebound and/or without even seeing the patients to ascertain whether or not they were homebound.

49. Relator also observed that numerous Form 485's were forged with Dr. Ezukanma's signature by Merna Parcon or others under her direction or control, including but not limited to Defendant Cua. As reflected in the Indictment in June of 2015, it was ultimately determined by the U.S. Government that false certifications of these form 485's alone cost Medicare over **$40 Million** in payments for fraudulent home health services over the time frame of January 1, 2009 through June 9, 2013 only! These damages were determined to have been caused by Defendants Parcon, Ezukanma, Gaines, Etindi and others.

50. The foregoing practices of Defendants Dr. Ezukanma, Merna Parcon, Etindi and the HHA's are in violation of the following "face to face" requirement before home health services can begin pursuant to CMS provisions, as Dr. Ezukanma

and/or Dr. Etindi NEVER saw the patients nor did they comply with any of the following Medicare regulations:

**30.5.1.1 – Face-to-Face Encounter**
**(Rev. 139, Issued: 02-16-11, Effective: 01-01-11, Implementation: 03-10-11)**

**1. The certifying physician must document that he or she or an allowed non-physician practitioner (NPP) had a face-to-face encounter with the patient.**

Certain NPPs may perform the face-to-face encounter and inform the certifying physician regarding the clinical findings exhibited by the patient during the encounter. However, the certifying physician must document the encounter and sign the certification. NPPs who are allowed to perform the encounter are:
A nurse practitioner or clinical nurse specialist working in collaboration with the certifying physician in accordance with State law;

A certified nurse-midwife as authorized by State law;

A physician assistant under the supervision of the certifying physician

NPPs performing the encounter are subject to the same financial restrictions with the HHA as the certifying physician, as described in 42CFR 424.22(d).

2. Encounter Documentation Requirements:

The documentation must include the date when the physician or allowed NPP saw the patient, and a brief narrative composed by the certifying physician who describes how the patient's clinical condition as seen during that encounter supports the patient's homebound status and need for skilled services. …

**It is unacceptable for the physician to verbally communicate the encounter to the HHA, where the HHA would then document the encounter as part of the certification for the physician to sign.** (emphasis added)

51. The way the procedure worked for Defendant Parcon would direct her staff to send on behalf of USPHV, AGood, and Essence, UNEC and Medpro rafts of paperwork to Dr. Ezukanma and/or Dr. Etindi to sign in exchange for periodic payments by Defendant Parcon and/or USPHV. They lent their signatures for use of his billing information and a check every month from Defendant Parcon. Ezukanma and Dr. Etindi were the quintessential "robo-signers" for a fee so that USPHV, AGood, Essence, UNEC and Medpro could submit claims for "homebound" care to Medicare. This process went on since at least January 1, 2008 until the Raid occurred. Defendants Parcon and Cua, among others, intentionally and knowingly signed Form 485's and other forms on behalf of Defendant Ezukanma and/or Etindi, thus committing Medicare fraud each and every time they did so as they knew those forms had to be signed by a medical doctor.

52. Without seeing the patient, Defendant Ezukanma obviously had no idea whether these patients he was "certifying" were "homebound" per the Medicare guidelines set forth above. Additionally, he did not have a nurse practitioner or physician's assistant in his employ that meets the guidelines set forth above. Because he had no idea of the condition of the patient, certifying the Medicare beneficiary as homebound was impossible, so each and every Form 485 was certified fraudulently by Defendant Dr. Ezukanma.

53. Defendant UNEC was a company founded by Defendant Ezukanma that also provided physician home services. Defendants Dr. Ezukanma and Parcon utilized UNEC's Medicare billing number for claims associated with Defendant USPHV, thus integrating part of UNEC into USPHV. Defendant UNEC knowingly submitted fraudulent claims to Medicare after the fraudulent certifications of Defendants Dr. Ezukanma and/or Etindi during the time period applicable herein.

54. Defendant Medpro was a physician house call company founded by Defendant Parcon that also provided physician home services. Defendant Parcon utilized Medpro's Medicare billing number for claims associated with Defendant USPHV, thus integrating part of Medpro into USPHV. Defendant Medpro knowingly and intentionally submitted fraudulent claims to Medicare after the fraudulent certifications of Defendants Dr. Ezukanma and/or Etindi during the time period applicable herein.

55. Defendant Ransome Etindi was also an associate medical director of USPHV who also knowingly and intentionally signed Form 485's for patients of USPHV, AGood, Essence, UNEC and Medpro with full knowledge that these patients were not homebound. Defendant Parcon provided payments to him as long as he did what she desired and certified the patients to receive home health services for another 60 days and billed Medicare for same. Because he had no idea of the condition of the patient, certifying the Medicare beneficiary as homebound was impossible, so each and every Form 485 was certified fraudulently by Defendant Dr. Etindi.

56. Additionally, at USPHV/AGood headquarters, nurses filled out and signed "Conditions of Participation" ("COPs") documents in violation of Medicare guidelines. These Conditions of Participation documents are mandated by law to be filled out and signed by a **doctor**--not a nurse. From Relator's observation, however, these forms were routinely filled out by nurses instead of doctors as mandated by Medicare regulations. One of the nurses who forged signatures of doctors these forms is Defendant Nieva Cua, who was part owner of USPHV and also owns Defendant Superior Home Health, another home health agency, through which she knowingly, willfully, and intentionally submitted fraudulent Medicare claims

knowing that the Form 485 authorizing home health care were not in compliance with Medicare guidelines.

## F. REFERRALS TO NON-USPHV OWNED HOME HEALTH CARE AGENCIES THAT RESULTED IN FALSE CLAIMS

57. In addition to referring to their own USPHV/Parcon owned and/or home health care agencies, USPHV and Parcon referred cases to other home health care agencies throughout the Dallas Fort Worth metroplex that Parcon/USPHV did not own or control. On each of these referrals, Doctors Ezukanma or Etindi would certify the patients being referred as "homebound" knowing that the patient in question in approximately 95% of the cases did not meet the criteria for receiving home health care as set forth above and incorporated herein by reference. Further, in each of these cases where a referral was made, the patient would receive multiple home visits, each and every one of which constituted a false claim under the FCA as defined herein.

58. These non-USPHV health care agencies (collectively sometimes referred to herein as "Non-USPHV Owned Home Health Care Agencies") who are Defendants herein to which referrals were made (with the approximate number of referrals in parentheses) that constituted False Claims are as follows:

  **AVEIN GROUP, INC. d/b/a SUPERIOR HOME HEALTH CARE(95);**
  **PADEZ HOME HEALTH, INC.(70);**
  **ACUTE HOME HEALTH SERVICES, LLC(55);**
  MAM **UNIQUE HEALTH SERVICES, INC.(45);**
  **MACHRIS HOME HEALTH SERVICES, INC.(36);**
  **BARCLAYS HEALTHCARE INC D/B/A**
  **BETA HOME HEALTH SERVICES INC.; and**
  **SYAM HOME HEALTHCARE, LLC**

59. The scheme between Defendants Parcon and each of the Non-USPHV Defendant Home Health Care Agencies was the same for each and worked as follows. Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health, and Syam Home Health did not have a doctor on staff who could certify a patient as being homebound, so each of them would pay USPHV to do that for them by getting Defendants Etindi and/or Ezukanma to sign the Form 485 described in detail above so that each of said Defendants could render services to the falsely certified patients. These services were nursing, physical therapy, and many other types of services other than what a doctor would perform. USPHV also billed Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health, and Syam Home Health for the services of Doctors Ezukanma or Etindi, and many times these patients would be recertified multiple times and stay on home health services for years. An audit has now shown that on average, well over 90% of the certifications of the patients as being homebound by Doctors Ezukanma or Etindi were fraudulent.

60. Accordingly, there was a scenario where USPHV was submitting false claims, doctors Ezukanma and/or Etindi who certified and recertified the patients as being home bound submitted false claims, and Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health, and Syam Home Health who paid USPHV to get patients certified likewise knowingly, willfully, and intentionally submitted False Claims for each and every visit (sometimes several times a week) after getting the patient certified. Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health, and Syam Home Health each came to Defendant Parcon and USPHV knowing that its medical director and assistant medical director (Defendants Ezukanma and/or Etindi—both now

incarcerated for Medicare fraud) would certify virtually any patient as homebound whether they were or not--without even seeing the patient!

61. Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health and Syam Home Health each knew that Defendants Etindi and/or Ezukanma had certified their patients as home bound knowing that Defendants Etindi and/or Ezukanma had never seen the patient, so each and every claim that was intentionally, willfully and knowingly submitted to Medicare by Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health and Syam Home Health that were certified by  Defendants Etindi and/or Ezukanma were False Claims under the FCA  as defined elsewhere herein. Out of the hundreds of referrals set forth above, most every patient was seen on multiple occasions over several months if not years, resulting in thousands of false claims being knowingly, willfully and intentionally submitted by Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health, and Syam Home Health at $5,500-$11,000 per false claim as described elsewhere herein.

62. As to the time frame during which the fraudulent claims were submitted to Medicare by Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, Beta Home Health, and Syam Home Health, the time frame is not the global time frame set forth above in Section A. Rather, the time frame for each of said Non-USPHV Owned Home Health Care Agencies is the time of the first referral during the 2008-2014 to the last referral during that time frame for each such entity.

## 8. IMPROPER REFERRALS BY DEFENDANTS
## RIZLI, RITZ, AND MAESE

63. Defendant Ali Rizli owned and operated Express Medical Center (hereinafter "EMC"--originally a Defendant to this action but not a Defendant now because an investigation into its practices several months after the USPHV Raid discussed above the government revoked EMC's Medicare license and put the company out of business) and Ritz Mobile Diagnostic Imaging ("Ritz"). Both are or were located at an office at 3648 Old Denton Road in Carrollton, 75007 (which is "where" the fraud occurred for Rule 9(b) purposes). Defendant Rizli's partner, Amed Kahn, MD, referred multiple unnecessary diagnostic tests from EMC to Ritz (the "how" for Rule 9(b) purposes). Defendant Rizli also owns a DME company in which he referred items like braces and scooters.

64. After government officials raided the offices of Defendant USPHV effectively shutting down its operations shortly thereafter, Defendant Parcon transferred her entire portfolio of patients to these entities which conducted multiple medically unnecessary procedures and knowingly, willfully and intentionally billed them to Medicare, including but not limited to conducting unnecessary nerve conduction studies ordered by Defendant Rizli (also part of the "how" for Rule 9(b) purposes). Moreover, for an extended period of time Defendant Parcon was actively running that office from EMC and/or remotely. Essentially the business of USPHV simply transferred to EMC, and Defendant Parcon was paid by EMC to run the operations pertaining to her previous patients. Thus, the "who" for purposes of Rule 9(b) were the entire patient population of USPHV that was transferred to said Defendants.

65. As to Defendants Rizli and Ritz, the applicable time period (the "when" for Rule 9(b) purposes) is not as set forth in Section A above. Rather, the applicable time period was from May of 2014 when USPHV was shut down until Parcon was arrested and indicted in 2015.

66. Additionally, Defendant Dr. Frederico Maese routinely certified patients as homebound when they were not. On multiple occasions, EMC and Defendant Maese would see the same patients in the same week or the even the same day, all of which visits were medically unnecessary. Further, Defendant Maese always coerced patients to sign a supplemental waiver of co-pay. While Relator was assisting doctors in the field, he witnessed many of these supplemental forms. Copies of these forms reside in the home care folder. Defendant Maese conducted multiple medically unnecessary procedures and knowingly, willfully and intentionally billed these false claims to Medicare (all of the foregoing in this paragraph being the "how" for Rule 9(b) purposes as to Defendant Maese). The "where" was at his office, the "when" was primarily 2014 and 2015, and the "who" again was the entire patient population of USPHV after it was shut down by the Raid.

## 9. ILLEGAL REFERRALS IN VIOLATION OF STARK LAW AND MEDICARE GUIDELINES

67. The Federal government has specific laws governing financial transactions between health care providers, including the Medicare Fraud and Abuse laws and the Stark I and Stark II (hereinafter "Stark Law"). These laws prohibit any incentives that influence physicians to refer patients. The Stark Law prohibits physicians from ordering designated health services ("DHS") for Medicare patients from entities with which the physician, or a family member, has a financial

relationship unless an exception applies. The Stark Law has been routinely violated by the Defendants for reasons which follow.

68. Physician self-referral is the practice of a physician referring a patient to a medical facility in which he has a financial interest, be it ownership, investment, or a structured compensation arrangement. Such arrangements create an inherent conflict of interest, given the physician's position to benefit from the referral and also because such arrangements may encourage over-utilization of services, in turn driving up health care costs. In a 1994 Bulletin issued by the OIG of the U.S. Department of Health and Human Services ("HHS"), published in the Federal Register, the OIG described why it is inappropriate to provide financial incentives for referrals:

> Why is it Illegal for Hospitals to Provide Financial Incentives to Physicians for Their Referrals?
>
> The Office of Inspector General has become aware of a variety of hospital incentive programs used to compensate physicians (directly or indirectly) for referring patients to the hospital. These arrangements are implicated by the anti-kickback statute because they can constitute remuneration offered to induce, or in return for, the referral of business paid for by Medicare or Medicaid. In addition, they are not protected under the existing ``safe harbor'' regulations.
>
> These incentive programs can interfere with the physician's judgment of what is the most appropriate care for a patient. They can inflate costs to the Medicare program by causing physicians to overuse inappropriately the services of a particular hospital. The incentives may result in the delivery of inappropriate care to Medicare beneficiaries and Medicaid recipients by inducing the physician to refer patients to the hospital providing financial incentives rather than to another hospital (or non-acute care facility) offering the best or most appropriate care for that patient.

69. During the global time frame set forth above, Relator has witnessed hundreds of referrals that violate the anti-referral provisions of the Stark Law. As one example, Defendant Gaines was an initial investor in, owner of, and past administrator of former Defendant AGood. He conspired with Defendant Parcon to accept "referrals" of patients from Defendants Ezukanma and USPHV and to over utilize physical therapy referrals for the sole purpose of increasing billing Medicare for services that were not medically necessary. Defendant Gaines has been paid for his actions by Defendant Parcon yet he knew these actions where illegal and has expressed and acknowledged same to Relator on numerous occasions.

## B. FACTS PERTAINING TO ASSURERX AND MEDICALLY UNNECESSARY BUCCAL SWABS OBTAINED FOR GENESIGHTRX TESTING

### 1. Overview of What the GenesightRX Test Purports to Do

70. Defendant Assurerx Health ("Assurex") committed multiple violations of the FCA and the anti-kickback statute ("AKS") with respect to the sale and marketing of its genetic test known as GenesightRx. GenesightRx allegedly analyzes and measures genetic variants that affect a patient's response to psychiatric medications. Assurex's marketing materials state that such tests are appropriate where a patient is diagnosed with a psychiatric disorder and medication therapy is deemed appropriate for a given patient. At the times relevant to this action, GenesightRx and other genetic testing for this purpose was not yet the standard practice in psychiatry.

71. The way the process is supposed to work is that a **doctor** is supposed to register with Assurex. For each patient tested, the doctor or someone under his or her direction is supposed to collect a saliva sample from a patient's cheek and

preserve it in an envelope, which is then shipped overnight to Assurex's lab in Mason, Ohio for testing. At the lab, the DNA is extracted from the cells on the buccal swab and analyzed. The results of that analysis are then forwarded to the doctor in question.

72. The GenesightRx report supposedly predicts a patient's likely response to commonly prescribed psychiatric medications with color-coded columns suggesting which medications would likely be successful or not and which should be avoided. In short, the report is intended to assist doctors when making decisions as to which psychiatric medication to take.

73. Medicare will reimburse an average of approximately $1,750--$2,500 for performance of the GenesightRx test itself using the applicable CPT codes to achieve payment for same. Assurex performs the test, not the doctors or the clinics such as USPHV. Assurex provided incentives to USPHV to administer these tests beginning in 2012, and Relator was integrally involved in this program as described below.

## 2. Waiver of Co-Pay resulting in Illegal Kickbacks to Patients by Assurex

74. Assurex provided illegal kickbacks to patients by waiving their co-pay. Medicare Advantage patients are required to pay a $20 co-pay per Genesight Rx test. In order to encourage Medicare Advantage patients and their doctors to use the test, Defendant Assurex told USPHV that while Assurex was supposed to send a bill to these patients for the $20 co-pay fee, USPHV was instructed by representatives of Assurex that Assurex would never attempt to collect the co-pay bills if they were unpaid. This provided an incentive which was illegal and all part of the plan to induce as many patients as possible to participate in the test in question. Relator was present when dozens of buccal swabs were collected from Medicare Advantage

patients and not once was a co-pay requested of a patient. After Merna Parcon (President of USPHV) was told by Assurex that it would waive co-pays, Parcon specifically instructed Relator and others who collected the buccal swabs NOT to collect or attempt to collect any co-pay from any patient.

75. Accordingly, while the amounts involved concerning the co-pay itself is minor in the scheme of things, each and every buccal swab collected without collecting a co-pay resulted in the voluntary, knowingly, willfully and intentionally submission of a False Claim under the FCA by Assurex. Thus, for each claim voluntarily, knowingly, willfully and intentionally submitted by Assurex to Medicare in which a co-pay was waived, it is liable to the government under the FCA for $5,500-11,000 in civil monetary penalties for EACH AND EVERY GENESIGHTRX TEST conducted on a USPHV patient. By way of example, if there were "only" 500 USPHV patients for whom co-pay was waived when collecting the buccal swab, Assurex would be liable for up to $5.5 million in penalties alone (500 x $11,000)!

76. According to the Department of Health and Human Services (HHS), Office of Inspector General (OIG), "It is unlawful to routinely waive co-payments, deductibles, coinsurances or other patient responsibility payments." *(67 Fed. Reg. 72,896 (Dec. 9, 2002)).* This applies to health care and services paid by Medicare and any other program paid partially or in full with federal funds. The OIG issued a Special Fraud Alert warning about this specific practice that year. *OIG Special Fraud Alert (1994) "Routine Waiver of Medicare Part B Copayments and Deductibles"*:

What Are Medicare Deductible and Copayment Charges?

The Medicare ``deductible'' is the amount that must be paid by a Medicare beneficiary before Medicare will pay for any items or services for that individual. Currently, the Medicare Part B deductible is $100 per year.

``Copayment'' (``coinsurance'') is the portion of the cost of an item or service which the Medicare beneficiary must pay.

Currently, the Medicare Part B coinsurance is generally 20 percent of the reasonable charge for the item or service. Typically, if the Medicare reasonable charge for a Part B item or service is $100, the Medicare beneficiary (who has met his [or her] deductible) must pay $20 of the physician's bill, and Medicare will pay $80.

Why Is it Illegal for ``Charged-Based'' Providers, Practitioners and Suppliers to Routinely Waive Medicare Copayment and Deductibles?

Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.

A ``charge-based'' provider, practitioner or supplier is one who is paid by Medicare on the basis of the ``reasonable charge'' for the item or service provided. 42 U.S.C. 1395u(b)(3); 42 CFR 405.501. Medicare typically pays 80 percent of the reasonable charge. 42 U.S.C. 1395l(a)(1). …

A provider, practitioner or supplier who routinely waives Medicare Co-payments or deductibles is misstating its actual charge. For example, if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a

> result of the                        supplier's misrepresentation, the Medicare program is
> paying $16                           more than it should for this item.
>      In certain cases, a provider, practitioner or supplier who
> routinely waives Medicare copayments or deductibles also could
>      be held liable under the Medicare and Medicaid anti-
> kickback                             statute. 42 U.S.C. 1320a-7b(b). The statute makes
> it illegal to                        offer, pay, solicit or receive anything of value as
> an inducement to                     generate business payable by Medicare or
> Medicaid. When                       providers, practitioners or suppliers
> forgive financial obligations        for reasons other than genuine
> financial hardship of the particular patient, they may be unlawfully
> inducing that patient to purchase    items or services from them….

> One important exception to the prohibition against waiving
> Co-payments and deductibles is that providers, practitioners or
> suppliers may forgive the copayment in consideration of a
> particular patient's financial hardship. This hardship exception,
> however, must not be used routinely; it should be used
> occasionally to address the special financial needs of a particular
> patient. Except in such special cases, a good faith effort to collect
> deductibles and copayments must be made….

77. Additionally, in 1994, in a Bulletin issued by the OIG of the U.S. Department of Health and Human Services ("HHS"), the anti-kickback provision of the OIG as it pertains to lab services is described as follows:

> How Does the Anti-Kickback Statute Relate to Arrangements for the
> Provision of Clinical Lab Services?
>
> Many physicians and other health care providers rely on the
> services of outside clinical laboratories to which they may refer high
> volumes of patient specimens every day. The quality, timeliness and
> cost of these services are of obvious concern to Medicare and Medicaid
> patients and to the programs that finance their health care services.
> Since the physician, not the patient, generally selects the clinical
> laboratory, it is essential that the physician's decision regarding
> where to refer specimens is based only on the best interests of the
> patient.

Whenever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business. The same is true whenever a referral source solicits or receives anything of value from the laboratory. By ``fair market value'' we mean value for general commercial purposes. However, ``fair market value'' must reflect an arms-length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them….

78. As far back as 1991, the Office of Inspector General  ("OIG") issued a Special Fraud Alert entitled "Routine Waiver of Copayments or Deductibles":

To help reduce fraud in the Medicare program, the Office of Inspector General is actively investigating health care providers, practitioners and suppliers of health care items and services who (1) are paid on the basis of charges and (2) routinely waive (do not bill) Medicare deductible and copayment charges to beneficiaries for items and services covered by the Medicare program.

79. OIG stated in another fraud alert/bulletin that Medicare fraud is evidenced by:

Routine use of ``Financial hardship'' forms which state that the beneficiary is unable to pay the coinsurance/deductible (i.e., there is no good faith attempt to determine the beneficiary's actual financial condition).

80. Under certain circumstances, such as the indigency or financial hardship of the patient, co-pays and deductibles may be legally waived. However, it is crucial that the physician, practice or facility document the circumstances. In order to qualify for hardship status and waiver of co-pay, Medicare regulations require that a "Financial Hardship Application" be filled out by the patient and approved. This

can't be a matter of routine, however, and should only be done when actual financial hardship and inability to pay are documented.

81. Again, in violation of the above fraud alerts and Medicare regulations, USPHV at the insistence of Assurex, made no attempts to collect co-pays from patients for buccal swab samples. Further, Relator never observed a patient of USPHV when collecting buccal swab samples fill out a hardship application to obtain a waiver of co-pay.

### 3. Assurex and USPHV Embarked on a Scheme to Conduct a GenesightRX Test on Virtually ALL of the Patient Population of USPHV

82. As described above, the so-called purpose of the GenesightRX test is to allegedly assist doctors (predominantly psychiatrists) with determining which medications might assist in treating a given patient. Notably, USPHV did NOT have a psychiatrist or any physician on staff or anyone with psychiatric training whatsoever. Dr. Ezukanma's specialty was pulmonology, and Dr. Etindi was a general practitioner. Thus, there was nobody at USPHV that was remotely qualified to test ANY patient to determine what psychiatric medications to prescribe.

83. Despite same, as described in detail below, USPHV and Assurex embarked on a mission to test as many of the patients of USPHV as possible. The routine administration of buccal swabs whether medically necessary or not is inappropriate under Medicare guidelines. First of all, there were no doctor's orders for these tests as required by Medicare before administering the test. There were literally hundreds if not thousands of swabs collected on USPHV patients without any doctor order stating that the buccal swab was medically necessary. When it was later determined by someone within USPHV that an order was required BEFORE

administering the buccal swab so that it was proper under Medicare regulations, Defendant Etindi was instructed to and did back date orders in some but not all of the patients' charts who had buccal swabs collected.

84. After collecting the buccal swabs, the drivers (including Relator) and others who collected the buccal swabs gave them to USPHV front desk personnel in sealed envelopes, who in turn would package up all of the buccal swabs for that day and ship them to the Assurex lab in Ohio for testing. Assurex would then voluntarily, knowingly, willfully, and intentionally bill or cause Medicare to be billed for the cost of the test, knowing that it was conducting testing on substantially all of the USPHV patient population without any medical necessity whatsoever for doing so.

85. Moreover, for what it was worth, Assurex would send the test results back to USPHV to put in the patients' charts, but to Relator's knowledge NOT ONCE was any treatment rendered to a patient based on the result of ANY test performed by Assurex. The sole purpose of doing the tests was for Assurex to voluntarily, knowingly, willfully and intentionally bill Medicare for the cost of the test to get paid for tests by Medicare knowing that they were not medically necessary for ANY purpose. Not once was the result of the test used to treat a patient.

86. With regard to Assurex billing Medicare for the GenesightRX tests on USPHV patients, (1) there were false statements by Defendant Assurex; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with Assurex billing Medicare for the GenesightRX tests on USPHV patients, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by Assurex to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were

submitted by Defendant Assurex to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

### 4. Abundant Proof of the "Who, What, When, Where and How" as to the Assurex Buccal Swab Collection and Testing Process

87. Attached hereto as Exhibit "A" under seal is a spreadsheet that sets forth in great detail the "who, what, where, when, and how" of the fraudulent claims as to the collection of the buccal swabs in question. The spreadsheet contains the name of each patient who had a buccal swab collected as of March 7, 2013, their address, their Medicare beneficiary number, the dates the buccal swabs were collected, the initials of the person treating them the day of collection of the buccal swab, and other pertinent information. This spreadsheet indicates that as of March 7, 2013, there were at least 200 patients documented to have had buccal swabs performed.

88. Astoundingly, that was not enough, as Assurex and USPHV got even more greedy in their desire to bill Medicare for as many GenesightRX tests as possible, whether medically necessary or not. At or about that time, that is when a concerted effort was being made to collect buccal swabs on virtually the entire patient population of USPHV. At that point, USPHV (with Assurex's assistance) began using Assurex's own web-based data facility and software to keep track of thousands of patients in the USPHV population. This system was set up so that both Assurex and USPHV would have access as to what patients had already had buccal swabs performed, and which ones had not yet so that the schedulers for USPHV could let the drivers and other personnel visiting home health care patients know which ones they needed to obtain swabs from—again with NO medical documentation in the patients' charts warranting same. From the point that USPHV began using the Assurex software going forward, the "who, what, when where and how" as to which

USPHV patients had buccal swabs done and when was equally within the knowledge of Assurex and USPHV.

89. Relator personally routinely used the Assurex database for the purposes set forth above. The sole purpose of USPHV using Assurex's database was to accurately capture and test virtually the entire USPHV patient portfolio without duplicating tests. Assurex and USPHV through the use of the lab's registry, by operation, ordered the tests on a majority of the USPHV patient portfolio. Defendant Assurex voluntarily, knowingly, willfully and intentionally fraudulently billed Medicare for these swabs knowing that in an overwhelmingly majority of the cases they were (a) not ordered by a doctor first, and (b) were not medically necessary in accordance with the Medicare guidelines and regulations set forth in detail above.

90. Interestingly, the chart attached as Exhibit "A" also include the dates of birth of the patients and it is indeed shocking the age of some of these patients. Assurex performed genetic testing without any medical justification whatsoever on a patient that was 100 years old at the time!! The Relator himself actually was instructed to and did collect the buccal swab on that patient (patient E. M.) whose date of birth was in 1912!! Several patients who had buccal swabs collected for genetic testing were in their 80's and 90's. In one day as demonstrated below Relator collected a buccal swab on patients that were 88 and 100 years old! Further, as Exhibit "A" reflects, buccal swabs were collected on a 92 year old man (P.M), a 91 year old man (E.C.), and two 93 year old ladies (E.J. and M.T.)!

91. Relator submits that it is a flagrant abuse of the system to systematically conduct testing on a majority of the USPHV population when it is doubtful that not even a single patient had a medical justification or reason to do so. These swabs were collected for one reason and one reason only—for Assurex to voluntarily, willfully,

knowingly and intentionally fraudulently bill Medicare for GenesightRX tests that it knew were not medically necessary, and/or with reckless disregard of the falsity of the claims it submitted to Medicare for GenesightRX testing.

### 5.  Relator's Personal Involvement in Administering Buccal Swabs

92. On September 14, 2012, and on many occasions before and after that date from 2012-2014, Relator was asked to obtain buccal swabs on ALL home healthcare patients that he was driving a Doctor or NP to see that day. That particular day, he went to see the scheduler, and was handed 13 charts of patients to see that day, along with 13 Assurex packages for which he was to obtain buccal swabs on all 13 patients! As it turned out, 5 of the patients were not home that day (so much for being home bound!) but ALL 8 of the others had buccal swabs collected!

93. The process was always the same. Relator would go to the scheduler, and was told how many patients that he and the doctor or NP were going to see that day. Regardless of whether it was 8, 10 or 13 patients or however many, Relator was ALWAYS given the charts of those patients and an equal number of Assurex buccal swab packages described below for the purpose of collecting buccal swabs for testing by Assurex on EVERY patient to be seen by them that day.

94. Further, as to the eight (8) patients that Relator personally was asked to collect buccal swabs for on September 14, 2012, none of them had any medical reason for getting the test other than for Assurex to voluntarily, willfully, knowingly and intentionally bill and receive payments from Medicare. Over the course of the next two years, Relator personally collected between 100 and 200 buccal swabs on patients, none of whom had a medical justification in their chart (which were in Relator's custody at the time) for doing so. On those occasions he would be a driver

for the medical professional seeing home health patients (whether a doctor such as Etindi or a Nurse Practitioner), and would collect the swab on all patients seen that day as instructed by USPHV. Other drivers collected these swabs during home health visits as well.

95. On September 14, 2012, Relator was the driver for Nurse Practitioner Ann Solomon. He was instructed to and did collect buccal swabs on EVERY single patient he and NP Solomon saw that day. Attached hereto as Exhibit "B" under seal is a list of the patients seen by Relator and Solomon that day. As reflected on Exhibit "B", they were scheduled to see 13 patients that day but 5 were not home. The other 8 patients ALL RECEIVED BUCCAL SWABS! What are the odds that ALL 8 patients seen that day were in need of a test to determine what psychiatric medication would be appropriate for them? Relator's handwriting is on Exhibit "B" and he indicated whether or not the patients were seen or not. The following 8 patients (names redacted) all seen by NP Solomon and Relator that day received buccal swabs:

(a) A. K.

(b) M. D.

(c) S. H.

(d) A. M.

(e) E. Meinart

(f) L. West

(g) A. Zavala

(h) J. Zavala

96. Notably, the last two patients listed above were a husband and wife who were seen at the same time at the same residence and BOTH of them received buccal

swabs! Again, what are the odds of both the husband and the wife needing to be evaluated for what type of psychiatric medication they should take?

97. Attached hereto collectively as Exhibit "C" under seal is an Assurex "Buccal Swab Sample Envelope" filled in by Relator with the names of the patients from whom he collected buccal swabs (the eight patients listed in Exhibit "B" who were home), their date of birth, the day the swab was collected (again all on the same day of September 14, 2012) and the collector's initials which in each of the 8 cases was GGB standing for Relator Gordon Grant Bachman. Relator had custody of each patient chart and there was not a single order for any of the 8 patients to receive a buccal swab prior to him collecting same. Additionally, on each of these envelopes was a phone number for Assurex for Relator or others with "questions" to call Assurex for assistance. Relator did in fact call Assurex at that phone number several times for guidance on collecting swabs, procedures to follow, etc.

98. After collecting the eight (8) buccal swabs, Relator placed the 8 swabs in 8 separate envelopes with the notation "AssureRx Health Outer Envelope" on each envelope. Attached hereto as Exhibit "D" and incorporated by reference is a photo of the 8 envelopes containing the 8 swabs Relator collected on September 14, 2012.

99. Attached hereto as Exhibit "E" and incorporated by reference is a photo of the entire contents of the Assurex package consisting of a swab, the form to fill out for each patient as reflected in Exhibit "C" above, as well as an insurance form to supposedly be filled out and submitted back to Assurex along with the buccal swab. Attached as Exhibit "F" and incorporated by reference is a more legible copy of the GenesightRX Insurance Information Form. Because all of the patients were on Medicare, Relator never filled out the insurance form, nor did any others to his knowledge.

100. Attached hereto as Exhibit "G" and incorporated by reference is a copy of the 8 envelopes for which swabs were collected bound together by a rubber band in Relator's backpack. Also reflected on Exhibit "H" is a photo of the actual patient charts in Relator's backpack that Relator was in charge of returning when he got back to the office either that day or the next morning depending on timing. Further, as did all drivers and others who collected the swabs, he took the 8 envelopes packaged together by rubber bands to the front desk, whereupon front desk personnel of USPHV would collect all of the buccal swabs collected by all USPHV personnel that day were sent to Assurex's lab in Ohio for testing.

101. Relator knows that the tests were actually performed by Assurex because in the course of his duties he routinely saw the results of the testing in patients charts after the testing was performed. (As set forth above, at times Relator was designated as Managing Director of USPHV). All of the patients in question were Medicare beneficiaries, and it is reasonable to infer that Assurex knowingly and intentionally billed Medicare and collected payment from Medicare for performing the tests on ALL of these Medicare beneficiaries. The information in Exhibits "A" through "H" is more than sufficient for Fed. R. Civ. Proc. Rules 8 and 9(b) to reasonably apprise Assurex of the nature of the claims against it as to the patients in question.

102. Relator would also show that he no longer had access to the Master Patient Lists after the middle of 2013, but knows that the collection of buccal swabs by USPHV and sending them to Assurex for testing continued because he personally continued to collect between 100 and 200 tests during the time period involved. Relator submits that discovery will reveal that at a minimum hundreds (if not thousands) of additional Medicare beneficiaries had tests performed without any medical reason or necessity whatsoever to do so.

### 6. Relator has Provided a "Reasonable Inference" that Assurex Knowingly and Intentionally Submitted False Claims to Medicare

103. Relator did not personally observe any employee from Assurex send a claim for payment from any of its tests to Medicare, nor does he need to have observed same to comply with the FCA and Rule 9(b) pleading standards. Pursuant to existing Fifth Circuit case law, a Relator can properly provide circumstantial evidence that false claims were submitted as it is not necessary to prove with certainty the existence of such a claim at all. Rather, all False Claims Act claims must be proven by a preponderance of the evidence (31 U.S.C. § 3731(d)), and the burden on a relator is simply to prove that it is more likely than not that such claims occurred. As pointed out by the seminal Fifth Circuit decision in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009)*,* under the False Claims Act, no specific claim need be proven, even at trial:

> **If at trial a qui tam plaintiff proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme . . . a reasonable jury could infer that more likely than not the defendant presented a false bill to the government**, this despite no evidence of the particular contents of the misrepresentation. (emphasis added)

104. A reasonable inference and "Reliable indicia" that Assurex "presented false bill[s] to the Government" per *Grubbs* can be proven by the following:

(a) Buccal swabs for Assurex to perform GenesightRX testing were collected in Texas from hundreds if not thousands of Medicare beneficiaries, some of which were collected by the Relator himself;

(b) Relator knows that the buccal swabs were preserved in Assurex labelled envelopes and that they were shipped for testing in Ohio at the lab of Assurex; and

---

**PLAINTIFF'S THIRD AMENDED COMPLAINT**                                                **Page 44**

(c) Relator knows that the tests were performed because in the course of his duties he observed the results of the tests in the patients' charts after the testing was completed.

105. Based on those and other factors set forth above, it is more than reasonable to infer that Defendant Assurex voluntarily, willfully, knowingly and intentionally submitted claims to Medicare for the cost of the GenesightRX tests that it received from USPHV given that ALL of the patients for who tests were performed were Medicare beneficiaries. These were false claims as defined by the FCA, some for testing on patients that were as much as 100 years old!! What 100 year-old patient needs psychiatric testing to see what psychiatric drug he or she should be on?

**7. The Raid of Certain Defendants Resulting in the Seizure of Evidence Depriving Relator of Access to Material Evidence Against Assurex Which Had Nothing to do with the Raid**

106. Just days prior to the Raid described in Section A above in detail, (which Relator had no idea was going to occur), Relator met with representatives of several government agencies, and gave a detailed account of what documents could be found where, where the flash drives with evidence would be stored, which computers belonged to whom and where they were located, and provided a diagram of the facilities that were shortly thereafter the subject of the Raid. During this Raid thousands of pages of documents were confiscated, and all computers and data (flash drives, etc.) in the company were confiscated as well in connection with same. Some of the data and evidence seized pertained to the business between USPHV and Assurex. Again, the two owners of USPHV (Parcon and Ezukanma) are currently serving ten (10) years in prison for Medicare fraud for activities taking place at or about the same time as the interaction between USDPHV and Assurex.

107. Unfortunately for Plaintiff, the documents that were seized by the government in 2014 remain seized and are not available to Plaintiff to assist in proving his allegations against most of the Defendants, including Assurex, at this time. Relator had planned to obtain copies of as much evidence as possible just prior to his departure (which was going to be in the not too distant future in relation to the Raid) against Assurex, Dallas Medical Center, and the other Defendants herein. If Relator had any inkling or advance notice that the Government was going to come in to the headquarters where he worked (he was present when the Raid began but asked to leave the premises like everyone else) and seize every document he described in detail, he of course would have made copies of as much evidence as possible beforehand.

108. Beginning in 2016 and continuing until present, Relator's counsel has made multiple attempts to obtain those documents from the criminal prosecutor in Dr. Ezukanma's case to no avail—she has steadfastly refused to allow any access to same because Ezukanma's case is on appeal. This is patently unfair given that Relator is the original source of the existence of those documents and if Relator had never come forward the Government would have never even known they existed. Yet now Relator is being denied access to the very documents that would assist in proving his case against Assurex and other Defendants having nothing to do with the criminal case. That is an absurd and unjust result!  It is patently unfair to this Relator to bring a case good enough that some Defendants are serving ten years in prison, yet documents having nothing whatsoever to do with the criminal trial or appeal thereof essentially remain held hostage by the Government.

109. Moreover, Relator's case is the subject of a Motion to Dismiss by Assurex and other Defendants, one contention being the lack of documentation of Relator's claims for Rule 9(b) purposes. Relator is indeed aware of many, many documents showing the culpability of Defendant Assurex and the other Defendants herein which would be material to defeating said Motions—he worked with many of these very documents day in and day out for several years.

110. Of all the documents seized by the Government, it turned out that the documents were only pertinent to only one Defendant out of dozens of Defendants in this case. As it turned out, they were only applicable to one of the four Defendants who were criminally prosecuted. Defendants Parcon, Etindi and Gaines pled guilty. Defendant Ezukanma elected to go to trial, and a very small portion of the documents seized were used in his criminal trial. He was convicted of Medicare fraud in the summer of 2017, and sentenced to ten (10) years in prison and he is currently incarcerated. He has appealed his conviction, however, being a reason given by the government that it cannot allow Relator or his counsel access to the seized documents at this time. Parcon is likewise serving ten (10) years and is currently incarcerated. Defendant Etindi, who cooperated in the criminal trial against Defendant Ezukanma, was sentenced to thirty (30) months in prison, and is currently incarcerated. Defendant Gaines has yet to be sentenced.

111. Plaintiff will be filing (if necessary) at the appropriate time a Motion to Compel the Government to produce documents having nothing to do with the appeal of Dr. Ezukanma's criminal trial such that Plaintiff can put his best forward with evidence in opposition to the pending and subsequent Motions to Dismiss. In the alternative, Plaintiff would request that any rulings on said Motions to Dismiss and certainly the trial of this matter be delayed until such time those documents are

available. In this regard, Plaintiff contends that Assurex violated the anti-kickback statute by giving money and/or other inducements to Parcon and/or USPHV, and the documents in question will show what that was. Otherwise, this whole plan to give Assurex access to most every patient to conduct unnecessary psychiatric genetic testing make no sense. Plaintiff reserves the right to plead this cause of action and what exactly that remuneration was upon discovery of same in the documents that were seized.

## C. FACTS PERTAINING TO DALLAS MEDICAL CENTER

112. The conspiracy between Defendant USPHV and Defendant Dallas Medical Center worked similarly to the referrals to the home health agencies discussed above. Doctors (at the time—they no longer have a medical license) Ezukanma and/or Etindi would certify patients referred to Defendant Dallas Medical Center as needing to be hospitalized knowing that treatment was not needed and/or knowing that if a referral was made to Dallas Medical Center that improper claims would be submitted to Medicare.

113. Relator was personally aware from his interactions with Dallas Medical Center and conversations he had with Defendant Parcon that Defendant Dallas Medical Center routinely voluntarily, willfully,  knowingly and intentionally  (a) billed Medicare for hospital services that were not medically necessary; (b) engaged in upcoding of procedures that were performed; and (c) allowed patients to stay much longer than needed for given procedures than was medically necessary, all for the purpose of voluntarily, willfully, knowingly and intentionally bill Medicare for false claims under the FCA. Relator knew that patients stayed longer than medically necessary because patients would often complain about the length of their stays after being discharged from Dallas Medical Center, and a review of the chart would often

show that stays were much longer than medically necessary. Notably, Dr. Etindi himself filed his own qui tam whistleblower Complaint against Dallas Medical Center for that very reason, alleging that he referred a couple of patients who at most should have stayed 2 or 3 days on one occasion and 3-5 days on another were permitted to stay more than 30 days each! *U.S. ex. rel. Etindi v Dallas Medical Center*, Cause No. 3-13-cv-3010-B, p.3, pars. 11-12.

114. Relator was also involved with interactions with representatives of Dallas Medical Center soliciting patients from USPHV because it knew Doctors (at the time) Etindi and/or Ezukanma would certify a given patient as needing hospital services whether needed or not. Despite Parcon's knowledge of same, she routinely referred patients to Defendant Dallas Medical Center.  In its Motion to Dismiss, Dallas Medical Center alleged that Plaintiff could not point to any individuals involved in the scheme to defraud Medicare. To the contrary, in terms of who was involved in connection with these false claims being submitted and when it took place, the following series of emails between Dallas Medical Center and USPHV reveals some of the "who, what, when, where and how" of the scheme took place. Indeed, on several of the emails (some of which involved the Relator) it is revealed that Raji Kumar, the President of Dallas Medical Center, was involved in setting the fax process up to obtain referrals from USPHV, knowing that the purpose of said referrals was to voluntarily, willfully, knowingly and intentionally bill Medicare for false claims under the FCA. The "who" for Rule 9(b) purposes) from Dallas Medical Center were Kumar, the CEO, Amy Parker-Ferguson MEd, BS, RN, LP, NREMT-P Chief Nursing Officer for Dallas Medical Center, as well as Morgan Howard, Nursing Administrative Assistant, and Dennis Webb from Dallas Medical Center. The pertinent e-mails setting the scheme in motion (and "how" and "when" [early 2012] for Rule 9(b) purposes) were as follows:

From: **us physicians** <usphysicians@hotmail.com>
Date: Fri, Feb 17, 2012 at 2:46 PM
Subject: FW: US Physicians Fax Sheet
To: ggbachman@gmail.com, morgan.howard@dallasmedcenter.com,
amy.parker@dallasmedcenter.com


*hello grant,*
*here is the new form we  used at dmc .....tks a lot best merna*
*pls do fax patient betty bailey asap...*
*hello morgan,*
*can you please forward info to amy asap so she can arrange transport today*
*before 4 30 pm....tks a lot*
*grant phone number is 214-920-9776*


Subject: US Physicians Fax Sheet
Date: Thu, 16 Feb 2012 14:26:55 -0600
From: Morgan.Howard@dallasmedcenter.com
To: AMY.Parker@dallasmedcenter.com; usphysicians@hotmail.com; DL-
DMC-Nurse-Supervisors@dallasmedcenter.com;
Dennis.Webb@dallasmedcenter.com

Hi All,

I have attached a copy of the US Physician Fax Sheet. If you have any
questions please email me or call me at the # below.

Merna – Can you also make sure that Grant has a copy of this? I do not have
his phone number or email.

Thank you and have a great day!

Morgan Howard
Nursing Administration Assistant
Dallas Medical Center
**972-888-7248**
**972-888-7144** fax
**morgan.howard@dallasmedcenter.com**

---------- Forwarded message ----------
From: **us physicians** <usphysicians@hotmail.com>
Date: Wed, Feb 8, 2012 at 12:45 PM
Subject: RE: wound referrals
To: ggbachman@gmail.com, amy.parker@dallasmedcenter.com

tks grant and amy...best merna

---

From: ggbachman@gmail.com
Date: Wed, 8 Feb 2012 12:04:34 -0600
Subject: Re: wound referrals
To: AMY.Parker@dallasmedcenter.com
CC: usphysicians@hotmail.com

Ms. Parker,

I have faxed to your assistant, Morgan Howard, the patient materials of Tom Joiner.

If you have any questions, please call me at 214-920-9776.

Regards,

Grant

On Wed, Feb 8, 2012 at 11:26 AM, AMY Parker <AMY.Parker@dallasmedcenter.com> wrote:

Utilize fax number 972-888-7144

Attention : Morgan  Howard

Amy Parker-Ferguson MEd, BS, RN, LP, NREMT-P
Chief Nursing Officer for Dallas Medical Center
Emergency Preparedness & Education Coordinator
Office: 972-888-7100
Fax: 972-888-7146
Cell: 214-563-1816

---

**From:** us physicians [mailto:usphysicians@hotmail.com]
**Sent:** Wednesday, February 08, 2012 10:47 AM
**To:** AMY Parker
**Cc:** Raji Kumar; ggbachman@gmail.com
**Subject:** wound referrals

*tks amy..*
*grant our us physicians referral- in -charge to fax you the*
*demographics*
*and physical at your fax 972-888-7146..*
*thank you for your prompt response best merna*

---

Date: Tue, 7 Feb 2012 18:30:42 -0600
From: AMY.Parker@dallasmedcenter.com
To: usphysicians@hotmail.com
CC: Raji.Kumar@dallasmedcenter.com

Myrna

I wanted to reach out and discuss the wound patients you had
mentioned coming to DMC. Could you give me more details with
these patients so I may properly accommodate you.

Thanks

Amy Parker-Ferguson MEd, BS, RN, LP, NREMT-P
Chief Nursing Officer for Dallas Medical Center
Emergency Preparedness & Education Coordinator
Office: 972-888-7100
Fax: 972-888-7146
Cell: 214-563-1816

115. Attached hereto as Exhibit "H" and incorporated by reference is the fax
cover sheet that began use in February of 2012 and continued until Relator left the
employ of USPHV and related entities toward the end of 2014, answering the
question of "when" this scheme took place with precision. The patients involved
who Dallas Medical Center billed for unnecessary services, upcoding and the like,

are revealed on copies of the fax forms that were seized during the raid discussed above. Although Relator does not currently possess the names of those patients, he knows exactly what documents (copies of the fax sheets and the charts of the patients for whom a fax was sent referring those patients for treatment) will show those patients for whom improper billing to Medicare took place.

116.  Unfortunately, as described in more detail in Section B above, these documents are in the possession of the federal government, and despite multiple attempts to obtain those documents by Relator's counsel from the government, the government has indicated that while Dr. Ezukanma's criminal appeal is pending, those documents cannot be released to Relator or anyone. Further, Dallas Medical Center is in possession of these fax sheets received by it and hence is in the best position to know what patients (the "who" for Rule 9(b) purposes) were billed for services to Medicare, and who in its billing office submitted the claims to Medicare, so it is given fair notice of the patients involved—those whose referrals were faxed by USPHV (including by Relator on occasion)—and also knows who within its facility (likely the billing department as in most cases) submitted the claims to Medicare. Once the form was faxed referring a patient, it was forseeable that Medicare would be billed for unnecessary services, and Relator has provided a reliable indicia that false claims were submitted by Dallas Medical Center to Medicare.

117.  With regard to Dallas Medical Center billing Medicare for medical services that were not medically necessary, (1) there were false statements by Defendant Dallas Medical Center; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with Dallas Medical Center billing Medicare for services that were not medically necessary, there were (1) false

or fraudulent claims; (2) which were presented, or caused to be presented, by Dallas Medical Center to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by Defendant Dallas Medical Center to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## D.  SUMMARY OF FALSE
## <u>CLAIMS ACT VIOLATIONS</u>

118.  A "Claim" as defined in Section 3730 of the FCA as follows:

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy  with no restrictions on that individual's use of the money or property.

A "False Claim" under Section 3729 of the FCA is defined as follows:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property…or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

119. Utilizing the foregoing definitions of a False Claim set forth above in the FCA, a summary of the categories of False Claims voluntarily, willfully, knowingly and intentionally with the requisite scienter submitted by the Defendants set forth above that Relator is aware of include, but are not limited to, the following:

(a) Billing Medicare voluntarily, willfully, knowingly, intentionally for services rendered to "patients" by Defendants USPHV, Avein Group, Inc. D/B/A Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC, knowing that said patients had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi;

(b) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendants USPHV, Avein Group, Inc. D/B/A Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services,   Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(c) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendants Avein Group, Inc. D/B/A Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; Syam Home Healthcare, LLC and USPHV were "home bound" when they had not even examined the patient first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(d) Billing Medicare voluntarily, willfully,  knowingly, and intentionally by Defendants Ezukanma, Etindi UNEC and/or Medpro for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.;Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta HomeHealth Services Inc.; Syam Home Healthcare, LLC.;  and USPHV, after certifying to Medicare that said patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(e) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma, Etindi, UNEC and/or Medpro for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.;Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; Syam Home Healthcare, LLC.; and USPHV, after certifying to Medicare that said patients were "home bound" when they had not even examined the patient

first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(f) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for services that were not medically necessary as described above and incorporated herein by reference;

(g) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for upcoding of services that were performed as described above and incorporated herein by reference;

(h) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for any services that were performed at its hospital for patients who were improperly certified as needing to be hospitalized as described above and incorporated herein by reference;

(i) Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, and intentionally submitting claims to Medicare for services that were medically unnecessary as described above and incorporated herein by reference;

(j) Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, intentionally submitting claims to Medicare for services that were upcoded as described above and incorporated herein by reference;

(k) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying that patients referred to Dallas Medical Center needed to be hospitalized knowing that they did not need hospitalization;

(l) Billing Medicare voluntarily, willfully, knowingly, and intentionally for systematic administering buccal swab testing by Defendants Assurex, and Parcon whether medically warranted or not as described above and incorporated herein by reference;

(m) Defendant Assurex voluntarily, willfully, knowingly, and intentionally submitting claims to and billing Medicare for Genesight tests after buccal swabs were obtained from USPHV and/or other Defendants that it knew were not medically necessary given that Assurex knew it was billing for GenesightRX tests on a significant percentage of USPHV's entire patient population whether medically warranted or not;

(n) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for services rendered to patients when they billed code 99354 on 98% of the approximate 27,000 patients they billed Medicare representing to Medicare that they had spent 90 minutes with each payment when they knew they had only spent on average 15-20 minutes with a patient;

(o) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for over 24 hours per day collectively on dozens of occasions from 2010 through early 2013, including at least 15 times they billed over 100 hours in one day!;

(p) Signing of Form 485 Certification Forms by Defendants Ezukanma Etindi and Maese who had not examined patients prior to doing so as   described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(q) Forging of Form 485 Certification Forms by Defendants Parcon and Cua and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(r) Billing Medicare by Defendant Maese for certifying to Medicare that patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(s) Signing of Conditions of Participation forms by Defendant Cua and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms when the forms should be signed by doctors as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(t) Improper referrals for DME's by Defendants USPHV, Ritz,  Rizli  and Parcon in violation of Stark Law as described above and  incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(u) Improper referrals to home health agencies not owned by USPHV, including but not limited to Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, and Beta Home Health as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(v) Improper referrals and fraudulent billings to Medicare by Defendant Rizli, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(w) Improper referrals and fraudulent billings to Medicare by Defendant Ritz, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(x) Improper referrals and fraudulent billings to Medicare by Defendant Maese, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(y) Assurex systematically waiving of co-pays on all patients of USPHV causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare; and

(z) Billing Medicare for medically unnecessary services by each and every Defendant to this action as described above and incorporated herein by reference.

120. With regard to each of the foregoing allegations (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the

alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## VI. CAUSES OF ACTION

### COUNT ONE-- SUBSTANTIVE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
[31 U.S.C. §§ 3729(a)(A), (B),(D) and (G)]]

121. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

122. This is a claim for treble damages, civil penalties and forfeitures under the FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, as amended.

123. Through the acts described above, the Defendants, by and through their officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants USPHV, Dallas Medical Center, AssureRx, and the other corporate Defendants listed above authorized and ratified all the violations of the FCA committed by their respective officers, agents, and employees.

124. Through the acts described above and otherwise, defendants knowingly used false records and statements to conceal, avoid, and/or decrease the Defendants'

obligations to repay money to the United States Government that the defendants improperly and/or fraudulently received. Defendants also failed to disclose to the United States Government material facts that would have resulted in substantial repayments by the Defendants to the United States Government and the State of Texas.

## A. HOME HEALTH AGENCIES, PARCON AND CUA

125. If the U.S. Government had known that Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health,Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC.; were billing Medicare for services rendered knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Each such Defendant received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove

that they should not have received had the material fact set forth above been disclosed. The owners of each such Defendant are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

126. If the U.S. Government had known that Defendants USPHV, Parcon, and Cua were billing Medicare for services rendered knowing that patients for which billings were submitted had been improperly certified as being "homebound" because Conditions of Participation forms had been signed by Defendant Cua and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms when all of said Defendants knew that the forms had to be signed by doctors to be in compliance with Medicare regulations, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, individually and/or by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Each such Defendant received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received had the material facts set forth above been disclosed. The owners of USPHV, including but not limited to Defendants Gaines,

Parcon, and Ezukanma, are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

127. With regard to each of the foregoing allegations in this Section A (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## B. DOCTORS EZUKANMA, ETINDI, UNEC, MEDPRO AND MAESE

128. If the U.S. Government had known that Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC and/or Medpro were billing Medicare for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC.; and/or other home health agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in

the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC and/or Medpro received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed. The owners of UNEC and Medpro are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

129. If the U.S. Government had known that Defendants Ezukanma, Etindi and/or Maese were billing Medicare for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC.; and/or other home health agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendants Ezukanma, Etindi and/or Maese because they had signed Form 485 Certification Forms when they had not examined patients prior to doing so, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government this material fact that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first

instance. In this regard, each of the Defendants listed above(i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Etindi USPHV, and AGood received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material fact set forth above had been disclosed.

130. If the U.S. Government had known that Defendants Ezukanma and/or Etindi were billing Medicare for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC., and/or other home health care agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" because they had allowed employees of USPHV, including but not limited to Defendants Cua and Parcon, to forge their signatures on Form 485 Certification Forms when Defendants Ezukanma and/or Etindi had not examined patients prior to them doing so, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above(i) knowingly presented, or caused to be presented, to the United States

Government,  false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Etindi and Maese received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

131. If the U.S. Government had known that Defendants Ezukanma, Ezuknma, M.D., and/or Etindi were billing Medicare for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care; Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC., and/or other home health care patients knowing that Defendants Ezukanma, Ezuknma, M.D., and/or Etindi billed code 99354 on approximately 98% of the approximate 27,000 patients they billed Medicare, thereby  representing to Medicare that they had spent 90 minutes with each patient when they knew they had only spent on average 15-20 minutes with each patient, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Ezukanma, and Etindi, individually, and  Ezuknma, M.D., by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United

States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., and Etindi received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

132. If the U.S. Government had known that Defendants Ezukanma and/or Etindi were billing Medicare for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care; Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC, and/or other home health care patients knowing that Defendants Ezukanma and/or Etindi had billed Medicare for over 24 hours per day collectively on dozens of occasions from 2010 through early 2013, including at least 15 times they billed over 100 hours in one day, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Ezukanma, and Etindi (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved

by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., and Etindi received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

133. If the U.S. Government had known that Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC and/or Medpro were billing Medicare for services rendered to patients of Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health,Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC, and/or other home health agencies knowing that patients for which billings were submitted by Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC and/or Medpro had not even examined first by Defendants Ezukanma and Etindi to determine whether or not they were not home bound per Medicare guidelines and for that reason had been improperly certified by Defendants Ezukanma and/or Etindi as being "homebound" under Medicare guidelines set forth above by, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent

claim paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC and/or Medpro received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received. The owners of UNEC and Medpro are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

134. If the U.S. Government had known that Defendant Maese was billing Medicare for services rendered to patients of home health agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendant Maese, Medicare would not have paid those claims. Said Defendant failed to disclose to the United States Government this material fact that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendant Maese (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant Maese received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that he should not have received if the material fact set forth above had been disclosed.

135. With regard to each of the foregoing allegations in this Section B (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## C. DALLAS MEDICAL CENTER

136. If the U.S. Government had known that Defendant Dallas Medical Center was billing Medicare for services that (a) were not medically necessary and/or (b) for upcoding of services that were performed on patients, (c) for services rendered to patients who were improperly certified to receive treatment, and/or (d) services for patient stays much longer than medically warranted, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendant Dallas Medical Center, by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant

Dallas Medical Center received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received. The owner and parent of Defendant Dallas Medical Center, Prime Healthcare Services, is jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

137. If the U.S. Government had known that Defendant Dallas Medical Center was billing Medicare for services pursuant to an arrangement whereby Defendants Parcon/USPHV and Dallas Medical Center had a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be submitting claims to Medicare for services that (a)were not medically necessary and/or (b) for upcoding of services that were performed on patients , Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Dallas Medical Center, by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant Dallas Medical Center received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received. The owner and parent of Defendant Dallas Medical Center, Prime Healthcare Services, is jointly

and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

138. With regard to each of the foregoing allegations in this Section C (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## D. ASSURERX GENESIGHTRX TESTING FALSE CLAIMS

139. If the U.S. Government had known that Defendants  AssureRx, USPHV and Parcon were billing Medicare for services rendered to patients of USPHV for the systematic administering of GenesightRX testing on an overwhelming majority of said Defendants entire patient population whether medically warranted or not, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii)

knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants AssureRx, USPHV, and Parcon received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received. The owners of Defendants AssureRx and USPHV are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

140. If the U.S. Government had known that Defendants  AssureRx, USPHV, and Parcon were billing Medicare for services rendered to patients of USPHV for the systematic administering of GenesightRX testing without a doctor's order for each such buccal swab collected for purposes of GenesightRX testing prior to it being performed, whether medically warranted or not, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants AssureRx, USPHV and Parcon received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received. The owners of Defendants AssureRx and USPHV are

jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

141. If the U.S. Government had known that Defendant AssureRx systematically billed Medicare for GenesightRX testing rendered to the entire patient population of Defendant USPHV whether medically warranted or not and/or that USPHV even maintained its data base for patients who had been administered buccal swabs in the office of AssureRx in order for Assurex to ensure that all of its patients received buccal swabs, Medicare would not have paid those claims. AssureRx failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, AssureRx, by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant AssureRx received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received. The owners of Defendants AssureRx and USPHV are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

142. If the U.S. Government had known that Defendant Assurex was systematically waiving co-pays on all of the patients of USPHV who had buccal swabs collected for GenesightRX testing (and had instructed USPHV that it would

not attempt to collect any such co-pay) whether medically necessary or not in violation of Medicare guidelines, Medicare would not have paid claims resulting from those claims for which co-pays were waived as it resulted in Medicare paying more than it should have for each such claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendant Assurex, by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Assurex received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received.

143. With regard to each of the foregoing allegations in this Section D (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## E.  DEFENDANTS RITZ AND RIZLI

144. If the U.S. Government had known that Defendants  Ritz and Rizli were making improper DME and other referrals on all or substantially all of their patients whether medically necessary or not in violation of Medicare guidelines, Medicare would not have paid said claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Ritz and Rizli, individually and/or by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants AGood and USPHV received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received. The owners of Ritz are jointly and severally liable for these False Claims.

145. With regard to each of the foregoing allegations in this Section E (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were

false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## F. SUMMARY OF FALSE CLAIMS

146. The term "claim" as defined in Section 3730 of the FCA as:

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

147.  A False Claim under Section 3729 of the FCA is defined as follows:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property…or

(G) knowingly makes, uses, or causes to be made or used, a false  record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $ 5,000 [currently approximately $5,500] and not more than $ 10,000 [currently approximately $11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

148.   Additionally, Plaintiff/Relator on behalf of the U.S. Government is entitled to recover civil monetary penalties pursuant to the following statutes:

42 U.S.C. §1320a–7a. Civil Monetary Penalties

*(A) IMPROPERLY FILED CLAIMS*

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that—

(1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or

agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines—

> (A) is for a medical or other item or service that the person knows or should know was not provided as claimed, including any person who engages in a pattern or practice of presenting or causing to be presented a claim for an item or service that is based on a code that the person knows or should know will result in a greater payment to the person than the code the person knows or should know is applicable to the item or service actually provided,
> (B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,
> (C) is presented for a physician's service (or an item or service incident to a physician's service) by a person who knows or should know that the individual who furnished (or supervised the furnishing of) the service—
>
> > (i) was not licensed as a physician,
> > (ii) was licensed as a physician, but such license had been obtained through a misrepresentation of material fact (including cheating on an examination required for licensing), or
> > (iii) represented to the patient at the time the service was furnished that the physician was certified in a medical specialty by a medical specialty board when the individual was not so certified,
>
> (D) is for a medical or other item or service furnished during a period in which the person was excluded from the Federal are program (as defined in section 1320a–7b(f) of this title) under which the claim was made pursuant to Federal law.
> (E) is for a pattern of medical or other items or services that a person knows or should know are not medically necessary;

(2) knowingly presents or causes to be presented to any person a request for payment which is in violation of the terms of (A) an assignment under section 1395u(b)(3)(B)(ii) of this title, or (B) an agreement with a State agency (or other requirement of a State plan under subchapter XIX of this chapter) not to charge a person for an item or service in excess of the amount

permitted to be charged, or (C) an agreement to be a participating physician or supplier under section 1395u(h)(1) of this title, or (D) an agreement pursuant to section 1395cc(a)(1)(G) of this title;

(3) knowingly gives or causes to be given to any person, with respect to coverage under subchapter XVIII of this chapter of inpatient hospital services subject to the provisions of section 1395ww of this title, information that he knows or should know is false or misleading, and that could reasonably be expected to influence the decision when to discharge such person or another individual from the hospital;

(4) in the case of a person who is not an organization, agency, or other entity, is excluded from participating in a program under subchapter XVIII of this chapter or a State health care program in accordance with this subsection or under section 1320a–7 of this title and who, at the time of a violation of this subsection—

> (A) retains a direct or indirect ownership or control interest in an entity that is participating in a program under subchapter XVIII of this chapter or a State health care program, and who knows or should know of the action constituting the basis for the exclusion; or
> (B) is an officer or managing employee (as defined in section 1320a–5(b) of this title) of such an entity;

(5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a–7(h) of this title) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this chapter, or a State health care program (as so defined);

(6) arranges or contracts (by employment or otherwise) with an individual or entity that the person knows or should know is excluded from participation in a Federal health care program (as defined in section 1320a–7b(f) of this title), for the provision of items or services for which payment may be made under such a program;

(7) commits an act described in paragraph (1) or (2) of section 1320a–7b(b) of this title;

(8) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program; or
(9) fails to grant timely access, upon reasonable request (as defined by the Secretary in regulations), to the Inspector General of the Department of Health and Human Services, for the purpose of audits, investigations, evaluations, or other statutory functions of the Inspector General of the Department of Health and Human Services;

(8) orders or prescribes a medical or other item or service during a period in which the person was excluded from a Federal health care program (as so defined), in the case where the person knows or should know that a claim for such medical or other item or service will be made under such a program;
(9) knowingly makes or causes to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a Federal health care program (as so defined), including Medicare Advantage organizations under part C of subchapter XVIII, prescription drug plan sponsors under part D of subchapter XVIII, medicaid managed care organizations under subchapter XIX, and entities that apply to participate as providers of services or suppliers in such managed care organizations and such plans;

(10) knows of an overpayment (as defined in paragraph (4) of section 1320a–7k(d) of this title) and does not report and return the overpayment in accordance with such section;

shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; in cases under paragraph (7), $50,000 for each such act, in cases under paragraph (8), $50,000 for each false record or statement, or  in cases under paragraph (9), $15,000 for each day of the failure described in such paragraph; or in cases under paragraph (9), $50,000 for each false statement or misrepresentation of a material fact). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States

or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose; or in cases under paragraph (9), an assessment of not more than 3 times the total amount claimed for each item or service for which payment was made based upon the application containing the false statement or misrepresentation of a material fact).

149. Utilizing the foregoing definitions of a False Claim set forth above in the FCA, a summary of the categories of False Claims voluntarily, willfully, knowingly and intentionally submitted by the Defendants set forth above that Relator is aware of include, but are not limited to, the following:

(a) Billing Medicare voluntarily, willfully, knowingly, intentionally for services rendered to "patients" by Defendants USPHV, Avein Group, Inc. D/B/A Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC, knowing that said patients had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi;

(b) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendants USPHV, Avein Group, Inc. D/B/A Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services,   Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; and Syam Home Healthcare, LLC were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(c) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendants Avein Group, Inc. D/B/A Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health

Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; Syam Home Healthcare, LLC and USPHV were "home bound" when they had not even examined the patient first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(d) Billing Medicare voluntarily, willfully,  knowingly, and intentionally by Defendants Ezukanma, Etindi UNEC and/or Medpro for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.;Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta HomeHealth Services Inc.; Syam Home Healthcare, LLC.;  and USPHV, after certifying to Medicare that said patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(e) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma, Etindi, UNEC and/or Medpro for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.;Elim Home Health, Inc.;Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; Syam Home Healthcare, LLC.; and USPHV, after certifying to Medicare that said patients were "home bound" when they had not even examined the patient first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(f) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for services that were not medically necessary as described above and incorporated herein by reference;

(g) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for upcoding of services that were performed as described above and incorporated herein by reference;

(h) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for any services that were performed at its hospital for patients who were improperly certified as needing to be hospitalized as described above and incorporated herein by reference;

(i) Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, and intentionally submitting claims to Medicare for services that were medically unnecessary as described above and incorporated herein by reference;

(j) Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, intentionally submitting claims to Medicare for services that were upcoded as described above and incorporated herein by reference;

(k) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying that patients referred to Dallas Medical Center needed to be hospitalized knowing that they did not need hospitalization;

(l) Billing Medicare voluntarily, willfully, knowingly, and intentionally for systematic administering buccal swab testing by Defendants Assurex, and Parcon whether medically warranted or not as described above and incorporated herein by reference;

 (m) Defendant Assurex voluntarily, willfully, knowingly, and intentionally submitting claims to and billing Medicare for Genesight tests after buccal swabs were obtained from USPHV and/or other Defendants that it knew were not medically necessary given that Assurex knew it was billing for GenesightRX tests on a significant percentage of USPHV's entire patient population whether medically warranted or not;

(n) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for services rendered to patients when they billed code 99354 on 98% of the approximate 27,000 patients they billed Medicare representing to Medicare that they had spent 90 minutes with each payment when they knew they had only spent on average 15-20 minutes with a patient;

(o) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for over 24 hours per day collectively on

dozens of occasions from 2010 through early 2013, including at least 15 times they billed over 100 hours in one day!;

(p) Signing of Form 485 Certification Forms by Defendants Ezukanma Etindi and Maese who had not examined patients prior to doing so as   described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(q) Forging of Form 485 Certification Forms by Defendants Parcon and Cua and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(r) Billing Medicare by Defendant Maese for certifying to Medicare that patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(s) Signing of Conditions of Participation forms by Defendant Cua and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms when the forms should be signed by doctors as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(t) Improper referrals for DME's by Defendants USPHV, Ritz,   Rizli   and Parcon in violation of Stark Law as described above and  incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(u) Improper referrals to home health agencies not owned by USPHV, including but not limited to Defendants Superior Home Health, Padez, Acute, Mam Unique, Machris, and Beta Home Health as   described above    and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(v) Improper referrals and fraudulent billings to Medicare by Defendant Rizli, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(w) Improper referrals and fraudulent billings to Medicare by Defendant Ritz, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(x) Improper referrals and fraudulent billings to Medicare by Defendant Maese, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(y) Assurex systematically waiving of co-pays on all patients of USPHV causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(z) Billing Medicare for medically unnecessary services by each and every Defendant to this action as described above and incorporated herein by reference.

150. With regard to each of the foregoing allegations (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

151. The United States Government and its citizens have been damaged as a result of the Defendants' violations of the FCA. Accordingly, Relator requests that he be awarded 30% of the Recovery because the U.S. Government has elected not to intervene in this action at this time, plus all attorneys' fees, costs and expenses incurred pursuant to the FCA which provides in pertinent part:

### § 3730. Civil Actions for False Claims

(d) AWARD TO QUI TAM PLAINTIFF

(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. …Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

## COUNT TWO—FEDERAL FALSE
## CLAIMS ACT CONSPIRACY
## [31 U.S.C. §§ 3729(C)]

152. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

153. This is a claim for treble damages, civil penalties and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

154. Through the acts described above and otherwise, the Defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the United States government by getting false and fraudulent claims allowed or paid. Defendants have also conspired with each other and with unnamed co-conspirators to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to the Defendants. Defendants have taken substantial steps in furtherance of those conspiracies by submitting False Claims for payment or approval that contained these improper charges, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices and those of their co-Defendants, as well.

155. The Medicare program, unaware of Defendants' conspiracies or the falsity of the records and statements, has paid claims to the Defendants, and as a result thereof, has paid tens of millions of dollars in Medicare reimbursements that it would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions caused to be made by Defendants, the United States has not recovered Medicare funds from the Defendants that otherwise would have been recovered.

156. The various Defendants combined, conspired, and agreed together to defraud the United States by knowingly submitting False Claims and billing Medicare for the purpose of getting the False Claims paid, or allowed, and committed other overt acts as set forth above in furtherance of that conspiracy. This conspiracy caused the United States government to pay tens of millions of dollars for False Claims that should not have been paid to the Defendants, for which damages the Relator seeks recovery thereof.

## A. CONSPIRACY BETWEEN DALLAS
## MEDICAL CENTER AND PARCON/USPHV

157. If the U.S. Government had known that Defendant Dallas Medical Center was billing Medicare for services pursuant to a conspiracy whereby Defendants Parcon/USPHV and Dallas Medical Center had a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be submitting claims to Medicare for services that (a)were not medically necessary and/or (b) for upcoding of services that were performed on patients and/or (c) for stays longer than medically necessary, Medicare would not have paid those claims. The purpose of the conspiracy was to defraud Medicare by submitting False Claims by each of said Defendants. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Dallas Medical Center and USPHV, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government.

157. Defendants Dallas Medical Center and USPHV received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received had the facts of this conspiracy been known by or disclosed to the Government. The owners of USPHV, including but not

limited to Defendants Parcon, and Ezukanma, are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations. The owners of Dallas Medical Center, including but not limited to its parent Prime Specialty Healthcare, are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

## B. CONSPIRACY BETWEEN ASSURERX AND USPHV

159. Defendant AssureRx engaged in a conspiracy with Defendant USPHV during the years 2012-2014, the purpose of which was to defraud Medicare by submitting False Claims by each of them, to systematically bill Medicare for services for GenesightRX tests rendered to all or substantially all of the patient population of Defendant USPHV whether medically warranted or not. Part and parcel of the conspiracy among USPHV and AssureRx was that USPHV requested and AssureRx allowed USPHV to maintain its data base for patients who had been administered buccal swabs in the offices of AssureRx in order to ensure that substantially ALL of its patients received buccal swabs, whether medically necessary or not. Each party defrauded Medicare as part of the conspiracy as Medicare would not have paid claims submitted for GenesightRX testing if it had known of this arrangement. In furtherance of the conspiracy, Assurex instructed USPHV as an inducement for patients to agree to have buccal swabs collected, Assurex would waive all co-pays and not attempt to collect them from USPHV's patients.

## The "Who, What, Where, When, and How of the Conspiracy

160. Relator incorporates by reference all preceding paragraphs in support of this claim. Specifically,  Section V. B. Sections 4-6 and paragraphs 87-105 above as

well as exhibits "A" through "H" discussed therein and attached hereto, constitute abundant proof as to the "who, what, where, when and how" of the conspiracy. These allegations and Exhibits prove the identity of at least 200 patients for whom buccal swabs were collected for GenesightRX testing, when they were taken and by whom, how they were taken, where they were taken (in the patients' homes), where the GenesightRX testing on the DNA in the buccal swabs was performed (the lab of Assurex in Ohio), and how the overall process worked.

161. AssureRx and USPHV failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. USPHV and AssureRx omitted disclosing and/or actively concealed facts which, if known, would have reduced government obligations to the Defendants. In this regard, AssureRx, and USPHV, by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government.

162. Defendants AssureRx and USPHV received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received had the facts of this conspiracy been known by or disclosed to the Government. The owners of AssureRx and USPHV are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

## C. CONSPIRACY BETWEEN HOME HEALTH CARE DEFENDANTS, USPHV, PARCON, CUA, AND DEFENDANTS EZUKANMA,ETINDI, UNEC, AND/OR MEDPRO

163. Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC and/or Medpro (sometimes hereinafter collectively referred to as "Doctor Billing Entities") and USPHV and Parcon were engaged in a conspiracy, the purpose of which was to defraud Medicare by submitting False Claims, to bill Medicare for services rendered to patients of Defendants Avein Group, Inc. d/b/a Superior Home Health Care Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; Syam Home Healthcare, LLC; Primary Angel, Inc., d/b/a Essence Home Health, AGood and/or other home health agencies (sometimes hereinafter collectively referred to as "Home Health Agencies") knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma,

Ezuknma, M.D., Etindi UNEC and/or Medpro received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

164. The purpose of the conspiracy was to allow the Doctor Billing Entities and Home Health Care Agencies to submit false and fraudulent claims to Medicare, a healthcare benefit program as defined in 18 U.S.C. Sec. 24(b), for physician house call visits and home health care, respectively. The Doctor Billing Entities and Home Health Care Agencies unlawfully enriched themselves by such conduct and by concealing from Medicare the nature and existence of the conspiracy.

165. Regarding the manner and means of the conspiracy, the purpose for which was to defraud Medicare, the Home Health Care Agencies and the Doctor Billing Entities essentially reversed the home health process. Typically, a physician initiates the home health care process by ordering that a patient receive home health care after (a) observing the patient in a face to face encounter, and (b) believed that the patient met the standards for receiving home health care, and (c) signed a Form 485 certification form ordering home health care for each such patient. As part of the conspiracy among the Home Health Care Agencies and the Doctor Billing Entities, the Home Health Care Agencies actually initiated the process of requesting home health care rather than it first being ordered by a physician. The reason for this was that as part of the conspiracy among the Home Health Care Agencies and the Doctor Billing Entities, the Home Health Care Agencies knew that the Doctor Billing Entities, specifically Doctors Ezukanma and Etindi, would sign a Form 485 form certifying any patient as being homebound whether or not they had seen the patient and regardless of whether Doctors Ezukanma and Etindi believed the patients in question qualified for home health care under the criteria described above.

166. Part and parcel of the conspiracy was that Doctors Ezukanma and Etindi would allow employees of USPHV, including but not limited to Defendants Parcon and Cua and other employees of USPHV to forge their signatures on Form 485's and/or Conditions of Participation forms described above regardless of whether the doctors had seen the patient. The variations of "signatures" by who were supposedly Doctors Ezukanma and/or Etindi are laughable as they can't possibly be the signatures of the same person! Once a request was made by one of the Home Health Care Agencies for a doctor (Defendants Ezukanma and/or Etindi) to certify or recertify a patient for home health care, Defendant Parcon and USPHV directed USPHV employees to schedule the Medicare beneficiary for a physician home health visit that would be fraudulently billed to Medicare.

167. Moreover, USPHV, at the direction of Defendants Parcon, Ezukanma, and Etindi submitted all claims as if Doctors Ezukanma and Etindi had performed the services to Medicare beneficiaries regardless of who actually performed the services, be it another doctor, physician assistant, or nurse practitioner. This caused Medicare to pay a higher reimbursement rate because physician assistants and nurse practitioners are reimbursed at a lower rate than doctors.

168. All of the Home Healthcare Defendants and Doctor Billing Entity Defendants received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received had the facts of this conspiracy been known by or disclosed to the Government. The owners of each of said Defendants are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

169. Defendants Ezukanma, Ezuknma, M.D., and/or Etindi were engaged in a conspiracy to bill Medicare for services rendered to patients of Defendants Avein

Group, Inc. d/b/a Superior Home Health Care; Padez Home Health, Inc.; Acute Home Health Services, LLC; Mam Unique Health Services, Inc.; Elim Home Health, Inc.; Machris Home Health Services, Inc.; Barclays Healthcare Inc d/b/a Beta Home Health Services Inc.; Syam Home Healthcare, LLC; Primary Angel, Inc., d/b/a Essence Home Health, AGood and/or other home health care patients at an alarming rate! Defendants Ezukanma, Ezuknma, M.D., and/or Etindi billed code 99354 on approximately 98% of the approximate 27,000 patients they billed Medicare, thereby representing to Medicare that they had spent 90 minutes with each patient when they knew they had only spent on average 15-20 minutes with each patient, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Ezukanma, and Etindi, individually, and Ezuknma, M.D., by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., and Etindi received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

## D. CONSPIRACY OF DEFENDANTS USPHV, GAINES, PARCON, EZUKANMA, AND ETINDI

170. Defendants USPHV, Gaines, Parcon, Ezukanma, and Etindi engaged in a conspiracy, the purpose of which was to defraud Medicare by submitting False Claims, to make it appear as though USPHV, AGood, and Essence were three (3) separate and independent entities when they were billing Medicare when in fact they were operated as one global entity. The same employees often worked for and were paid by all three (3) entities. In fact, Relator himself was paid by ALL THREE ENTITIES at differing points in time! As part of the conspiracy, whose purpose was to defraud Medicare, Defendants Ezukanma and Etindi certified 94% of the Medicare beneficiaries receiving home health services from AGood, and 64% of the beneficiaries receiving home health services from Essense. All of said Defendants concealed from Medicare that Defendant Parcon exercised control over USPHV, AGood, and Essence.

171. Had Medicare known about the true ownership and improper relationship between USPHV, AGood, and Essence, Medicare would not have allowed any of them to enroll in the Medicare program, much less pay thousands of fraudulent Medicare claims submitted over the years. Defendants USPHV, AGood, and Essence, received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received had the facts of this conspiracy been known by or disclosed to the Government. The owners of USPHV, AGood, and Essence, including but not limited to Defendants Gaines, Parcon, and Ezukanma, are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

## E. CONSPIRACY OF DEFENDANTS PARCON, GAINES,
## AND USPHV REGARDING WAIVER OF CO-PAYS

172. Defendants Parcon, Gaines, and USPHV engaged in a conspiracy, the purpose of which was to defraud Medicare by submitting False Claims, whereby they would systematic waive co-pays on all or substantially all of their patients in violation of Medicare guidelines. None of these Defendants ever requested that a hardship application be filled out and submitted and considered to ascertain whether a waiver of co-pay was justified as required by Medicare regulations. If Medicare had known of the conspiracy in this regard, Medicare would not have paid claims resulting from those claims for which co-pays were waived as it resulted in Medicare paying more than it should have for each such claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Parcon and Gaines, and Defendants USPHV, AGood and Essence, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Parcon, Gaines, AGood, Essence and USPHV received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received. The owners of USPHV, AGood and Essence, including but not limited to Defendants Gaines, Parcon, and Ezukanma, are jointly and severally liable for these violations.

## F. **CONSTRUCTIVE TRUST**

173. Relator requests a thorough investigation and accounting of any and all transfers of money by and between the Defendant entities, including all Defendants named herein and any other companies or entities or persons to which transfers of money received by the Defendants from Medicare. To the extent that it is determined that the Defendants have conspired to transfer monies and/or assets and acquire assets from monies derived directly or indirectly from Medicare, Relator requests that a constructive trust be established over the property and assets of all such persons and entities.

174. Additionally, as a result of the Raid and the investigation by the Government because of Relator coming forward and reporting this massive case of Medicare fraud, the Government was able to seize several hundred thousand dollars from the residence of Defendant Ezukanma and other Defendants herein. Those monies are a direct result of the fraud perpetrated by the Defendants and this action initiated by Relator, and Relator requests that a constructive trust be placed on all of such assets and monies seized by the government and that Relator be entitled to a Relator fee of 30% of the recovery from all such assets.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Relator, on behalf of himself and the United States Government, prays that this Second Amended Complaint be received and filed in camera under seal until further Order of the Court, and would pray unto the Court for the following relief and Judgment upon a trial by jury:

(a) That this Court enter a judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the FCA; and

(b) that this Court enter a judgment against the Defendant for a civil penalty of $11,000 for each of Defendants' violations of the Section 3729 of the FCA; and

(c) that Relator recovers all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action; and

(d) that Relator be awarded all reasonable attorneys' fees and expenses in bringing this action; and

(e) that because the United States government has elected not to proceed with this action as of the filing of this Third Amended Complaint, Relator be awarded the maximum amount for bringing this action of 30% of the proceeds of the action pursuant to Section 3730(d) of the FCA and/or other statutes permitting recovery of same; and

(f) that Relator be awarded pre-judgment and post-judgment interest; and

(g) that defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.*; and

(h) that Relator and the United States government be awarded all damages and Civil Monetary Penalties to which the U.S. Government is entitled42 U.S.C. §1320a–7a.

(i) that a constructive trust be establish as set forth in Count Two, Section j set forth above;

(j) that a trial by jury be held on all issues so triable; and

(k) that Relator and the United States receive all relief to which either or both may be entitled at law or in equity as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.


DATED, this the 2cd day of May, 2018.

RESPECTFULLY SUBMITTED

**LAW OFFICES OF JAMES R. TUCKER, P.C.**

/s/ James Rusty Tucker

**JAMES "RUSTY" TUCKER**
**LAW OFFICES OF JAMES R. TUCKER, P.C.**
**STATE BAR NO. 20272020**
**3100 DREXEL DRIVE**
**DALLAS, TX 75205**
**214-505-0097 (PHONE)**
**214-599-8874 (FACSIMILE)**
**rusty@rustytuckerlaw.com**


## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2018, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing has been forwarded to all counsel of record by operation of the Court's electronic filing system.

/s/ James R. Tucker
James R. Tucker

# EXHIBIT "A"

## (Filed Under Seal Only Per Court Order [Doc. 157])

# EXHIBIT "B"

## (Filed Under Seal Only Per Court Order [Doc. 157])

# EXHIBIT "C"

## (Filed Under Seal Only Per Court Order [Doc. 157])

# EXHIBIT "D"



# EXHIBIT "E"



# EXHIBIT "F"

**GeneSightRx**   **GeneSightRx® Insurance Information Form**   *AssureR$_x$*

**PLEASE SEND THIS COMPLETED FORM TO ASSURERX HEALTH WITH THE SALIVA SAMPLE
RESULTS WILL NOT BE RELEASED PRIOR TO RECEIPT OF PATIENT INSURANCE INFORMATION**

If you do not want AssureRx Health to file an insurance claim on your behalf, please
initial to the right.  You will be responsible for the full balance of the test.  Skip all
sections below and include this initialed form with the saliva sample shipment.        Initial: _____

PLEASE INCLUDE A COPY OF BOTH SIDES OF YOUR INSURANCE CARD TO EXPEDITE PROCESSING

**Patient Information**

| Patient Name: | | |
|---|---|---|
| Insurance Plan Name: | | |
| Group Number: | ID Number: | |
| Patient's Sex:  M  F  (circle one) | Patient's Marital Status:     Single      Married      Other      (circle one) | |
| Patient's Employment Status: | Employed     Full-Time Student      Part-Time Student      (circle one) | |
| Patient's Relationship to Insured:   Self  Spouse  Child  Other   (circle one) | **If Self, skip Insured Information Section** | |

**Insured's Information**

| Insured's Name: | | |
|---|---|---|
| Insured's Date of Birth: | | |
| Employer/School: | | |
| Insured's Address: | | |
| City: | State: | Zip: |
| Insured's Telephone:  (        ) | Insured's Sex:    M   F   (circle one) | |

If you have a secondary insurance provider, please provide the following information:

| Insurance Plan Name: | |
|---|---|
| Group Number: | ID Number: |
| Employer/School: | |
| Insured's Name: | |
| Insured's Date of Birth: | Insured's Sex:   M   F   (circle one) |

CONFIDENTIAL HEALTHCARE INFORMATION
© 2011 AssureRx Health, Inc.      Office: (866) 757-9204    Fax: (888) 894-8344

# EXHIBIT "G"



# EXHIBIT "H"



**FAX COVER SHEET**

DATE: _____


FROM:   US PHYSICIANS GROUP

NAME OF SENDER: _____ PHONE # _____


TO:     NURSING SUPERVISOR FAX: 972-888-7144

        NURSING SUPERVISOR PHONE: 214-870-5091


PATIENT NAME: _____ DOB: _____

MALE  ☐      FEMALE ☐

ALLERGIES: _____

ADMITTING DIAGNOSIS: _____

ADMITTING PHYSICIAN: _____

ER PHYSICIAN vs DIRECT ADMIT: _____

IF DIRECT ADMIT-ADMITTING PHYSICIAN: _____

MRSA/VRE    YES ☐  NO ☐

OPEN WOUNDS:  YES ☐  NO ☐

INFECTIOUS DISEASE:  YES ☐  NO ☐

WOUND INFECTION:  YES ☐  NO ☐

LOCATION OF WOUND: _____

PATIENT LOCATION: _____

PHONE # _____ CITY: _____ ZIP CODE: _____

NAME OF APT. COMPLEX: _____ APT # _____

**DETAILS RELATING TO LOCATION OR PICK-UP:** _____

_____

**TIME TO BE PICKED UP:** _____

**DATE FOR TRANSFER:** _____   **# TO ARRANGE PICK-UP:** _____

**METHOD OF TRANSPORTATION:**   ☐   **PRIVATE VEHICLE**

      ☐   **WHEELCHAIR VAN**

      ☐   **AMBULANCE**

                        ☐   **OTHER**
                        ☐
**OTHER INFORMATION/HX:** _____
_____

*Treat patient as VIP Triage

*Please attached an accurate face sheet