## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

**THE UNITED STATES OF AMERICA**
**ex. rel. GORDON GRANT BACHMAN**

      **Plaintiffs,**

**vs.**                                    **CIVIL ACTION NO. 3:13-cv-0023-M**

**HEALTHCARE LIAISON PROFESSIONALS,**
**INC. d/b/a US PHYSICIAN HOME VISITS;**
**DALLAS MEDICAL CENTER, LLC;**
**UNEC GROUP, INC; MEDPRO A-CLASS**
**SERVICES, INC.; BEN P. GAINES, III;**
**MERNA PARCON a/k/a MYRNA PARCON;**
**RANSOME ETINDI; NOBLE**
**EZUKANMA, M.D.; NOBLE EZUKANMA,**
**M.D., P.A.; DR. FREDERICO MAESE; and**
**PADEZ HOME HEALTH, INC.**

**Defendants**

### PLAINTIFFS' FOURTH AMENDED COMPLAINT

      COMES NOW GORDON GRANT BACHMAN, on behalf of the United States of America, by and through his attorney, James "Rusty" Tucker of the Law Offices of James R. Tucker, P.C., and respectfully would show unto the Court the following:

### I.  INTRODUCTION

      1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made, presented, and caused to be presented by the defendants and/or their agents, employees and co-conspirators in violation of the federal

civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended (hereinafter "FALSE CLAIMS ACT" or "FCA").

2. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government for payment or approval of payment is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the government. The FCA allows any person having information regarding a false or fraudulent claim against the government to bring an action for himself or herself (the "Relator" or "*qui tam* plaintiff") and on behalf of the government and to share in any recovery. The Original Complaint was filed under seal for at least 60 days (without service on the Defendants during that period) to enable the government: (a) to conduct its own investigation without the Defendants' knowledge, and (b) to determine whether to join in the action. After several extensions of that deadline, in February of 2016, the United States notified the Court that it was not intervening in the action at this time but reserved the right to do so at a later date [Doc. 28].

3. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program ("Medicare"), to pay for the costs of certain health care services for those persons entitled to receive such health care. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program. The Center for Medicare Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

4. Plaintiff Grant Bachman (the "Relator") brings this action on behalf of the United States of America against Defendants for civil damages and penalties arising from the Defendants' false claims in violation of the FCA. The violations at issue arise out of false Medicare claims by the

Defendants who fraudulently billed the government for Medicare payments for at least a five (5) year period from 2009 through 2014 for providing home health and other services for Medicare patients that were not in conformity with federal statutes and/or regulations authorizing reimbursement for said charges.

## II. JURISDICTION AND VENUE

5. This Court has Jurisdiction of this action because it arises under the FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 et. seq.  This Court has jurisdiction over the subject matter of the FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

6. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) one or more of the Defendants reside in this district; (ii) one or more of the Defendants transacts business in this district and did so at all times relevant to this third amended complaint; and, as averred below, (iii) the Defendants committed acts prohibited by 28 U.S.C. § 3729—which are acts giving rise to this action within this district.

## III. CONDITIONS PRECEDENT

7. Before filing his Original Complaint, Relator served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possessed, pursuant to the requirements of 31 U.S.C. §3730(b) (2) of the FCA. The Relator has previously made the required disclosure ("Disclosure Statement") to the U.S. Government by providing to the Attorney General of the United States and the U.S. Attorney for the Northern District of Texas a copy of the Original Complaint and a statement of all material information relative to the Complaint. The Disclosure Statement consisted of Affidavit of the Relator and exhibits thereto and other evidence submitted was and is supported by material

evidence and information known to the Relator at the time of his filing, establishing the existence of Defendants' False Claims. Because the information provided included attorney-client communications and work product of Relator's attorneys, and was submitted to the Attorney General of the United States and the U.S. Attorney for the Northern District of Texas in their capacity as potential co-counsel in the litigation, the Relator understands that the Disclosure Statement is confidential. Relator has complied with all other conditions precedent to bringing this action.

8. Relator does not believe that any of the information upon which he bases his allegations is the subject of public disclosure. In the unlikely event the Court were to deem that certain information has been publicly disclosed, Relator is nevertheless the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the federal and state governments before filing this action.

## IV. PARTIES

9. Relator is a citizen of the State of Texas. A Raid of certain Defendants and former Defendants (described hereinbelow) in approximately May of 2014 by the Government effectively shut down the operations of several Defendants and/or former Defendants in the previous Complaint and Amended Complaints that are now dismissed. From 2009 until the Raid occurred and for several months thereafter, Relator was an officer, member and/or employee of one or more of Defendant USPHV, and/or former Defendants AGood, Essence and/or other Defendants as well as other entities affiliated with Defendants USPHV and Parcon. Relator has direct, independent and personal knowledge of the fraud perpetrated by all current Defendants during the time of his

employment. Relator brings this action based upon his direct, independent, and personal knowledge.

10. The U.S. Government funds certain health care services through Medicare when those services are determined to be medically necessary in compliance with regulations of the U.S. Government, as well as federal laws pertaining to payment and/or reimbursement for Medicare health care expenses. Medicare regulations provide that if a person needing health care is unable to travel for medical reasons, they are entitled to be provided with home health care services under very strict and well-defined guidelines. Most of the Defendants herein (other than Dallas Medical Center) repeatedly over the years have billed Medicare for thousands of claims for beneficiaries that were not "homebound" as required by Medicare, thus qualifying as False Claims in violation of the FCA as defined below.

11. As set forth below, Relator is aware of multiple False Claims, as defined herein, whereby Medicare was fraudulently billed by the Defendants to the U.S. Government. In fact, Relator submits that an overwhelming majority of claims submitted by the Defendants were False Claims, therefore entitling the U.S. Government to tens of millions of dollars in recovery from the Defendants for civil damages and penalties for the claims submitted.

12. Defendant HEALTHCARE LIAISON PROFESSIONALS, INC. d/b/a US PHYSICIAN HOME VISITS (hereinafter "USPHV") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process and is properly before the Court.

13. Defendant DALLAS MEDICAL CENTER, LLC ("Dallas Medical Center" or "DMC") is a domestic Limited Liability Company organized under the laws of the State of Texas. Dallas Medical Center is owned by and is a subsidiary of Prime Healthcare Services, which operates 42 acute care hospitals in 14 states. Per its' website, it is one of the nation's largest healthcare service providers with nearly 42,000 employees. Said Defendant has been served with process and is properly before the Court.

14. Defendant UNEC GROUP, INC (hereinafter "UNEC") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

15. Defendant MEDPRO A-CLASS SERVICES, INC. (hereinafter "Medpro") is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Diamond Financial Services, who may be served with process by serving Merna Parcon's attorney, Don Wood, Jr., 303 N Central Expressway Dallas, TX 75205.

16. Defendant BEN P. GAINES, III ("Gaines") is an individual who has filed a pro se answer and is properly before the Court.

17. Defendant MERNA PARCON a/k/a MYRNA PARCON (hereinafter "Parcon") is an individual who has filed a pro se answer and is properly before the Court.

18. Defendant RANSOME ETINDI (hereinafter "Etndi") is an individual who has returned a Waiver of Service of Process and is properly before the Court.

19. Defendant NOBLE EZUKANMA, M.D. (hereinafter " EZUKANMA") is an individual who is properly before the Court.

20. Defendant NOBLE EZUKANMA, M.D., P.A. is a professional association which is properly before the Court.

21. Defendant DR. FREDERICO MAESE (hereinafter "Maese") is an individual who has been served with process and is properly before the Court.

22. Defendant PADEZ HOME HEALTH, INC. (hereinafter "Padez") is a domestic corporation organized under the laws of the State of Texas. Said Defendant has been served with process, is represented by counsel, and is properly before the Court.

## V. FACTS

### 1. FACTS PERTAINING TO HOME HEALTH AGENCIES AND COMPANIES AND INDIVIDUALS CONNECTED THEREWITH

23. In this section, Relator will discuss facts relating to USPHV and the owners thereof and the egregious fraudulent conduct that resulted in the owners thereof and several other employees being charged with and either pleading guilty to or being convicted of criminal conduct for Medicare fraud. The two owners of USPHV, Defendants Parcon and Ezukanma, are currently serving ten (10) years and 200 months, respectively, in prison for Medicare fraud and/or conspiracy to commit Medicare fraud resulting from allegations brought by this lawsuit. Additionally, this section will discuss the Medicare fraud committed by a home health care agency Padez not owned by USPHV, and other companies and individuals doing business with USPHV in an effort to systematically defraud Medicare. The fraud committed by Dallas Medical Center is equally as egregious, and the facts pertaining to DMC are discussed in section B below.

### APPLICABLE TIME PERIOD THAT FALSE CLAIMS WERE SUBMITTED TO MEDICARE BY THE DEFENDANTS IN THE ALLEGATIONS WHICH FOLLOW

24. It should be noted that unless otherwise specified herein, the activity alleged to have occurred throughout the entirety of this Fourth Amended Complaint occurred each and every day services were "provided" by said Defendants from the time Relator was employed by one or more

Defendants in 2009 and the time of the Raid in May of 2014 which effectively shut down the operations of some of the Defendants, former Defendants, and others. Accordingly, Relator will not be specifying time frames with respect to each allegation unless the above statement is not applicable, thus satisfying the "when" criteria under applicable case law criteria pertaining to Fed. Rule Civ. Proc. 9(b) the Medicare fraud in question was committed. In the case of Defendant Dallas Medical Center, the applicable time period for satisfying the "when" criteria for Fed. Rule Civ. Proc. 9(b) purposes is from 2012 until mid-year in 2014.

## 2.THE RAID OF CERTAIN DEFENDANTS RESULTING IN THE SEIZURE OF EVIDENCE

25. As to certain Defendants identified herein, this case involves one of the largest cases of home health care fraud in the history of the United States. After Relator came forward and reported this fraud to the federal government and filed this lawsuit, the United States investigated the actions of the Defendants thoroughly. Based upon the information provided by Relator to the government, a raid (hereinafter "Raid") of the corporate headquarters of Defendants USPHV and former Defendants Essence and A-Good took place on or about May 14, 2014, by the U.S. Attorney's office in conjunction with the FBI, HHS Office of Inspector General, and possibly other federal and/or State agencies. That same day a search warrant was also executed on Defendant Ezukanma's home and office, as well as Defendant Parcon's home, among other locations.

26. Just days prior to the Raid (which Relator had no idea was going to occur), Relator met with representatives of several government agencies, and gave a detailed account of what documents could be found where, where the flash drives with evidence would be stored, which computers belonged to whom and where they were located, and provided a diagram of the facilities that were shortly thereafter the subject of the Raid. During this Raid thousands of pages of

documents were confiscated, and all computers and data (flash drives, etc.) in the company were confiscated as well in connection with same. The Raid effectively shut down the operations of Defendants USPHV, Medpro and UNEC. Defendant Parcon, however, who controlled all of these entities, continued to find ways to defraud Medicare via other Defendants and other entities as explained herein.

### 3. THE INDICTMENTS OF DEFENDANTS PARCON, EZUKANMA, ETINDI AND GAINES

27. After examining the data obtained during the Raid, along with other information provided by Relator in several meetings with the U.S. Attorney's office, the United States issued indictments for conspiracy to commit Medicare fraud in June of 2015 against Defendants Parcon, Ezukanma, Etindi, and Gaines, among others involved in the fraud. At that time, it was announced in a press release that these Defendants were a significant part of a nationwide sweep involving the **largest home health care fraud committed in the history of the United States.** The press release read, in part, as follows:

> **DALLAS** – Attorney General Loretta E. Lynch and Department of Health and Human Services (HHS) Secretary Sylvia Mathews Burwell announced today a nationwide sweep led by the Medicare Fraud Strike Force in 17 districts, resulting in charges against 243 individuals, including 46 doctors, nurses and other licensed medical professionals, for their alleged    participation in Medicare fraud schemes involving approximately **$712 million** in false billings. In addition, the Centers for Medicare & Medicaid Services (CMS) also suspended a number of providers using its suspension  authority as provided in the Affordable Care Act. This coordinated takedown is the largest in Strike Force history, both in terms of the number of defendants charged and loss amount.

> "This action represents the **largest criminal health care fraud** takedown in the history of the Department of Justice, and it adds to an already remarkable  record of enforcement," said Attorney General Lynch. "The defendants charged include doctors, patient recruiters, home health care providers, pharmacy owners, and others. They billed for equipment that wasn't provided, for care that wasn't needed, and for services that weren't rendered….

According to the indictment, from January 1, 2009 to approximately June 9, 2013, the defendants ran a conspiracy to defraud Medicare. As part of the fraudulent business model, Ezukanma and another physician certified 94% of the Medicare beneficiaries receiving home health services from A Good, and 65% of the Medicare beneficiaries receiving home health services from  Essence. …

The indictment alleges that USPHV submitted billing primarily under Dr.  Ezukanma's Medicare provider number, regardless of who actually performed the service. They billed at an alarming rate, generally billing for only the most comprehensive physician exam, and always adding a prolonged service code. USPHV submitted claims to Medicare for physician visits of 90 minutes or more, when most visits took only 15 to 20 minutes. Most all of USPHV patients came from home health companies soliciting  certifications and re-certifications for home health. More than 97% of USPHV Medicare patients received home health care, whether they needed it or not. **(emphasis added).**

### 4. THE INDICTMENTS REVEALED THAT DEFENDANTS ETINDI AND EZUKANMA BILLED MORE THAN ONE HUNDRED OF HOURS A DAY TO MEDICARE ON MULTIPLE OCCASIONS

28. Relator observed on many occasions that Defendants Ezukanma and Etindi would "up-code" charges for the time spent with patients. If a patient was seen for 30 minutes, it was routinely up-coded to 60 or 90 minutes, and if a patient was seen for 60 minutes, it was routinely up-coded to 90 minutes, etc. As a result of Relator's conveying this knowledge to the government, the government's investigation based upon Relator's allegations in this regard revealed that the fraud was even more rampant than that first reported by Relator. It was ultimately revealed as set forth in the indictment that 98% of the approximate 27,000 physician home visits submitted to Medicare for payment by Defendants Ezukanma and Etindi were upcoded to show that the maximum time (90 minutes billed via Code 99354) was spent with the patient, whereas on most occasions the patient was only seen 15-20 minutes.

29. This fraudulent scheme astoundingly resulted in resulted in Doctors Ezukanma or Etindi billing over 100 hours--per day!--on several occasions to Medicare for physician home visits! Between May 25, 2010 and November 20, 2012, on twelve different occasions Defendant **Ezukanma** (now no longer a doctor) billed Medicare hours ranging from **102.7 hours per day** to

**205.9 hours per day!** Similarly, on three occasions between January 17, 2013, and March 19, 2013, Defendant **Etindi** (also no longer a doctor) billed Medicare between **103.8 hours per day** and **131.8 hours per day!** The Indictment revealed in total that these two Defendant doctors billed in excess of 24 hours per day on **at least 21 occasions!**

### 5. MOST PATIENTS OF THE HHA's WERE NOT "HOMEBOUND"

30. USPHV is or was a physicians' practice that employed physicians, nurse practitioners and occasionally physician assistants. It was formed by Defendants Parcon and Ezukanma, among others. Relator on occasion was designated as Managing Director of USPHV, and on other occasions was paid as an employee of affiliated home health agencies (former Defendants AGood and/or Essence), among other entities. USPHV saw patients exclusively at their place of residence, and patients were typically seen every month to six weeks. The primary clients of USPHV were home health agencies ("HHA's"). Parcon made referrals to dozens of other home health agencies, one of which is Defendant Padez that was not owned and/or controlled by USPHV and Defendant Merna Parcon as discussed below. Also, Padez and other home health agencies actually reversed the home health care process, and made referrals **TO** USPHV knowing that Defendants Ezukanma and/or Etindi and thereafter Defendant Maese would certify a patient as being home bound without ever seeing the patient!

31. In order to receive Medicare benefits, patients of a HHA must be certified as "homebound," meaning that leaving the home must involve a "taxing effort" under Medicare regulations. These and other regulations cited herein are found in Chapter 7 of the Medicare Benefit Policy Manual of the Center for Medicare Services ("CMS") regarding Home Health Care. "Homebound" is defined in Medicare regulations as follows:

---

Generally speaking, a patient will be considered to be homebound if they have a condition due to an illness or injury that restricts their ability to leave their place of residence except with the aid of: supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated.

32. As described more fully below, most of the patients of the HHA's discussed herein receiving Medicare payments are not "homebound' in compliance with the foregoing definition. In support of same, Relator would often be with the medical professional driving them to home health visits, and in a significant percentage of time, Relator would note on the list of patients to be seen that day that they were "not home", which of course by common sense means that they were not "home bound". Pursuant to Medicaid Guidelines, the criteria for coverage for Home Health Services is as follows:

> 20 - Conditions to Be Met for Coverage of Home Health Services
> (Rev. 1, 10-01-03)
> A3-3116, HHA-203
>
> Medicare covers HHA services when the following criteria are met:
> 1. The person to whom the services are provided is an eligible Medicare beneficiary;
>
> 2. The HHA that is providing the services to the beneficiary has in effect a valid agreement to participate in the Medicare program;
>
> 3. The beneficiary qualifies for coverage of home health services as described in §30;
>
> 4. The services for which payment is claimed are covered as described in §§40 and 50;
>
> 5. Medicare is the appropriate payer; and
>
> 6. The services for which payment is claimed are not otherwise excluded from payment.

33. For **patients** to be eligible to receive home health care, the Medicare regulations stipulate as follows:

---

**PLAINTIFF'S FOURTH AMENDED COMPLAINT**                                    **Page 12**

**30 - Conditions Patient Must Meet to Qualify for Coverage of Home Health Services**
**(Rev. 1, 10-01-03)**
**A3-3117, HHA-204, A-98-49**

To qualify for the Medicare home health benefit, under §§1814(a)(2)(C) and 1835(a)(2)(A) of the Act, a Medicare beneficiary must meet the following requirements:

Be confined to the home;
Under the care of a physician;
Receiving services under a plan of care established and periodically reviewed by a physician;
Be in need of skilled nursing care on an intermittent basis or physical therapy or speech-language pathology; or
Have a continuing need for occupational therapy.

34. These "homebound" patients of HHA's must be certified or re-certified every sixty days, a period of time in Medicare regulations and HHA practice that is referred to as an "episode", as more fully described in Medicare regulations as follows:

**HH-201**

The unit of payment under home health PPS is a national 60-day episode rate with applicable adjustments. The episodes, rate, and adjustments to the rates are detailed in the following sections.

10.1 - National 60-Day Episode Rate
(Rev. 1, 10-01-03)
HH-201.1

A. Services Included
The law requires the 60-day episode to include all covered home health services, including medical supplies, paid on a reasonable cost basis. That means the 60-day episode rate includes costs for the six home health disciplines and the costs for routine and non-routine medical supplies. The six home health disciplines included in the 60-day episode rate are:

1. Skilled nursing services
2. Home health aide services;
3. Physical therapy;
4. Speech-language pathology services;

5. Occupational therapy services; and
6. Medical social services.
The 60-day episode rate also includes amounts for:

1. Non-routine medical supplies and therapies that could have been unbundled to part B prior to PPS. See §10.12.C for those services;
2. Ongoing reporting costs associated with the outcome and assessment information set (OASIS); and
3. A one time first year of PPS cost adjustment reflecting implementation costs associated with the revised OASIS assessment schedules needed to classify patients into appropriate case-mix categories.

B. Excluded Services

The law specifically excludes durable medical equipment from the 60-day episode rate and consolidated billing requirements. DME continues to be paid on the fee schedule outside of the PPS rate.

10.4 - Counting 60-Day Episodes
(Rev. 1, 10-01-03)
HH-201.4

A. Initial Episodes
The "From" date for the initial certification must match the start of care (SOC) date, which is the first billable visit date for the 60-day episode. The "To" date is up to and including the last day of the episode which is not the first day of the subsequent episode. The "To" date can be up to, but never exceed a total of 60 days that includes the SOC date plus 59 days.

B. Subsequent Episodes
If a patient continues to be eligible for the home health benefit, the home health PPS permits continuous episode re-certifications. At the end of the 60-day episode, a decision must be made whether or not to recertify the patient for a subsequent 60-day episode.

30.5.2 - Periodic Recertification
(Rev. 139, Issued: 02-16-11, Effective: 01-01-11, Implementation: 03-10-11) At the end of the 60-day episode, a decision must be made whether or not to recertify the patient for a subsequent 60-day episode. An eligible beneficiary who qualifies for a subsequent 60-day episode would start the subsequent 60-day episode on day 61. Under HH PPS, the plan of care must be reviewed and signed by the physician every 60 days unless one of the following occurs:

A beneficiary transfers to another HHA;
A discharge and return to the same HHA during the 60-day episode.

Medicare does not limit the number of continuous episode re-
certifications for beneficiaries who continue to be eligible for the
home health benefit. The physician certification may cover a period
less than but not greater than 60 days.

30.5.3 - Who May Sign the Certification
(Rev. 1, 10-01-03)
A3-3117.5.C, HHA-204.5.C

The physician who signs the certification must be permitted to do so
by 42 CFR 424.22.

35.  At each certification, a physician must certify his or her approval of the plan of care

("POC") and that the patient is "homebound" per Medicare guidelines. This signature is placed by

the following statement box 26 on what is known as a Medicare Form 485 wherein the physician

certifies:

"I certify/recertify that this patient is confined to his/her home and needs
intermittent skilled nursing care, physical therapy and/or speech therapy or
continues to need occupational therapy. The patient is under my care, and I have
authorized the services on this plan of care and will periodically review the plan."

**6. CERTIFICATION FORMS WERE ROUTINELY SIGNED BY
DOCTORS AND NURSES WHO NEVER SAW THE PATIENT!**

36.  Defendant Ezukanma was the so-called "medical director" of USPHV. During the time

period applicable to this action he owned a very profitable pulmonary practice in Fort Worth,

Texas which is where his primary practice was located. He signed thousands of Form 485

certifications on behalf of patients of USPHV without seeing any of these patients, yet an

overwhelming majority of the patients were not "homebound" per Medicare guidelines. Defendant

Ezukanma billed Medicare for these fraudulent services via his Medicare number with Defendants

Ezukanma, M.D., P.A. and UNEC which he owned. Etindi likewise signed Form 485 certifications

knowing that the patients involved were not homebound and/or without even seeing the patients to ascertain whether or not they were homebound.

37. Relator also observed that numerous Form 485's were forged with Dr. Ezukanma's signature by Merna Parcon or others under her direction or control. As reflected in the Indictment in June of 2015, it was ultimately determined by the U.S. Government that false certifications of these form 485's alone cost Medicare over **$40 Million** in payments for fraudulent home health services over the time frame of January 1, 2009 through June 9, 2013 only! These damages were determined to have been caused by Defendants Parcon, Ezukanma, Gaines, and Etindi, among others.

38. The foregoing practices of Defendants Dr. Ezukanma, Merna Parcon, Etindi and the HHA's are in violation of the following "face to face" requirement before home health services can begin pursuant to CMS provisions, as Dr. Ezukanma and/or Dr. Etindi NEVER saw the patients nor did they comply with any of the following Medicare regulations:

30.5.1.1 – Face-to-Face Encounter
(Rev. 139, Issued: 02-16-11, Effective: 01-01-11, Implementation: 03-10-11)

1. The certifying physician must document that he or she or an allowed non-physician practitioner (NPP) had a face-to-face encounter with the patient.

Certain NPPs may perform the face-to-face encounter and inform the certifying physician regarding the clinical findings exhibited by the patient during the encounter. However, the certifying physician must document the encounter and sign the certification. NPPs who are allowed to perform the encounter are:

A nurse practitioner or clinical nurse specialist working in collaboration with the certifying physician in accordance with State law;
A certified nurse-midwife as authorized by State law;
A physician assistant under the supervision of the certifying physician

NPPs performing the encounter are subject to the same financial restrictions with the HHA as the certifying physician, as described in 42 CFR 424.22(d).

2. Encounter Documentation Requirements:

The documentation must include the date when the physician or allowed NPP saw the patient, and a brief narrative composed by the certifying physician who describes how the patient's clinical condition as seen during that encounter supports the patient's homebound status and need for skilled services. …

It is unacceptable for the physician to verbally communicate the encounter to the HHA, where the HHA would then document the encounter as part of the certification for the physician to sign. (emphasis   added)

39. The way the procedure worked for Defendant Parcon would direct her staff to send on behalf of USPHV, AGood, and Essence, UNEC and Medpro rafts of paperwork to Dr. Ezukanma and/or Dr. Etindi to sign in exchange for periodic payments by Defendant Parcon and/or USPHV. They lent their signatures for use of his billing information and a check every month from Defendant Parcon.  Ezukanma and Dr. Etindi were the quintessential "robo-signers" for a fee so that USPHV, AGood, Essence, UNEC and Medpro could submit claims for "homebound" care to Medicare. This process went on since at least January 1, 2008 until the Raid occurred. Defendant Parcon, among others, intentionally and knowingly signed Form 485's and other forms on behalf of Defendant Ezukanma and/or Etindi, thus committing Medicare fraud each and every time they did so as they knew those forms had to be signed by a medical doctor.

40. Without seeing the patient, Defendant Ezukanma obviously had no idea whether these patients he was "certifying" were "homebound" per the Medicare guidelines set forth above. Additionally, he did not have a nurse practitioner or physician's assistant in his employ that meets the guidelines set forth above. Because he had no idea of the condition of the patient, certifying the Medicare beneficiary as homebound was impossible, so each and every Form 485 was certified fraudulently by Defendant Dr. Ezukanma.

41. Defendant UNEC was a company founded by Defendant Ezukanma that also provided physician home services. Defendants Dr. Ezukanma and Parcon utilized UNEC's Medicare billing number for claims associated with Defendant USPHV, thus integrating part of UNEC into USPHV. Defendant UNEC knowingly submitted fraudulent claims to Medicare after the fraudulent certifications of Defendants Dr. Ezukanma and/or Etindi during the time period applicable herein.

42. Defendant Medpro was a physician house call company founded by Defendant Parcon that also provided physician home services. Defendant Parcon utilized Medpro's Medicare billing number for claims associated with Defendant USPHV, thus integrating part of Medpro into USPHV. Defendant Medpro knowingly and intentionally submitted fraudulent claims to Medicare after the fraudulent certifications of Defendants Dr. Ezukanma and/or Etindi during the time period applicable herein.

43. Defendant Ransome Etindi was also an associate medical director of USPHV who also knowingly and intentionally signed Form 485's for patients of USPHV, AGood, Essence, UNEC and Medpro with full knowledge that these patients were not homebound. Defendant Parcon provided payments to him as long as he did what she desired and certified the patients to receive home health services for another 60 days and billed Medicare for same. Because he had no idea of the condition of the patient, certifying the Medicare beneficiary as homebound was impossible, so each and every Form 485 was certified fraudulently by Defendant Dr. Etindi.

44. Additionally, at USPHV/AGood headquarters, nurses filled out and signed "Conditions of Participation" ("COPs") documents in violation of Medicare guidelines. These Conditions of Participation documents are mandated by law to be filled out and signed by a **doctor**--not a nurse.

From Relator's observation, however, these forms were routinely filled out by nurses instead of doctors as mandated by Medicare regulations.

### 7. REFERRALS BY DEFENDANT PADEZ HOME HEALTH TO USPHV THAT RESULTED IN FALSE CLAIMS

45. In addition to referring to their own USPHV/Parcon owned and/or home health care agencies, USPHV and Parcon and Defendant Padez essentially reversed the home health care process. Rather than Defendants USPHV and Parcon referring patients to Defendant Padez as should be the case, Padez reversed the ordinary home health referral process. That is, Padez referred the patients to USPHV, knowing that with respect to each of these referrals, Defendants Ezukanma or Etindi would certify the patients being referred as "homebound" knowing that the patient in question in approximately 95% of the cases did not meet the criteria for receiving home health care. Attached as Exhibit "A" and incorporated by reference and to be filed under seal is a referral form showing that **Padez was the referral source to USPHV**, not the other way around as should be the case in home health care referrals. In the Indictment of Defendant Ezukanma and others in his criminal trial, with respect to Padez and other home health agencies, the Indicment stated in part as follows:

> **USPHV received thousands of requests from HHA's**, including A Good and Essence, to certify and recertify Medicare beneficiaries for home health services, regardless of the beneficiares homebound status. Most if not all of USPHV patients were improperly generated by referrals from HHAs. As part of the fraudulent scheme and contrary to Medicare regulations, USPHV, A Good, Essence, and **all the other participating HHAs reversed the home health process**. HHAs requested home health rather than home health being ordered by a physician who (1) had face-to-face contact treating the beneficiary, (2) believed the beneficiary eligible for the service, and (3) intended the beneficiary receive medical benefit from home health care. Once a HHA referred a patient and requested a doctor certify or recertify the beneficiary for home health care, defendants Myrna Parcon… directed USPHV employees to schedule the beneficiary for a physician home visit that would be billed to Medicare. [*USA v. Ezukanma et. al*., Cause No.3:15-cr-00254-B (N.D. TX), [Dkt. 3, par. 20) (emphasis added).

46. Padez was one of the **"other participating HHAs [which] reversed the home health process." (emphasis added).** Relator has knowledge of this type of referral TO USPHV by Padez happened on at least 70 occasions. Attached hereto collectively as Exhibit "B" and incorporated by reference (to be filed under seal only) is documentation of referrals of at least 58 of those 70 patients that Relator had knowledge of. These documents consist of Form 485 Certifications and other medical records of the patients showing the patient's name, the type of services being rendered to them, the dates during which the services were rendered, and other pertinenet information. These documents provide a reliable indicia that Medicare was fraudulently billed for these services by Defendant Padez.

47. Further, in each of these cases where a referral was made, the patient would receive multiple home visits from Padez, each and every one of which constituted a false claim under the FCA as defined in the Complaint. On each of these referrals, Doctors Ezukanma or Etindi would certify and/or re-certify the patients being referred as "homebound" knowing that the patient in question in approximately 95% of the cases did not meet the criteria for receiving home health care as set forth above and incorporated herein by reference. Further, in each of these cases where a referral was made, the patient would receive multiple home visits, each and every one of which constituted a false claim under the FCA as defined herein.

48. The scheme between Defendants Parcon and Padez worked as follows. Defendant Padez did not have a doctor on staff who could certify a patient as being homebound, so it would pay USPHV to do that for them by getting Defendants Etindi and/or Ezukanma to sign the Form 485 described in detail above so that Defendant Padez could render services to the falsely certified patients. These services were nursing, physical therapy, and many other types of services other than what a doctor would perform. USPHV also billed Defendant Padez for the services of Doctors

Ezukanma or Etindi, and many times these patients would be recertified multiple times and stay on home health services for years. An audit has now shown that on average, well over 90% of the certifications of the patients as being homebound by Doctors Ezukanma or Etindi were fraudulent.

49. Accordingly, there was a scenario where USPHV was submitting false claims, doctors Ezukanma and/or Etindi who certified and recertified the patients as being home bound submitted false claims, and Defendant Padez which paid USPHV to get patients certified likewise knowingly, willfully, and intentionally submitted False Claims for each and every visit (sometimes several times a week) after getting the patient certified. Defendant Padez came to Defendant Parcon and USPHV knowing that its medical director and assistant medical director (Defendants Ezukanma and/or Etindi—both now incarcerated for Medicare fraud) would certify virtually any patient as homebound whether they were or not--without even seeing the patient!

50. Defendant Padez knew that Defendants Etindi and/or Ezukanma had certified their patients as home bound knowing that Defendants Etindi and/or Ezukanma had never seen the patient, so each and every claim that was intentionally, willfully and knowingly submitted to Medicare by Defendant Padez that were certified by Defendants Etindi and/or Ezukanma were False Claims under the FCA as defined elsewhere herein. Out of the referrals set forth above, most every patient was seen on multiple occasions over several months if not years, resulting in thousands of false claims being knowingly, willfully and intentionally submitted by Defendant Padez at $5,500-$11,000 per false claim as described elsewhere herein.

51. As to the time frame during which the fraudulent claims were submitted to Medicare by Defendant Padez the time frame is not the global time frame set forth above in Section A. Rather, the time frame for Padez is the time of the first referral during the 2008-2014 time frame to the last referral during that time.

### 8. IMPROPER REFERRALS AND CERTIFICATIONS AND
### BILLING MEDICARE FOR FALSE CLAIMS BY DEFENDANT MAESE

52. As was the case with Defendants Ezukanma and Etindi, Defendant Dr. Frederico Maese routinely certified patients as homebound when they were not. On an overwhelming majority of the time, he did so without ever seeing the patient! On multiple occasions, Defendant Maese would see the same patients in the same week or the even the same day, all of which visits were medically unnecessary. Defendant Maese conducted multiple medically unnecessary procedures and knowingly, willfully and intentionally billed these false claims to Medicare (all of the foregoing in this paragraph being the "how" for Rule 9(b) purposes as to Defendant Maese). The "where" was at his office and/or seeing the patients in their homes even though as reflected above in a majority of cases they did not meet the criteria for "honebound" certification, the "when" was primarily 2014 and 2015, and the "who" again was the entire patient population of USPHV after it was shut down by the Raid. Essentially, Defendant Maese picked up where Etindi and Ezukanma left off after the Raid.

53. Attached hereto collectively as Exhibit "C" and incorporated by refence and to be filed filed under seal for HIPAA reasons are documents showing payments received by Defendant Maese from USPHV, identifying the names and number of patients he saw for which false claims were submitted to Medicare. These documents show that Dr Maese submitted claims for at least 200 patients to Medicare within an approximate one month period for USPHV patients. As the billing records reflect, Maese and USPHV had an arrangement whereby Maese would bill Medicare for his "services", and USPHV would be paid 70% of the amount of the service and Defendant Maese kept 30% for each USPHV patient. Exhibit "C" further reflects that Defendant Maese was paid 30% (approximately $14,000) of the amount of service on each of the 200 patients, and that he paid approximately $33,000 to USPHV for its 70% share during this time frame.  The

Government is entitled to recover 3 times the amount retained by Defendant Maese, plus $11,000 in civil monetary penalties for each of the 200 claims submitted to Medicare, amounting to $2.2 Million. Thus, Plaintiff is entitled to recover on behalf of the government $2.242,000, plus reasonable attorney's fees and expenses. Plaintiff believes the amounts billed by Defendant Maese to Medicare were many multiples of this amount, but thus far Plaintiff has not located further documentation of same Relator was only able to view between 10-20 percent of the over 500 boxes of documents.

## 9.WAIVER OF CO-PAY RESULTING IN ILLEGAL KICKBACKS TO PATIENTS BY DEFENDANT MAESE

54. Defendant Maese also provided illegal kickbacks to patients by waiving their co-pay. Further, Defendant Maese always coerced patients to sign a supplemental waiver of co-pay. While Relator was assisting doctors in the field, he witnessed many of these supplemental forms being signed by patients. Copies of these forms reside in the home care folder. In order to encourage Medicare patients to receive Medical care from Defendant Maese, Defendant Maese would never attempt to collect the co-pay for any patient. This provided an incentive which was illegal and all part of the plan to induce as many patients as possible to participate in receiving home health care from Maese.

55. Accordingly, while the amounts involved concerning the co-pay itself is minor in the scheme of things, each and every service provided by Defendant Maese without collecting a co-pay resulted in the voluntary, knowingly, willfully and intentionally submission of a False Claim under the FCA by Maese. Thus, for each claim voluntarily, knowingly, willfully and intentionally submitted by Defendant Maese to Medicare in which a co-pay was waived, it is liable to the government under the FCA for $5,500-11,000 in civil monetary penalties for EACH AND EVERY service provided by Maese on a USPHV patient. By way of example, if there were "only" 200

USPHV patients for whom co-pay was waived, Mases would be liable for up to $2.2 million in penalties alone (500 x $11,000)!

56. According to the Department of Health and Human Services (HHS), Office of Inspector General (OIG), "It is unlawful to routinely waive co-payments, deductibles, coinsurances or other patient responsibility payments." *(67 Fed. Reg. 72,896 (Dec. 9, 2002)).* This applies to health care and services paid by Medicare and any other program paid partially or in full with federal funds. The OIG issued a Special Fraud Alert warning about this specific practice that year. *OIG Special Fraud Alert (1994) "Routine Waiver of Medicare Part B Copayments and Deductibles"*:

What Are Medicare Deductible and Copayment Charges?

The Medicare ``deductible'' is the amount that must be paid by a Medicare beneficiary before Medicare will pay for any items or services for that individual. Currently, the Medicare Part B deductible is $100 per year.

``Copayment'' (``coinsurance'') is the portion of the cost of an item or service which the Medicare beneficiary must pay. Currently, the Medicare Part B coinsurance is generally 20 percent of the reasonable charge for the item or service. Typically, if the Medicare reasonable charge for a Part B item or service is $100, the Medicare beneficiary (who has met his [or her] deductible) must pay $20 of the physician's bill, and Medicare will pay $80.

Why Is it Illegal for ``Charged-Based'' Providers, Practitioners and Suppliers to Routinely Waive Medicare Copayment and Deductibles?

Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.

A ``charge-based'' provider, practitioner or supplier is one who is paid by Medicare on the basis of the ``reasonable charge'' for the item or service provided. 42 U.S.C. 1395u(b)(3); 42 CFR

405.501.                          Medicare typically pays 80 percent of the reasonable charge. 42
                                  U.S.C. 1395l(a)(1). …

A provider, practitioner or supplier who routinely waives Medicare Co-payments or deductibles is misstating its actual charge. For example, if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item.

In certain cases, a provider, practitioner or supplier who routinely waives Medicare copayments or deductibles also could be held liable under the Medicare and Medicaid anti-kickback statute. 42 U.S.C. 1320a-7b(b). The statute makes it illegal to offer, pay, solicit or receive anything of value as an inducement to generate business payable by Medicare or Medicaid. When providers, practitioners or suppliers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they may be unlawfully inducing that patient to purchase items or services from them….

One important exception to the prohibition against waiving Co-payments and deductibles is that providers, practitioners or suppliers may forgive the copayment in consideration of a particular patient's financial hardship. This hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect deductibles and copayments must be made….

58. As far back as 1991, the Office of Inspector General  ("OIG") issued a

Special Fraud Alert entitled "Routine Waiver of Copayments or Deductibles":

To help reduce fraud in the Medicare program, the Office of Inspector General is actively investigating health care providers, practitioners and suppliers of health care items and services who (1) are paid on the basis of charges and (2) routinely waive (do not bill) Medicare deductible and copayment charges to beneficiaries for items and services covered by the Medicare program.

59. OIG stated in another fraud alert/bulletin that Medicare fraud is evidenced by:

> Routine use of ``Financial hardship'' forms which state
> that the beneficiary is unable to pay the coinsurance/deductible
> (i.e., there is no good faith attempt to determine the beneficiary's
> actual financial condition).

60. Under certain circumstances, such as the indigency or financial hardship of the patient, co-pays and deductibles may be legally waived. However, it is crucial that the physician, practice or facility document the circumstances. In order to qualify for hardship status and waiver of co-pay, Medicare regulations require that a "Financial Hardship Application" be filled out by the patient and approved. This can't be a matter of routine, however, and should only be done when actual financial hardship and inability to pay are documented. Relator never observed a patient of Defendant Maese when he was seeing patients fill out a hardship application to obtain a waiver of co-pay.

## B. FACTS PERTAINING TO DALLAS MEDICAL CENTER

61. The conspiracy between Defendant USPHV and Defendant Dallas Medical Center worked similarly to the referrals to the home health agencies discussed above. Doctors (at the time—they no longer have a medical license) Ezukanma and/or Etindi would certify patients referred to Defendant Dallas Medical Center as needing to be hospitalized knowing that treatment was not needed and/or knowing that if a referral was made to Dallas Medical Center that improper claims would be submitted to Medicare.

62. Relator was personally aware from his interactions with Dallas Medical Center and conversations he had with Defendant Parcon that Defendant Dallas Medical Center routinely voluntarily, willfully,  knowingly and intentionally  (a) billed Medicare for hospital services that

were not medically necessary; (b) engaged in upcoding of procedures that were performed; and (c) allowed patients to stay much longer than needed for given procedures than was medically necessary, all for the purpose of voluntarily, willfully, knowingly and intentionally bill Medicare for false claims under the FCA. Relator knew that patients stayed longer than medically necessary because patients would often complain about the length of their stays after being discharged from Dallas Medical Center, and a review of the chart would often show that stays were much longer than medically necessary. Notably, Dr. Etindi himself filed his own qui tam whistleblower Complaint against Dallas Medical Center for that very reason, alleging that he referred a couple of patients who at most should have stayed 2 or 3 days on one occasion and 3-5 days on another were permitted to stay more than 30 days each! *U.S. ex. rel. Etindi v Dallas Medical Center*, Cause No. 3-13-cv-3010-B, p.3, pars. 11-12.

63. Relator was also involved with interactions with representatives of Dallas Medical Center soliciting patients from USPHV because it knew Doctors (at the time) Etindi and/or Ezukanma would certify a given patient as needing hospital services whether needed or not. Despite Parcon's knowledge of same, she routinely referred patients to Defendant Dallas Medical Center.  In its Motion to Dismiss, Dallas Medical Center alleged that Plaintiff could not point to any individuals involved in the scheme to defraud Medicare. To the contrary, in terms of who was involved in connection with these false claims being submitted and when it took place, the following series of emails between Dallas Medical Center and USPHV reveals some of the "who, what, when, where and how" of the scheme took place. Indeed, on several of the emails (some of which involved the Relator) it is revealed that Raji Kumar, the President of Dallas Medical Center, was involved in setting the fax process up to obtain referrals from USPHV, knowing that the purpose of said referrals was to voluntarily, willfully, knowingly and intentionally bill Medicare

for false claims under the FCA. The "who" for Rule 9(b) purposes) from Dallas Medical Center were Kumar, the CEO, Amy Parker-Ferguson MEd, BS, RN, LP, NREMT-P Chief Nursing Officer for Dallas Medical Center, as well as Morgan Howard, Nursing Administrative Assistant, and Dennis Webb from Dallas Medical Center. The pertinent e-mails setting the scheme in motion (and "how" and "when" [early 2012] for Rule 9(b) purposes) were as follows:

> From: **us physicians** <usphysicians@hotmail.com>
> Date: Fri, Feb 17, 2012 at 2:46 PM
> Subject: FW: US Physicians Fax Sheet
> To: ggbachman@gmail.com, morgan.howard@dallasmedcenter.com,
> amy.parker@dallasmedcenter.com
>
> *hello grant,*
> *here is the new form we  used at dmc .....tks a lot best merna*
> *pls do fax patient betty bailey asap...*
> *hello morgan,*
> *can you please forward info to amy asap so she can arrange transport today*
> *before 4 30 pm....tks a lot*
> *grant phone number is 214-920-9776*
>
> Subject: US Physicians Fax Sheet
> Date: Thu, 16 Feb 2012 14:26:55 -0600
> From: Morgan.Howard@dallasmedcenter.com
> To: AMY.Parker@dallasmedcenter.com; usphysicians@hotmail.com; DL-DMC-Nurse-
> Supervisors@dallasmedcenter.com; Dennis.Webb@dallasmedcenter.com
> Hi All,
> I have attached a copy of the US Physician Fax Sheet. If you have any questions please
> email me or call me at the # below.
> Merna – Can you also make sure that Grant has a copy of this? I do not have his phone
> number or email.
> Thank you and have a great day!
> Morgan Howard
> Nursing Administration Assistant
> Dallas Medical Center
> **972-888-7248**
> **972-888-7144** fax
> **morgan.howard@dallasmedcenter.com**
>
> ---------- Forwarded message ----------
> From: **us physicians** <usphysicians@hotmail.com>
> Date: Wed, Feb 8, 2012 at 12:45 PM

Subject: RE: wound referrals
To: ggbachman@gmail.com, amy.parker@dallasmedcenter.com
tks grant and amy...best merna

From: ggbachman@gmail.com
Date: Wed, 8 Feb 2012 12:04:34 -0600
Subject: Re: wound referrals
To: AMY.Parker@dallasmedcenter.com
CC: usphysicians@hotmail.com
Ms. Parker,

I have faxed to your assistant, Morgan Howard, the patient materials of Tom Joiner.
If you have any questions, please call me at 214-920-9776.
Regards,
Grant
On Wed, Feb 8, 2012 at 11:26 AM, AMY Parker <AMY.Parker@dallasmedcenter.com>
wrote:
Utilize fax number 972-888-7144
Attention : Morgan  Howard
Amy Parker-Ferguson MEd, BS, RN, LP, NREMT-P
Chief Nursing Officer for Dallas Medical Center
Emergency Preparedness & Education Coordinator
Office: 972-888-7100
Fax: 972-888-7146
Cell: 214-563-1816

**From:** us physicians [mailto:usphysicians@hotmail.com]
**Sent:** Wednesday, February 08, 2012 10:47 AM
**To:** AMY Parker
**Cc:** Raji Kumar; ggbachman@gmail.com
**Subject:** wound referrals
*tks amy..*
*grant our  us physicians referral- in -charge to fax you the demographics*
*and physical at your fax 972-888-7146..*
*thank you for your prompt response best merna*

Date: Tue, 7 Feb 2012 18:30:42 -0600
From: AMY.Parker@dallasmedcenter.com
To: usphysicians@hotmail.com
CC: Raji.Kumar@dallasmedcenter.com
Myrna
I wanted to reach out and discuss the wound patients you had mentioned coming to
DMC. Could you give me more details with these patients so I may properly
accommodate you.
Thanks
Amy Parker-Ferguson MEd, BS, RN, LP, NREMT-P

Chief Nursing Officer for Dallas Medical Center
Emergency Preparedness & Education Coordinator
Office: 972-888-7100
Fax: 972-888-7146
Cell: 214-563-1816

64. Attached hereto as Exhibit "D" and incorporated by reference and to be filed under seal is the fax cover sheet that began use in February of 2012 and continued until Relator left the employ of USPHV and related entities toward the end of 2014, answering the question of "when" this scheme took place with precision. The patients involved who Dallas Medical Center billed for unnecessary services, upcoding and the like, are revealed on copies of the fax forms that were seized during the raid discussed above. Although Relator does not currently possess the names of those patients, he knows exactly what documents (copies of the fax sheets and the charts of the patients for whom a fax was sent referring those patients for treatment) will show those patients for whom improper billing to Medicare took place.

65. Further, Dallas Medical Center is in possession of these fax sheets received by it and hence is in the best position to know what patients (the "who" for Rule 9(b) purposes) were billed for services to Medicare, and who in its billing office submitted the claims to Medicare, so it is given fair notice of the patients involved—those whose referrals were faxed by USPHV (including by Relator on occasion)—and also knows who within its facility (likely the billing department as in most cases) submitted the claims to Medicare. Once the form was faxed referring a patient, it was forseeable that Medicare would be billed for unnecessary services, and Relator has provided a reliable indicia that false claims were submitted by Dallas Medical Center to Medicare.

66. With regard to Dallas Medical Center billing Medicare for medical services that were not medically necessary, (1) there were false statements by Defendant Dallas Medical Center; (2)

made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with Dallas Medical Center billing Medicare for services that were not medically necessary, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by Dallas Medical Center to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by Defendant Dallas Medical Center to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

### D. SUMMARY OF FALSE
### CLAIMS ACT VIOLATIONS

67.  A "Claim" as defined in Section 3730 of the FCA as follows:

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
(i) is presented to an officer, employee, or agent of the United States; or
(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--
(I) provides or has provided any portion of the money or property requested or demanded; or
(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and
(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

A "False Claim" under Section 3729 of the FCA is defined as follows:
(a) Liability for certain acts.
(1) In general. Subject to paragraph (2), any person who--
(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property…or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

68. Utilizing the foregoing definitions of a False Claim set forth above in the FCA, a summary of the categories of False Claims voluntarily, willfully, knowingly and intentionally with the requisite scienter submitted by the Defendants set forth above that Relator is aware of include, but are not limited to, the following:

(a) Billing Medicare voluntarily, willfully, knowingly, intentionally for services rendered to "patients" by Defendants USPHV and Padez Home Health, Inc. knowing that said patients had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi;

(b) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendants USPHV and Padez Home Health, Inc were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(c) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendant Padez Home Health, Inc. and USPHV were "home bound" when they had not even examined the patient first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(d) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma, Etindi UNEC and/or Medpro for services rendered to patients of Defendant Padez Home Health, Inc. and USPHV, after certifying to Medicare that said patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(e) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma, Etindi, UNEC and/or Medpro for services rendered to patients of Defendant

Padez Home Health, Inc. and USPHV, after certifying to Medicare that said patients were "home bound" when they had not even examined the patient first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(f) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for services that were not medically necessary as described above and incorporated herein by reference;

(g) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for upcoding of services that were performed as described above and incorporated herein by reference;

(h) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for any services that were performed at its hospital for patients who were improperly certified as needing to be hospitalized as described above and incorporated herein by reference;

(i)Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, and intentionally submitting claims to Medicare for services that were medically unnecessary as described above and incorporated herein by reference;

(j) Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, intentionally submitting claims to Medicare for services that were upcoded as described above and incorporated herein by reference;

(k) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying that patients referred to Dallas Medical Center needed to be hospitalized knowing that they did not need hospitalization;

(l) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for services rendered to patients when they billed code 99354 on 98% of the approximate 27,000 patients they billed Medicare representing to Medicare that they had spent 90 minutes with each payment when they knew they had only spent on average 15-20 minutes with a patient;

(m) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for over 24 hours per day collectively on dozens of occasions from 2010 through early 2013, including at least 15 times they billed over 100 hours in one day!;

(n) Signing of Form 485 Certification Forms by Defendants Ezukanma Etindi and Maese who had not examined patients prior to doing so as  described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(o) Forging of Form 485 Certification Forms by Defendants Parcon and Cua and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(p) Billing Medicare by Defendant Maese for certifying to Medicare that patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(q) Signing of Conditions of Participation forms by Defendant Cua and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms when the forms should be signed by doctors as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

 (r) Improper referrals from Defendant Padez, described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

 (s) Improper referrals and fraudulent billings to Medicare by Defendant Maese, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare by USPHV and/or Maese; and

(t) Billing Medicare for medically unnecessary services by each and every Defendant to this action as described above and incorporated herein by reference.

69. With regard to each of the foregoing allegations (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the

alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## VI. CAUSES OF ACTION

### COUNT ONE-- SUBSTANTIVE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729(a)(A), (B),(D) and  (G)]]

70. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

71. This is a claim for treble damages, civil penalties and forfeitures under the FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, as amended.

72. Through the acts described above, the Defendants, by and through their officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants USPHV, Dallas Medical Center, and the other corporate Defendants listed above authorized and ratified all the violations of the FCA committed by their respective officers, agents, and employees.

73. Through the acts described above and otherwise, defendants knowingly used false records and statements to conceal, avoid, and/or decrease the Defendants' obligations to repay money to the United States Government that the defendants improperly and/or fraudulently

received. Defendants also failed to disclose to the United States Government material facts that would have resulted in substantial repayments by the Defendants to the United States Government and the State of Texas.

## A. HOME HEALTH AGENCIES and PARCON

74. If the U.S. Government had known that Defendant Padez Home Health, Inc. was billing Medicare for services rendered knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi, Medicare would not have paid those claims. Said Defendant failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant Padez received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received had the material fact set forth above been disclosed.

75. If the U.S. Government had known that Defendants USPHV and Parcon, were billing Medicare for services rendered knowing that patients for which billings were submitted had been improperly certified as being "homebound" because Conditions of Participation forms had been

signed by nurses and other employees of Defendant USPHV that Parcon directed to forge said forms when all of said Defendants knew that the forms had to be signed by doctors to be in compliance with Medicare regulations, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, individually and/or by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Each such Defendant received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received had the material facts set forth above been disclosed.

76. With regard to each of the foregoing allegations in this Section A (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

**B. DEFENDANTS EZUKANMA, ETINDI, UNEC,
MEDPRO, MAESE, and PADEZ**

77. If the U.S. Government had known that Defendants Ezukanma, Ezuknma, M.D., Etindi
UNEC, Medpro, Maese and/or Padez were billing Medicare for services rendered to patients of
Defendant Padez Home Health, Inc. and/or other home health agencies knowing that patients for
which billings were submitted had been improperly certified as being "homebound" by Defendants
Ezukanma and Etindi, Medicare would not have paid those claims. Said Defendants failed to
disclose to the United States Government these material facts that would have resulted in
substantial repayments by the Defendants to the United States Government and/or the payments
not being approved by Medicare in the first instance. In this regard, each of the Defendants listed
above, by and through their officers, agents, and employees (i) knowingly presented, or caused to
be presented, to the United States Government, a false or fraudulent claims for payment or
approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to
get false or fraudulent claims paid or approved by the United States Government; and (iii)
knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid,
or decrease an obligation to pay or transmit money or property to the United States Government.
Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC, Medpro and/or Padez received payment
from Medicare for these false or fraudulent claims during the time periods specified hereinabove
that they should not have received if the material facts set forth above had been disclosed.

78. If the U.S. Government had known that Defendants Ezukanma, Etindi and/or Maese were billing Medicare for services rendered to patients of Defendant Padez Home Health, Inc. and/or other home health agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendants Ezukanma, Etindi and/or Maese because they had signed Form 485 Certification Forms when they had not examined patients prior to doing so, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government this material fact that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above(i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Etindi, Maese, USPHV, and Padez received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material fact set forth above had been disclosed.

79. If the U.S. Government had known that Defendants Ezukanma and/or Etindi and/or Maese were billing Medicare for services rendered to patients of Defendant Padez Home Health, Inc. and/or other home health care agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" because they had allowed employees of USPHV, including but not limited to Defendant Parcon, to forge their signatures on Form 485 Certification Forms when Defendants Ezukanma and/or Etindi had not examined

patients prior to them doing so, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above(i) knowingly presented, or caused to be presented, to the United States Government,  false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Etindi, Maese and Padez received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

80. If the U.S. Government had known that Defendants Ezukanma, Ezuknma, M.D., and/or Etindi were billing Medicare for services rendered to patients of Defendant Padez Home Health, Inc. and/or other home health care patients knowing that Defendants Ezukanma, Ezuknma, M.D., and/or Etindi billed code 99354 on approximately 98% of the approximate 27,000 patients they billed Medicare, thereby  representing to Medicare that they had spent 90 minutes with each patient when they knew they had only spent on average 15-20 minutes with each patient, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Padez, Ezukanma, and Etindi, individually, and  Ezuknma, M.D., by and through its officers, agents, and employees (i) knowingly presented, or caused to be

presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., Etindi and Padez received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

81. If the U.S. Government had known that Defendants Ezukanma and/or Etindi were billing Medicare for services rendered to patients of Defendant Padez Home Health, Inc. and/or other home health care patients knowing that Defendants Ezukanma and/or Etindi had billed Medicare for over 24 hours per day collectively on dozens of occasions from 2010 through early 2013, including at least 15 times they billed over 100 hours in one day, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Ezukanma, and Etindi (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., and Etindi received payment from Medicare for these false or

fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

82. If the U.S. Government had known that Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC, Medpro and/or Maese were billing Medicare for services rendered to patients of Padez Home Health, Inc. and/or other home health agencies knowing that patients for which billings were submitted by Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC, Medpro and/or Padez had not even examined first by Defendants Ezukanma and Etindi to determine whether or not they were not home bound per Medicare guidelines and for that reason had been improperly certified by Defendants Ezukanma and/or Etindi and/or Maese as being "homebound" under Medicare guidelines set forth above by, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., Etindi Maese, UNEC, Medpro and/or Padez received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received.

83. If the U.S. Government had known that Defendant Maese was billing Medicare for services rendered to patients of home health agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendant Maese, Medicare would not have paid those claims. Said Defendant failed to disclose to the United States Government this material fact that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendant Maese (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant Maese received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that he should not have received if the material fact set forth above had been disclosed.

84. With regard to each of the foregoing allegations in this Section B (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## C. DALLAS MEDICAL CENTER

85. If the U.S. Government had known that Defendant Dallas Medical Center was billing Medicare for services that (a) were not medically necessary and/or (b) for upcoding of services that were performed on patients, (c) for services rendered to patients who were improperly certified to receive treatment, and/or (d) services for patient stays much longer than medically warranted, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendant Dallas Medical Center, by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant Dallas Medical Center received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received. The owner and parent of Defendant Dallas Medical Center, Prime Healthcare Services, is jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

86. If the U.S. Government had known that Defendant Dallas Medical Center was billing Medicare for services pursuant to an arrangement whereby Defendants Parcon/USPHV and Dallas Medical Center had a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be submitting claims to Medicare for services that (a)were not medically necessary and/or (b) for upcoding of services that were performed on patients, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Dallas Medical Center, by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant Dallas Medical Center received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received. The owner and parent of Defendant Dallas Medical Center, Prime Healthcare Services, is jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

87. With regard to each of the foregoing allegations in this Section C (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or

fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

## F. SUMMARY OF FALSE CLAIMS

88. A "Claim" as defined in Section 3730 of the FCA as follows:

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
(i) is presented to an officer, employee, or agent of the United States; or
(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--
(I) provides or has provided any portion of the money or property requested or demanded; or
(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and
(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

89. A "False Claim" under Section 3729 of the FCA is defined as follows:

(a) Liability for certain acts.
(1) In general. Subject to paragraph (2), any person who--
(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
(D) has possession, custody, or control of property or money used, or to be used, by the Government and

knowingly delivers, or causes to be delivered, less than all of that money or property…or
(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

90. Additionally, Plaintiff/Relator on behalf of the U.S. Government is entitled to recover civil monetary penalties pursuant to the following statutes:

42 U.S.C. §1320a–7a. Civil Monetary Penalties

(A) IMPROPERLY FILED CLAIMS

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that—

(1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines—

(A) is for a medical or other item or service that the person knows or should know was not provided as claimed, including any person who engages in a pattern or practice of presenting or causing to be presented a claim for an item or service that is based on a code that the person knows or should know will result in a greater payment to the person than the code the person knows or should know is applicable to the item or service actually provided,
(B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,
(C) is presented for a physician's service (or an item or service incident to a physician's service) by a person who knows or should know that the individual who furnished (or supervised the furnishing of) the service—

(i) was not licensed as a physician,
(ii) was licensed as a physician, but such license had been obtained through a misrepresentation of material fact (including cheating on an examination required for licensing), or
(iii) represented to the patient at the time the service was furnished that the physician was certified in a medical

specialty by a medical specialty board when the
individual was not so certified,

(D) is for a medical or other item or service furnished during a period in which the person was excluded from the Federal Medicare program (as defined in section 1320a–7b(f) of this title) under which the claim was made pursuant to Federal law.

(E) is for a pattern of medical or other items or services that a person knows or should know are not medically necessary;

(2) knowingly presents or causes to be presented to any person a request for payment which is in violation of the terms of (A) an assignment under section 1395u(b)(3)(B)(ii) of this title, or (B) an agreement with a State agency (or other requirement of a State plan under subchapter XIX of this chapter) not to charge a person for an item or service in excess of the amount permitted to be charged, or (C) an agreement to be a participating physician or supplier under section 1395u(h)(1) of this title, or (D) an agreement pursuant to section 1395cc(a)(1)(G) of this title;

(3) knowingly gives or causes to be given to any person, with respect to coverage under subchapter XVIII of this chapter of inpatient hospital services subject to the provisions of section 1395ww of this title, information that he knows or should know is false or misleading, and that could reasonably be expected to influence the decision when to discharge such person or another individual from the hospital;

(4) in the case of a person who is not an organization, agency, or other entity, is excluded from participating in a program under subchapter XVIII of this chapter or a State health care program in accordance with this subsection or under section 1320a–7 of this title and who, at the time of a violation of this subsection—

(A) retains a direct or indirect ownership or control interest in an entity that is participating in a program under subchapter XVIII of this chapter or a State health care program, and who knows or should know of the action constituting the basis for the exclusion; or

(B) is an officer or managing employee (as defined in section 1320a–5(b) of this title) of such an entity;

(5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a–7(h) of this title) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this chapter, or a State health care program (as so defined);

(6) arranges or contracts (by employment or otherwise) with an individual or entity that the person knows or should know is excluded from participation in a Federal health care program (as defined in section 1320a–7b(f) of this title), for the provision of items or services for which payment may be made under such a program;

(7) commits an act described in paragraph (1) or (2) of section 1320a–7b(b) of this title;

(8) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program; or

(9) fails to grant timely access, upon reasonable request (as defined by the Secretary in regulations), to the Inspector General of the Department of Health and Human Services, for the purpose of audits, investigations, evaluations, or other statutory functions of the Inspector General of the Department of Health and Human Services;…

(10) knows of an overpayment (as defined in paragraph (4) of section 1320a7k(d) of this title) and does not report and return the overpayment in accordance with such section;

shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; in cases under paragraph (7), $50,000 for each such act, in cases under paragraph (8), $50,000 for each false record or statement, or in cases under paragraph (9), $15,000 for each day of the failure described in such paragraph; or in cases under paragraph (9), $50,000 for each false statement or misrepresentation of a material fact). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose; or in cases under paragraph (9), an assessment of not more than 3 times the total amount claimed for each item or service for which payment was made based upon the application containing the false statement or misrepresentation of a material fact).

91. Utilizing the foregoing definitions of a False Claim set forth above in the FCA, a summary of the categories of False Claims voluntarily, willfully, knowingly and intentionally with the requisite scienter submitted by the Defendants set forth above that Relator is aware of include, but are not limited to, the following:

(a) Billing Medicare voluntarily, willfully, knowingly, intentionally for services rendered to "patients" by Defendants USPHV and Padez Home Health, Inc. knowing that said patients had been improperly certified as being "homebound" by Defendants Ezukanma and Etindi;

(b) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendants USPHV and Padez Home Health, Inc were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(c) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying to Medicare that patients of Defendant Padez Home Health, Inc. and USPHV were "home bound" when they had not even examined the patient first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(d) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma, Etindi UNEC, Medpro and/or Maese for services rendered to patients of Defendant Padez Home Health, Inc. and USPHV, after certifying to Medicare that said patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

(e) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma, Etindi, UNEC, Medpro and/or Maese for services rendered to patients of Defendant Padez Home Health, Inc. and USPHV, after certifying to Medicare that said patients were "home bound" when they had not even examined the patient first to determine whether or not they were not home bound per Medicare guidelines as described above and incorporated herein by reference;

 (f) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for services that were not medically necessary as described above and incorporated herein by reference;

(g) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for upcoding of services that were performed as described above and incorporated herein by reference;

(h) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Dallas Medical Center for any services that were performed at its hospital for patients who were improperly certified as needing to be hospitalized as described above and incorporated herein by reference;

(i)Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, and intentionally submitting claims to Medicare for services that were medically unnecessary as described above and incorporated herein by reference;

(j) Defendants Parcon/USPHV and Dallas Medical Center having a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be voluntarily, willfully, knowingly, intentionally submitting claims to Medicare for services that were upcoded as described above and incorporated herein by reference;

(k) Billing Medicare voluntarily, willfully, knowingly, and intentionally by Defendants Ezukanma and Etindi for certifying that patients referred to Dallas Medical Center needed to be hospitalized knowing that they did not need hospitalization;

 (l) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for services rendered to patients when they billed code 99354 on 98% of the approximate 27,000 patients they billed Medicare representing to Medicare that they had spent 90 minutes with each payment when they knew they had only spent on average 15-20 minutes with a patient;

(m) Billing Medicare voluntarily, willfully, knowingly and intentionally by Defendants Ezukanma and Etindi for over 24 hours per day collectively on dozens of occasions from 2010 through early 2013, including at least 15 times they billed over 100 hours in one day!;

(n) Signing of Form 485 Certification Forms by Defendants Ezukanma Etindi and Maese who had not examined patients prior to doing so as  described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(o) Forging of Form 485 Certification Forms by Defendant Parcon and other nurses and other employees of Defendant USPHV that Parcon directed to forge said forms as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(p) Billing Medicare by Defendant Maese for certifying to Medicare that patients were "home bound" when they were not home bound per Medicare guidelines as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(q) Signing of Conditions of Participation forms by nurses and other employees of Defendant USPHV that Parcon directed to forge said forms when the forms should be signed by doctors as described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(r) Improper referrals from Defendant Padez, described above and incorporated herein by reference, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare;

(s) Improper referrals and fraudulent billings to Medicare by Defendant Maese, causing false claims to be voluntarily, willfully, knowingly and intentionally submitted to Medicare by USPHV and/or Maese; and

(t) Billing Medicare for medically unnecessary services by each and every Defendant to this action as described above and incorporated herein by reference.

92. With regard to each of the foregoing allegations (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

93. The United States Government and its citizens have been damaged as a result of the Defendants' violations of the FCA. Accordingly, Relator requests that he be awarded 30% of the Recovery because the U.S. Government has elected not to intervene in this action at this time, plus all attorneys' fees, costs and expenses incurred pursuant to the FCA which provides in pertinent part:

§ 3730. Civil Actions for False Claims

(d) AWARD TO QUI TAM PLAINTIFF

… (2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

### COUNT TWO—FEDERAL FALSE CLAIMS ACT CONSPIRACY [31 U.S.C. §§ 3729(C)]

94. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

95. This is a claim for treble damages, civil penalties and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

96. Through the acts described above and otherwise, the Defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the United States government by getting false and fraudulent claims allowed or paid. Defendants have also conspired with each other and with unnamed co-conspirators to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to the Defendants. Defendants have taken substantial steps in furtherance of those conspiracies by submitting False Claims for payment or approval that contained these improper charges, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices and those of their co-Defendants, as well.

97. The Medicare program, unaware of Defendants' conspiracies or the falsity of the records and statements, has paid claims to the Defendants, and as a result thereof, has paid tens of

millions of dollars in Medicare reimbursements that it would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions caused to be made by Defendants, the United States has not recovered Medicare funds from the Defendants that otherwise would have been recovered.

98. The various Defendants combined, conspired, and agreed together to defraud the United States by knowingly submitting False Claims and billing Medicare for the purpose of getting the False Claims paid, or allowed, and committed other overt acts as set forth above in furtherance of that conspiracy. This conspiracy caused the United States government to pay tens of millions of dollars for False Claims that should not have been paid to the Defendants, for which damages the Relator seeks recovery thereof.

## A. CONSPIRACY BETWEEN DALLAS MEDICAL CENTER AND PARCON/USPHV

99. If the U.S. Government had known that Defendant Dallas Medical Center was billing Medicare for services pursuant to a conspiracy whereby  Defendants Parcon/USPHV and Dallas Medical Center had a quid pro quo that they would refer each other Medicare patients with each party knowing that the party they were referring the patients to would be submitting claims to Medicare for services that (a)were not medically necessary and/or (b) for upcoding of services that were performed on patients and/or (c) for stays longer than medically necessary, Medicare would not have paid those claims. The purpose of the conspiracy was to defraud Medicare by submitting False Claims by each of said Defendants. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Dallas Medical Center and USPHV, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United

States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government.

100. Defendants Dallas Medical Center and USPHV received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received had the facts of this conspiracy been known by or disclosed to the Government. The owners of USPHV, including but not limited to Defendants Parcon, and Ezukanma, are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations. The owners of Dallas Medical Center, including but not limited to its parent Prime Specialty Healthcare, are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

## B. CONSPIRACY BETWEEN DEFENDANTS, USPHV, PARCON, AND DEFENDANTS EZUKANMA, ETINDI, UNEC, MEDPRO, MAESE, and/or PADEZ

101. Defendants Ezukanma, Ezuknma, M.D., Etindi UNEC, Medpro and/or Maese (sometimes hereinafter collectively referred to as "Doctor Billing Entities") and USPHV and Parcon were engaged in a conspiracy, the purpose of which was to defraud Medicare by submitting False Claims, to bill Medicare for services rendered to patients of Defendant Padez Home Health, Inc. and/or other home health agencies knowing that patients for which billings were submitted had been improperly certified as being "homebound" by Defendants Ezukanma, Etindi, and/or Maese. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States

Government and/or the payments not being approved by Medicare in the first instance. In this regard, each of the Defendants listed above, by and through their officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Padez, Ezukanma, Ezuknma, M.D., Etindi, Maese, UNEC and/or Medpro received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

102. The purpose of the conspiracy was to allow the Doctor Billing Entities and Defendant Padez to submit false and fraudulent claims to Medicare, a healthcare benefit program as defined in 18 U.S.C. Sec. 24(b), for physician house call visits and home health care, respectively. The Doctor Billing Entities and Home Health Care Agencies unlawfully enriched themselves by such conduct and by concealing from Medicare the nature and existence of the conspiracy.

103. Regarding the manner and means of the conspiracy, the purpose for which was to defraud Medicare, the Home Health Care Agencies including Padez and the Doctor Billing Entities essentially reversed the home health process. Typically, a physician initiates the home health care process by ordering that a patient receive home health care after (a) observing the patient in a face to face encounter, and (b) believed that the patient met the standards for receiving home health care, and (c) signed a Form 485 certification form ordering home health care for each such patient.

As part of the conspiracy among the Home Health Care Agencies and the Doctor Billing Entities, the Home Health Care Agencies actually initiated the process of requesting home health care rather than it first being ordered by a physician. The reason for this was that as part of the conspiracy among the Home Health Care Agencies and the Doctor Billing Entities, the Home Health Care Agencies knew that the Doctor Billing Entities, specifically Doctors Ezukanma, Etindi, and/or Maese would sign a Form 485 form certifying any patient as being homebound whether or not they had seen the patient and regardless of whether Doctors Ezukanma, Etindi and/or Maese believed the patients in question qualified for home health care under the criteria described above.

104. Part and parcel of the conspiracy was that Doctors Ezukanma and Etindi would allow employees of USPHV, including but not limited to Defendant Parcon and other employees of USPHV to forge their signatures on Form 485's and/or Conditions of Participation forms described above regardless of whether the doctors had seen the patient. The variations of "signatures" by who were supposedly Doctors Ezukanma and/or Etindi are laughable as they can't possibly be the signatures of the same person! Once a request was made by one of the Home Health Care Agencies for a doctor (Defendants Ezukanma and/or Etindi) to certify or recertify a patient for home health care, Defendant Parcon and USPHV directed USPHV employees to schedule the Medicare beneficiary for a physician home health visit that would be fraudulently billed to Medicare.

105. Moreover, USPHV, at the direction of Defendants Parcon, Ezukanma, and Etindi submitted all claims as if Doctors Ezukanma and Etindi had performed the services to Medicare beneficiaries regardless of who actually performed the services, be it another doctor, physician assistant, or nurse practitioner. This caused Medicare to pay a higher reimbursement rate because physician assistants and nurse practitioners are reimbursed at a lower rate than doctors.

106. Defendant Padez and Doctor Billing Entity Defendants received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received had the facts of this conspiracy been known by or disclosed to the Government. The owners of each of said Defendants are jointly and severally liable for damages and civil penalties for these False Claims submitted in violation of Medicare regulations.

107. Defendants Ezukanma, Ezuknma, M.D., and/or Etindi were engaged in a conspiracy to bill Medicare for services rendered to patients of Defendant Padez Home Health, Inc. and/or other home health care patients at an alarming rate! Defendants Ezukanma, Ezuknma, M.D., and/or Etindi billed code 99354 on approximately 98% of the approximate 27,000 patients they billed Medicare, thereby representing to Medicare that they had spent 90 minutes with each patient when they knew they had only spent on average 15-20 minutes with each patient, Medicare would not have paid those claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Ezukanma, and Etindi, individually, and  Ezuknma, M.D., by and through its officers, agents, and employees (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used,  false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Ezukanma, Ezuknma, M.D., and Etindi received payment from Medicare for these false or fraudulent claims during the time periods

specified hereinabove that they should not have received if the material facts set forth above had been disclosed.

## C. CONSPIRACY OF DEFENDANTS USPHV, PADEZ GAINES, PARCON, EZUKANMA, ETINDI and MAESE

108. Defendants USPHV, Padez, Gaines, Parcon, Ezukanma, Etindi and Maese engaged in a conspiracy, the purpose of which was to defraud Medicare by submitting False Claims, to make it appear as though USPHV, AGood, and Essence were three (3) separate and independent entities when they were billing Medicare when in fact they were operated as one global entity. The same employees often worked for and were paid by all three (3) entities. In fact, Relator himself was paid by ALL THREE ENTITIES at differing points in time! As part of the conspiracy, whose purpose was to defraud Medicare, Defendants Ezukanma and Etindi certified 94% of the Medicare beneficiaries receiving home health services from AGood, and 64% of the beneficiaries receiving home health services from Essense. All of said Defendants concealed from Medicare that Defendant Parcon exercised control over USPHV, AGood, and Essence.

109. Had Medicare known about the true ownership and improper relationship between USPHV, AGood, and Essence, Medicare would not have allowed any of them to enroll in the Medicare program, much less pay thousands of fraudulent Medicare claims submitted over the years. Defendant USPHV and former Defendants AGood, and Essence received payments from Medicare for these false or fraudulent claims during the time periods specified hereinabove that it should not have received had the facts of this conspiracy been known by or disclosed to the Government.

## D. CONSPIRACY OF DEFENDANTS MAESE, PARCON, GAINES, AND USPHV REGARDING WAIVER OF CO-PAYS

110. Defendants Maese, Parcon, Gaines, and USPHV engaged in a conspiracy, the purpose of which was to defraud Medicare by submitting False Claims, whereby they would systematic waive co-pays on all or substantially all of their patients in violation of Medicare guidelines. None of these Defendants ever requested that a hardship application be filled out and submitted and considered to ascertain whether a waiver of co-pay was justified as required by Medicare regulations. If Medicare had known of the conspiracy in this regard, Medicare would not have paid claims resulting from those claims for which co-pays were waived as it resulted in Medicare paying more than it should have for each such claims. Said Defendants failed to disclose to the United States Government these material facts that would have resulted in substantial repayments by the Defendants to the United States Government and/or the payments not being approved by Medicare in the first instance. In this regard, Defendants Maese, Parcon and Gaines (i) knowingly presented, or caused to be presented, to the United States Government, false or fraudulent claims for payment or approval; (ii) knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants Parcon, Gaines, and Maese USPHV received payment from Medicare for these false or fraudulent claims during the time periods specified hereinabove that they should not have received.

## E. CONSTRUCTIVE TRUST

111. Relator requests a thorough investigation and accounting of any and all transfers of money by and between the Defendant entities, including all Defendants named herein and any other companies or entities or persons to which transfers of money received by the Defendants

from Medicare. To the extent that it is determined that the Defendants have conspired to transfer monies and/or assets and acquire assets from monies derived directly or indirectly from Medicare, Relator requests that a constructive trust be established over the property and assets of all such persons and entities.

112. Additionally, as a result of the Raid and the investigation by the Government because of Relator coming forward and reporting this massive case of Medicare fraud, the Government was able to seize several hundred thousand dollars from the residence of Defendant Ezukanma. Those monies are a direct result of the fraud perpetrated by the Defendants and this action initiated by Relator, and Relator requests that a constructive trust be placed on all of such assets and monies seized by the government and that Relator be entitled to a Relator fee of 30% of the recovery from all such assets.

## VII.

### PLAINTIFF IS ENTITLED TO JUDGMENTS AS A MATTER OF LAW AS TO DEFENDANTS EZUKANMA, ETINDI, PARCON, GAINES, AND MAESE

### A. THE PLEA AGREEMENTS OF ETINDI, PARCON AND GAINES AND CONVICTION OF EZUKANMA

113. Defendants Ezukanma, Etindi, Parcon, and Gaines had criminal charges filed against them in large part based up on their actions described herein in the case of *United States v. Ezukanma, et. al.* No. 3:15-CR-254-B (N.D. Tex.) (Boyle, J.) (hereinafter "*Criminal Case*"). Defendants Etindi, Parcon, and Gaines elected to plead guilty to conspiracy to commit Medicare fraud as described below. Defendant Ezukanma elected to go to trial and was convicted of Medicare fraud and conspiracy to commit Medicare fraud.

114. A Factual Resume was filed pertaining to Defendant Etindi on April 8, 2016. [Dkt. 89; App. at 014-18]. A Plea Agreement was also reached with Defendant Etindi on that date whereby said Defendant pled guilty to Count One of the Indictment--conspiracy to commit Medicare fraud. [Dkt. 90; App.at 019-25]. The stipulated facts concerning the manner and means of the conspiracy were set forth in great detail in the factual resume of Defendant Etindi, which facts closely mirror those of Relator in his Original and subsequent amended complaints. A Judgment was later entered pertaining to Defendant Etindi on August 21, 2017 whereby Defendant Etindi was found guilty of conspiracy to commit health care fraud in violation of 18 U.S.C. Section 1347 and 1349. [Dkt. 333; App. at 026-30].  He was sentenced to a period of incarceration of 30 months and ordered to pay restitution of $18,309,171.21 jointly and severally with Defendants Parcon and Gaines, among other defendants. [Dkt. 333; App. at  027-29].

115. A Factual Resume was filed pertaining to Defendant Parcon on November 4, 2016. [Dkt. 144; App. at 031-35]. A Plea Agreement was also reached with Defendant Parcon on that date whereby said Defendant pled guilty to Count One of the Indictment—conspiracy to commit Medicare fraud. [Dkt.143; App.at 036-042]. The stipulated facts concerning the manner and means of the conspiracy were set forth in great detail in the factual resume of Defendant Parcon, which facts closely mirror those of Relator in his Original and subsequent amended complaints. A Judgment was entered pertaining to Defendant Parcon on August 21, 2017 whereby Defendant Parcon was found guilty of conspiracy to commit health care fraud in violation of 18 U.S.C. Sections 1347 and 1349. [Dkt. 331; App. at 043-049]. She was sentenced to a period of incarceration of 120 months and ordered to pay restitution of $51,497,930.87. [Dkt. 333; App. at 047-49].

116. A Factual Resume was filed pertaining to Defendant Gaines on November 4, 2016. [Dkt. 148; App. at 050-056]. A Waiver of Indictment was filed and a Plea Agreement was also reached with Defendant Gaines on that date whereby said Defendant pled guilty to Count One of the Indictment—conspiracy to commit Medicare fraud. [Dkts. 147, 149; App. at 072-78]. Superseding Information was filed that day in connection with same. [Dkt.146; App. at 059-071]. The stipulated facts concerning the manner and means of the conspiracy were set forth in great detail in the factual resume of Defendant Gaines, which facts closely mirror those of Relator in his Original and subsequent amended complaints. A Judgment was entered pertaining to Defendant Gaines on August 22, 2018 whereby Defendant Gaines was found guilty of conspiracy to commit health care fraud in violation of 18 U.S.C. Sections 1347 and 1349. [Dkt. 464; App. at 086-092]. He was sentenced to a period of incarceration of 60 months and ordered to pay restitution of $9,323,957.60 [Dkt. 464, App. at 090-92].

117. As reflected above, Defendant Ezukanma elected to go to trial. Before the trial a Superseding Indictment was filed on February 7, 2017, alleging conspiracy to commit health care fraud in violation of 18 U.S.C. Sections 1347 and 1349, as well as health care fraud in violation of 18 U.S.C. Sections 1347 and 2. [Dkt. 203; App. at 103-109]. On March 24, 2017, the jury found Defendant Ezukanma guilty on all Counts alleged in the Superseding Indictment for health care fraud and conspiracy to commit health care fraud. [Dkt. 256; App.at 110-111]. A Judgment was entered as to Defendant Ezukanma on September 14, 2017 whereby the Defendant was sentenced to 200 months of incarceration and ordered to pay restitution of $34,003,151.24. [Dkt. 363; App. at 112-119]. Defendant Ezukanma appealed his conviction and on November 28, 2018, the United States Court of Appeals for the Fifth Circuit affirmed this court's judgment. *See United States v. Ezukanma*, __ Fed. App'x. __, 2018 WL 6264232 (5th Cir. 2018).

118. Because there is no genuine issue as to any material fact and the defendants' criminal convictions and/or plea agreements legally preclude them from challenging their civil liability under the False Claims Act, Relator Bachman is entitled to summary judgment as a matter of law. In this regard, the False Claims Act provides:

> Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730. 31 U.S.C. § 3731(e).

119. It is well established that "a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding ... [provided the questions were] 'distinctly put in issue and directly determined' in the criminal prosecution." *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 568–69, 71 S.Ct. 408, 413–14, 95 L.Ed. 534 (1951); *Thomas v. Can-Do, Inc.*, 74 F.3d 1236 (5th Cir. 1995) (collateral estoppel applies in criminal and civil cases to bar "relitigation of an issue actually and necessarily decided in a prior action") (citations omitted); *S.E.C. v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993). The essential elements of Defendants Etindi, Parcon and Gaines criminal pleas are the same as those that are relevant to their FCA violations. Further, the essential elements of the guilty verdict and Judgment as to Defendant Ezukanma are the same as those that are relevant to his FCA violations. The criminal proceeding determined as a matter of law the predicate facts necessary to find violations of the False Claims Act. As a result, defendants are prevented from denying the allegations of health care fraud detailed in Relator's Original and subsequent Amended Complaints.

### FALSE CLAIMS ACT DAMAGES AGAINST DEFENDANTS EZUKANMA, ETINDI, PARCON AND GAINES

120. The False Claims Act provides that persons violating the Act are liable "for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410) [$5,500—11,000 at all times applicable herein], plus 3 times the amount of damages which the Government sustains because of the act of that person."31 U.S.C. § 3729(a)(1). The Act also requires defendants to pay the attorneys' fees, expenses and costs incurred on behalf of the relator. *Id*. at 3730(d)(2). Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, civil penalties under the False Claims Act ranged from $5,500 to $11,000 per false claim at all times relevant to this action. 28 C.F.R. § 85.3(9).

120. The Court in the Criminal Case was required to determine the total amount of the victim's loss when ordering restitution when entering Judgments against them. 18 U.S.C. § 3664; *Boutte*, 907 F. Supp. at 242 (assessing treble FCA damages based on restitution order in related criminal case); *United States v. Szilvagyi*, 398 F. Supp. 2d 842, 849-50 (E.D. Mich. 2005) (same); *United States Ex Rel. Phi-Nga Jeannie Le v. Thaw and Kincaid*, No. 3:12-CR-261-P (N.D. Tex.) (same). Accordingly, judgment should be issued against these four Defendants in the following amounts:

**Noble Ezukanma**

121. Judge Boyle determined the loss suffered by United States as a result of the criminal actions of Defendant Ezukanma and ordered him to pay restitution of $34,003,151.24. Under the FCA, Relator is entitled to recover on behalf of the United States treble damages of $102,009,454.00 plus attorneys' fees, expenses and costs incurred on his behalf. Accordingly, Relator seeks Judgment against Defendant Ezukanma for total recovery in the amount of $102,009,454.00. Given the substantial nature of the above amounts, Relator will waive any claim

for additional civil penalties, as well as any claim for attorneys' fees, expenses and costs incurred on his behalf.

### Ransome Etindi

122. Judge Boyle determined the loss suffered by United States as a result of the criminal actions of Defendant Etindi and ordered him to pay restitution of $18,309,171.21. Under the FCA, Relator is entitled to recover on behalf of the United States treble damages of $54,927,513.60, plus attorneys' fees, expenses and costs incurred on her behalf. Accordingly, Relator seeks Judgment against Defendant Etindi for a total recovery in the amount of $54,927,513.60. Given the substantial nature of the above amounts, Relator will waive any claim for additional civil penalties, as well as any claim for attorneys' fees, expenses and costs incurred on his behalf.

### Myrna Parcon

123. Judge Boyle determined the loss suffered by United States as a result of the criminal actions of Defendant Gaines and ordered him to pay restitution of $51,497,930.87. Under the FCA, Relator is entitled to recover on behalf of the United States treble damages of $154,493,792, plus attorneys' fees, expenses and costs incurred on his behalf. Accordingly, Relator seeks Judgment against Defendant Parcon for total recovery in the amount of $154,493,792. Given the substantial nature of the above amounts, Relator will waive any claim for additional civil penalties, as well as any claim for attorneys' fees, expenses and costs incurred on his behalf.

### Ben Gaines

124. Judge Boyle determined the loss suffered by United States as a result of the criminal actions of Defendant Gaines and ordered him to pay restitution of $9,323,957.60. Under the FCA, Relator is entitled to recover on behalf of the United States treble damages of $27,971,872.80, plus attorneys' fees, expenses and costs incurred on his behalf. Accordingly, Relator seeks Judgment against Defendant Gaines for total recovery in the amount of $27,971,872.80. Given the substantial

nature of the above amounts, Relator will waive any claim for additional civil penalties, as well as any claim for attorneys' fees, expenses and costs incurred on his behalf.

## B. DAMAGES PLAINTIFF IS ENTITLED TO
## RECOVER AGAINST DEFENDANT MAESE

125. As reflected above, attached hereto collectively as Exhibit "C" and incorporated by refence and to be filed filed under seal for HIPAA reasons are documents showing payments received by Defendant Maese from USPHV, identifying the names and number of patients he saw for which false claims were submitted to Medicare. These documents show that Dr Maese submitted claims for at least 200 patients to Medicare within an approximate one month period for USPHV patients. As the billing records reflect, Maese and USPHV had an arrangement whereby Maese would bill Medicare for his "services", and USPHV would be paid 70% of the amount of the service and Defendant Maese kept 30% for each USPHV patient. Exhibit "C" further reflects that Defendant Maese was paid 30% of the amount of service on each of the 200 patients, and that he paid approximately $33,000 to USPHV for its 70% share during this time frame, retaining approximately $14,000  The Government is entitled to recover 3 times the amount retained by Defendant Maese ($42,000), plus $11,000 in civil monetary penalties for each of the 200 claims submitted to Medicare, amounting to $2.242,000. Thus, Plaintiff is entitled to recover against Defendant Maese on behalf of the government $2.242,000, plus reasonable attorney's fees and expenses.

126. Additionally, another ground of liability of Defendant Mease is that Defendant Maese provided illegal kickbacks to patients by waiving their co-pay. Further, Defendant Maese always coerced patients to sign a supplemental waiver of co-pay. While Relator was assisting doctors in the field, he witnessed many of these supplemental forms being signed by patients. In order to

encourage Medicare patients to receive Medical care from Defendant Maese, Defendant Maese would never attempt to collect the co-pay for any patient. This provided an incentive which was illegal and all part of the plan to induce as many patients as possible to participate in receiving home health care from Maese.

127. Accordingly, each and every service provided by Defendant Maese without collecting a co-pay resulted in the voluntary, knowingly, willfully and intentionally submission of a False Claim under the FCA by Maese. Thus, for each claim voluntarily, knowingly, willfully and intentionally submitted by Defendant Maese to Medicare in which a co-pay was waived, it is liable to the government under the FCA for $5,500-11,000 in civil monetary penalties for EACH AND EVERY service provided by Maese on a USPHV patient. By way of example, if there were "only" 200 USPHV patients for whom co-pay was waived, Mases would be liable for up to $2.2 million in penalties alone (500 x $11,000)! Thus, Plaintiff is entitled to recover against Defendant Maese on behalf of the government $2.242,000, plus reasonable attorney's fees and expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Relator, on behalf of himself and the United States Government, prays that this Second Amended Complaint be received and filed in camera under seal until further Order of the Court, and would pray unto the Court for the following relief and Judgment upon a trial by jury:

(a) That this Court enter a judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the FCA; and

(b) As to Defendants Ezukanma, Etindi, Parcon, and Gaines, that damages be awarded against them in the amount of three times the amount of restitution ordered by the Criminal Court as reflected above wherein they pled guilty to and/or were convicted of Medicare fraud and conspiracy to commit Medicare fraud; and

(c) that this Court enter a judgment against each Defendant for a civil penalty of $11,000 for each of Defendants' violations of the Section 3729 of the FCA; and

(d) that Relator recovers all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action; and

(e) that Relator be awarded all reasonable attorneys' fees and expenses in  bringing this action; and

(f) that because the United States government has elected not to proceed with this action as of the filing of this Fourth Amended Complaint, Relator be awarded the maximum amount for bringing this action of 30% of the proceeds of the action pursuant to Section 3730(d) of the FCA and/or other statutes permitting recovery of same; and

(g) that Relator be awarded pre-judgment and post-judgment interest; and

(h) that defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.*; and

(i) that Relator and the United States government be awarded all damages  and Civil Monetary Penalties to which the U.S. Government is entitled 42 U.S.C. §1320a–7a.

(j) that a constructive trust be establish as set forth in Count Two, Section j set forth above;

(k) that a trial by jury be held on all issues so triable; and

(l) that Relator and the United States receive all relief to which either or both may be entitled at law or in equity as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED, this the 31st day of January, 2019.

RESPECTFULLY SUBMITTED

**LAW OFFICES OF JAMES R. TUCKER, P.C.**

/s/ James Rusty Tucker
**JAMES "RUSTY" TUCKER**
**LAW OFFICES OF JAMES R. TUCKER, P.C.**
**STATE BAR NO. 20272020**
**3100 DREXEL DRIVE**
**DALLAS, TX 75205**
**214-505-0097 (PHONE)**
**214-599-8874 (FACSIMILE)**
**rusty@rustytuckerlaw.com**

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2019, a copy of the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing has been forwarded to all counsel of record by operation of the Court's electronic filing system.

/s/ James R. Tucker
James R. Tucker